# EXHIBIT H

Sandford L. Frey (State Bar No. 117058)
Philip A. Toomey (State Bar No. 089598)
Fadi K. Rasheed (State Bar No. 267175)
**LEECH TISHMAN FUSCALDO & LAMPL, INC.**
200 S. Los Robles Avenue, Suite 300
Pasadena, California 91101
Telephone: (626) 796-4000; Facsimile: (626) 795-6321
E-mail: sfrey@leechtishman.com; ptoomey@leechtishman.com; frasheed@leechtishman.com

Attorneys for Plaintiffs Hawkeye Entertainment, LLC and W.E.R.M. Investments, LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| **In re**<br><br>**HAWKEYE ENTERTAINMENT, LLC,**<br><br>Debtor | Case No.:  1:19-bk-12102-MT<br>Adv. No.: |
| **HAWKEYE ENTERTAINMENT, LLC, and W.E.R.M. INVESTMENTS, LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**MICHAEL CHANG, an individual; SMART CAPITAL INVESTMENTS I, LLC; SMART CAPITAL INVESTMENTS II, LLC; SMART CAPITAL INVESTMENTS III, LLC; SMART CAPITAL INVESTMENTS IV, LLC; SMART CAPITAL INVESTMENTS V, LLC; TOP PROPERTIES CORPORATION; AND DOES 1-25**<br><br>Defendants. | **COMPLAINT FOR:**<br><br>1. **PRELIMINARY INJUNCTIVE RELIEF PURSUANT TO 11 U.S.C. §§ 105, FRBP 7065, FRCP 65 (a) and (d), AND LBR 7065-1 (a) and (b)(2)**<br>2. **TEMPORARY RESTRAINING ORDER WITH NOTICE TO THE AFFECTED PARTY PURSUANT TO 11 U.S.C. §§ 105, FRBP 7065, FRCP 65(b) and (d) AND LBR 7065-1(a) and (b)(1)**<br>3. **BREACH OF CONTRACT**<br>4. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>5. **BREACH OF IMPLIED COVENANT OF QUIET ENJOYMENT**<br>6. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>7. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>8. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** |

1    Plaintiffs, HAWKEYE ENTERTAINMENT, LLC (Debtor and Debtor in Possession) and

2   W.E.R.M. INVESTMENTS, LLC (collectively, "Plaintiffs"), hereby files their complaint for

3   damages, preliminary injunction, a temporary restraining order and declaratory relief (the

4   "Complaint"), which alleges as follows:

5   **JURISDICTION AND VENUE**

6    1.    This Court has jurisdiction over this matter under Chapter 11 of Title 11 of the

7   United States Code (the "Bankruptcy Code"), pursuant to 28 U.S.C. §§ 151, 157 and 1334.

8    2.    This adversary proceeding is commenced pursuant to Rule 7001, *et. seq.* of the

9   Federal Rules of Bankruptcy Procedure and Sections 105(a), 362(a)(3), 1107 1121, and 1129 of the

10   Bankruptcy Code to obtain a temporary restraining order and preliminary injunction and

11   declaratory relief for willful violation of the automatic stay.

12    3.    Venue in this Court is proper pursuant to 28 U.S.C. §1409 as this adversary

13   proceeding arises under and in connection with a case under Title 11 which is pending in this

14   District.

15    4.    This is a core proceeding as defined by 28 U.S.C. §157(b)(2)(A), (G), and (O).

16   **PARTIES**

17    5.    Debtor and Debtor in Possession HAWKEYE ENTERTAINMENT, LLC ("Debtor"

18   or "Hawkeye") commenced this case by filing a Voluntary Petition ("Chapter 11 Case") under

19   Chapter 11 of the Bankruptcy Code on August 21, 2019 ("Petition Date") to protect its most

20   valuable asset, the Lease Agreement, dated July 17, 2009 ("2009 Lease") as modified by the First

21   Amendment to Lease Agreement, dated August 19, 2014 ("First Amendment"), and any and all

22   options and extensions thereunder and related thereto ("Options" and together with the 2009 Lease

23   and First Amendment, the "Lease"), between (i) Defendants, Smart Capital Investments I, LLC, a

24   California limited liability company, Smart Capital Investments II, LLC, a California limited

25   liability company, Smart Capital Investments III, LLC, a California limited liability company,

26   Smart Capital Investments IV, LLC, a California limited liability company, and Smart Capital

27   Investments V, LLC, a California limited liability company, as successor-in-interest to New Vision

28   Horizon, LLC (successor-in-interest to Pax America Development, LLC) (collectively "Smart

-2-    COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000544**

1    Capital") and (ii) the Debtor, for the premises described in the Lease on the real property,

2    commonly known as the Pacific Stock Exchange Building, located at 618 South Spring Street, Los

3    Angeles, California ("Premises") (the whole of which is sometimes referred to as the "Building").

4         6.       The Debtor is a California limited liability company with its headquarters in Los

5    Angeles, California. The Debtor conducts its business in Los Angeles County.

6         7.       Plaintiff, W.E.R.M. Investments, LLC ("WERM") is a California limited liability

7    company conducting business in Los Angeles County. WERM is a sublessor of the Premises and

8    operates a nightclub commonly known as "Exchange LA."

9         8.       Defendant, Smart Capital Investment I, LLC, is now, and was at the time of the

10    filing of this Complaint and at all intervening times, a California limited liability company, duly

11    organized under the laws of California, with its principal place of business in Los Angeles County.

12         9.       Defendant, Smart Capital Investment II, LLC, is now, and was at the time of the

13    filing of this Complaint and at all intervening times, a California limited liability company, duly

14    organized under the laws of California, with its principal place of business in Los Angeles County.

15        10.       Defendant, Smart Capital Investment III, LLC, is now, and was at the time of the

16    filing of this Complaint and at all intervening times, a California limited liability company, duly

17    organized under the laws of California, with its principal place of business in Los Angeles County.

18        11.       Defendant, Smart Capital Investment IV, LLC, is now, and was at the time of the

19    filing of this Complaint and at all intervening times, a California limited liability company, duly

20    organized under the laws of California, with its principal place of business in Los Angeles County.

21        12.       Defendant Smart Capital Investment V, LLC, is now, and was at the time of the

22    filing of this Complaint and at all intervening times, a California limited liability company, duly

23    organized under the laws of California, with its principal place of business in Los Angeles County.

24        13.       Plaintiffs are informed and believe and, based thereon, alleges that Defendant,

25    Michael Chang ("Chang") is now, and was at the time of the filing of this Complaint and at all

26    intervening times, a resident of Los Angeles California and the managing member of Smart

27    Capital. Chang owns and/or otherwise controls Smart Capital and Top Properties (defined below).

28        14.       Defendant Top Properties Corporation ("Top Properties") (Smart Capital, Top

COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000545**

1 Properties and Chang collectively "Defendants"), is now, and was at the time of the filing of this

2 Complaint and at all intervening times, a California corporation, duly organized under the laws of

3 California, with its principal place of business in Los Angeles County.  Defendants claim that Top

4 Properties is the management company assigned by Chang and Smart Capital to manage the

5 Building.

6      15.    Plaintiffs are informed and believe and, based thereon, alleges that at all times

7 mentioned herein, each of the defendants sued herein, including those sued as DOES 1 through 25,

8 inclusive, were agents, servants, employees and/or alter egos of each of the other remaining

9 defendants and in doing the things hereinafter alleged was acting within the full scope and course

10 of said agency, service and/or employment and with the full knowledge and consent, express or

11 implied, of each of the other defendants.

12      16.    Plaintiffs are informed and believe and, based thereon, alleges that, at all times

13 mentioned herein, all of the acts done by the defendants, including those sued herein as DOES 1

14 through 25, inclusive, were so done at the specific instance and request of the other defendants and

15 each is responsible in some manner for the occurrences herein alleged.

16 **GENERAL ALLEGATIONS**

17      17.    On or about July 17, 2009, Hawkeye entered into the 2009 Lease for the Premise

18 with Pax America Development, LLC, the then-landlord.

19      18.    On or about October 1, 2009, Hawkeye entered into the Standard Sublease with

20 WERM ("Sublease").

21      19.    Pax America Development, LLC, subsequently transferred through a foreclosure

22 process the property where the Premises is located to New Vision Horizon, LLC, who assumed the

23 obligations of landlord under the 2009 Lease.  Chang was the managing member of New Vision

24 Horizon, LLC.

25      20.    On or about August 19, 2014, New Vision Horizon, LLC, as landlord, and

26 Hawkeye, as tenant, entered into the First Amendment.

27      21.    Contemporaneously with the execution of the First Amendment, New Vision

28 Horizon, LLC, as landlord, adopted Hawkeye, as debtor and debtor in possession in a then-pending

-4-    COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

1    Bankruptcy action, entered into a Settlement Agreement resolving certain claims between them and

2    approving the sublease by Hawkeye to WERM, subject to the Bankruptcy Court's approval of

3    Hawkeye's assumption of the 2009 Lease and sublease with WERM ("Settlement Agreement").

4    The Settlement Agreement is referenced and attached within the Lease, which, again, is attached as

5    **Exhibit 1**.

6        22.    The Bankruptcy Court approved Hawkeye's assumption of the 2009 Lease and

7    Sublease with WERM and approved the Settlement Agreement.

8        23.    The condition precedent to the Settlement Agreement having been fulfilled,

9    WERM's sublease and assignment of the 2009 Lease and First Amendment by Hawkeye was

10    approved, and WERM became the assignee to the Tenant under the 2009 Lease and First

11    Amendment.

12        24.    Eventually, the Building was conveyed to Smart Capital and it assumed the

13    responsibilities of landlords under the leases.

14        25.    At the time that Hawkeye entered into the 2009 Lease and prior to the Landlord's

15    acquisition, the Premises had substantial deferred maintenance (including non-compliance with the

16    City or Los Angeles High Rise Retrofit Ordinance for fire life safety systems), were in deplorable

17    condition. Plaintiffs spent millions of dollars for renovations and building compliance, which

18    included the cost of certain renovations to the Building to obtain a temporary certificate of

19    occupancy and the conditional use permit for the on-site sale of alcoholic beverages for the

20    Premises ("CUB"), and to make the Premises code compliant for its intended use. As a result of

21    Plaintiffs' substantial efforts and investment, WERM opened, developed and operates an extremely

22    successful entertainment venue from the Premises. The CUB was issued on or about February 25,

23    2013.

24        26.    Except for the Premises and portions of the first-floor lobby and basement that had a

25    temporary Certificate of Occupancy secured by Hawkeye, the Building has never had a Certificate

26    of Occupancy. In fact, the portions of the Building that did not have a temporary Certificate of

27    Occupancy are virtually unusable. Defendants have failed to provide a Certificate of Occupancy

28    for the Premises and Building, despite agreeing to provide one following the Settlement Agreement

1  and Defendants have hindered efforts by Hawkeye to secure one. To make matters worse,

2  Defendants have falsely testified that an active Certificate of Occupancy for the Building exists.

3       27.    WERM and Hawkeye are and have been current with all of its obligations under the

4  Lease. This was verified by the Bankruptcy Court following an evidentiary hearing ("Trial") on

5  an Motion to Assume Lease and Sublease ("Assumption Motion") filed by Hawkeye and opposed

6  by Smart Capital, which was conducted by the Court on October 13, 14, 15 and 16, 2020. The

7  Bankruptcy Court made extensive findings of fact and conclusions of law as fully set forth on the

8  Bankruptcy Court Court's official record of the Trial, which found, among other things, that Smart

9  Capital failed to prove the existence of any material default or breach under the Lease.

10       28.    On October 27, 2020, the Court entered the Assumption Order which provided: (1)

11  the Assumption Motion was granted; (2) the Lease is assumed; (3) the Sublease is assumed; (3) that

12  WERM is a properly authorized subtenant, and the Sublease is a properly authorized sublease

13  under and pursuant to the terms of the Lease with the express consent of the Landlord; (4) the

14  Lease and Sublease are deemed current and reinstated as if no default exists or ever existed; and,

15  (5) that no cure payment or compensation need by paid to the Landlord or any other party in

16  connection with the assumption of the Lease and/or Sublease ("Assumption Order").

17       29.    The Bankruptcy Court also found that Chang's testimony was less that truthful and

18  stated that: *"He [referring to Chang] understandable is very upset. He's got an under-market*

19  *lease… but I thought he was using immaterial issues, or manufacturing issues that hadn't been*

20  *there, as an attempt to characterize them as a default, and the bottom line is, there was no*

21  *preponderance of evidence on any of these issues to convince me there's a default."*

22       30.    Moreover, on June 6, 2019, Smart Capital and Chang, acting through its "manager"

23  Chang, executed an AIR CRE standard estoppel certificate ("Estoppel Certificate") as part of an

24  effort to refinance the Building, leverage the Building to buyout Chang's co-owners of the Building

25  and secure additional monies that Smart Capital and Chang falsely claimed were for improvements

26  to the Building[1]. In the Estoppel Certificate, Chang affirmatively represented that Landlord had no

27  _____

28  [1] Upon information and belief, Smart Capital and Chang did not use the vast majority of loan

                                            (Continued...)

COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000548**

1  knowledge of any uncured defaults of Hawkeye.  Chang also affirmatively represented that there

2  were no disputes between Smart Capital and Hawkeye concerning the Lease, the Premises, or the

3  improvements on the Premises.

4       31.    Therefore, it was adjudicated by the Bankruptcy Court that Hawkeye and WERM

5  were in full compliance with the Lease, and laws and permits applicable to them.

6       32.    Moreover, the Bankruptcy Court entered a judgment in favor of Hawkeye against

7  Smart Capital on March 8, 2021in an amount of $605,937.40 in attorneys' fees and costs as the

8  prevailing party pursuant to the *Final Order and Judgment for an Award of Attorney's Fees*

9  [Docket No. 297] ("Fee Judgment").  Hawkeye's ability to collect on the Fee Judgment has been

10  hindered by, among other things, Chang and Smart Capital's leverage of the Building discussed

11  above.

12       33.    WERM operates the Premises as an event venue, for concerts, private parties,

13  corporate events, live entertainment, fashion shows, and more.  WERM's event venue was recently

14  ranked the second best in the United States and within the top ten worldwide.

15       34.    During its subtenancy and because of WERM's operations, the Premises has

16  undergone significant renovation by WERM and Hawkeye, resulting in a substantial increase in

17  value to the Landlord.  In contrast, upon information and belief, Defendants have been unable to

18  obtain the permits necessary to reasonably use the other portions of the Building.

19       35.    Despite the Assumption Order, Defendants have been wrongfully engaging in a

20  campaign to harass, bully and otherwise interfere with WERM's quiet enjoyment of the Premises

21  and ability to conduct business.  Defendants' efforts to sabotage Plaintiffs are ongoing, resulting in

22  tremendous expense and damage to the Plaintiffs.

23       36.    Upon information and belief, Defendants' campaign to cause Plaintiffs' harm are

24  _____

25  (...Continued)

26  amounts earmarked for improvements to the Building on improvements to the Building.  In fact,
upon information and belief, Defendants represented that certain portions of the Building above the

27  Premises were leased by a third party entity, which was in fact a third party entity owned and/or
controlled by Chang that did not conduct genuine business.

28

-7-

4846-0258-3803, v. 4

**000549**

motivated, at least in part, by Chang and Smart Capital's efforts to conceal misrepresentations made to lenders, punish Plaintiffs for the Assumption Order and Attorney Fees Award, prevent Hawkeye from collecting on the Attorney Fees Award, and force Plaintiffs to satisfy Smart Capital and Chang's requirements under city and/or county rules and regulations to prevent additional substantial business interruptions to Plaintiffs, such as forced closures of WERM's operations.

37.    On information and belief, the egregious acts of the Defendants include, but are not limited to, intentionally failing to (1) obtain a proper certificate of occupancy for the Building; (2) satisfy real property taxes on the Building due and owing; (3) maintain necessary health and safety codes that would protect the Premises; (4) secure the Premises from crime-related activities; (5) adhere to necessary fire life safety code; (6) adhere to rules and regulations requiring city and/or county approval of architectural plans; and (7) otherwise maintain the Building in as required under the Lease.  Indeed, such actions thereby put the Premises and the Plaintiffs' businesses at risk.  In fact, such failures have required Plaintiffs to expend much time, money and resources (without reimbursement or rent credit) in efforts to satisfy obligations that are the responsibility of Smart Capital and Chang in order to mitigate damages and save its business from further losses.

38.    Such wrongful actions by Defendants include making false claims to public officials and agencies, as well as Plaintiffs' clients, vendors, employees, and permitting agencies and public officials and agencies, and permitting agencies concerning Plaintiffs' ability to do business with them and Plaintiffs' use of the Premises.

39.    As an example, Defendants falsely informed WERM's former longtime client, Fearless LA, that Fearless LA's use of the Premises and arrangement with Plaintiff was a default of the Lease and in violation of the CUB in efforts to interfere with the Plaintiffs' contractual rights to use the Premises to do business with Fearless LA.  Such actions by Defendants eventually caused WERM and Fearless LA's longtime business relationship to come to an end.

40.    Defendants also made similar false claims to the Los Angeles City Attorney by informing them that Plaintiffs were in violation of laws and/or permits in hopes that the Los Angeles City Attorney interfere with Plaintiffs' business.

41.    Defendants did the same with respect to Film LA, who WERM uses to procure

COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000550**

1  filming permits.   Defendants informed Film LA that Plaintiffs have committed numerous

2  violations of the Lease and CUB.

3       42.     Defendants also made false reports to the California Department of Alcoholic

4  Beverage Control and Los Angeles Police Department claiming that WERM was violating the

5  CUB.

6       43.     Defendants did not stop there as Defendants reached out to one of WERM's largest

7  clients, Insomniac Holdings, LLC, to interfere in their business together.

8       44.     Defendants also wrongfully pursued payments from Hawkeye for taxes owed by

9  Defendants.

10      45.     Despite these false accusations from Defendants, Smart Capital still does not

11  possess the requisite occupancy certificate required of it from the Lease and applicable laws.

12      46.     Evidencing the falsity of Defendants' statements above, the Bankruptcy Court held

13  that Plaintiffs were not in violation of any laws or permits alleged by Defendants.[2]  The Bankruptcy

14  Court also found Chang to lack credibility.  This is especially true since it is clear that Chang

15  constantly seeks to conjure up claims he knew to be false in efforts to harass and bully Plaintiffs.

16      47.     Within the last couple of months, Defendants have made little efforts to prevent

17  break-ins[3],  installed cameras within portions of Building that are exclusively used by Plaintiffs and

18  appear to be for the purpose of spying on Plaintiffs and their operations, and trespassed onto the

19  Premises to interfere with their business by, among other things, harassing and bullying WERM's

20  clients and staff.

21      48.     In fact, on September 1, 2021, Chang called the Director of Operations for

22  Exchange LA and stated he was going to test the generator at the premises on September 2, 2021.

23   In response, WERM informed Chang that it was not a convenient day because Exchange LA had

24  
_____

25  [2] In fact, no enforcement agencies have cited Plaintiffs for their use of the Premises.

26  [3] Defendants' workers and/or agents continuously failed to lock the door, which caused numerous

27  break-ins.  While Defendants did change the locks on the Building, this did not resolve the break-in
   issue as the lock was inadequate and repeatedly failed.

28  

COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

000551

1   an event scheduled for the evening of September 2, 2021, whereupon Chang vociferously argued

2   with the Director of Operations that Exchange LA is not permitted to have "special events."

3       49.     The Director of Operations is not the appropriate person with whom Chang should

4   be discussing interpretations of the Lease terms, allocation of responsibility under Lease or

5   permissible uses under the Lease.  Those type of discussions are more appropriately had directly

6   with the principals of WERM or between the attorneys for the parties (particularly given the

7   overlap with pending litigation).

8       50.     Plaintiffs received only approximately fifteen hours written notice of Chang's

9   intention to test the generator.  To that end, Chang refused to disclose the type of test that he

10  intended to perform despite the Debtor's requests, which is critically important.  If it is a regular

11  run test, it should not be impactful.  However, a reg 4 test or any testing requiring shutting down of

12  the power to the Building to test the generator's ability to automatically engage and power the

13  emergency systems potentially has a materially adverse effect upon Exchange LA's business

14  operations.  By way of example, on at least one previous occasion when the power was shut down

15  for generator testing by Chang, it caused disruption of the entire electrical system the night of a

16  scheduled event, causing WERM to incur substantial costs, including having to rent a temporary

17  generator, so as to avoid cancelation of the scheduled event (a cost which Chang agreed to

18  reimburse, but never did).  In addition, whenever the power is shut down, the Debtor and WERM

19  need to, among other things, power down their servers and computer equipment and take other

20  precautions to avoid damage.

21      51.     Chang arrived at the Premises on September 2nd at 8 a.m.  Shortly before Chang

22  entered the Premises, another individual arrived to meet Chang at the Building, who was openly

23  carrying a firearm.  This resulted in intervention by WERM's unarmed security, who requested the

24  individual remove the gun from the premises.  When Chang arrived, the situation escalated with

25  Chang insisting that the individual retain his weapon on the Premises.

26      52.     Additionally, Chang's armed individual violated Plaintiff's strict policy of no

27  firearms in the Building, except for on duty police officers and sheriffs.  There is a sound reason for

28  this policy apart from the intimidation factor posed by the single armed individual.  In light of the

-10-    COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
        AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000552**

business location, security issues, vandalism and the number of guests visiting the Building, it is too risky to permit firearms in the Building that are exposed to being grabbed with potential life-threatening results to staff and public in general. Visitors, staff and patrons of the Building are entitled to enjoy as safe of an environment and experience as reasonably possible.

53.     Later, Plaintiffs determined that the armed individual appeared at the Premises three weeks prior at the direction of Chang. Said individual trespassed onto the Premises and videotaped the Premises and WERM's staff without consent.

54.     Immediately following the incident with the armed individual, Chang then confronted an Exchange LA female staff member, who happened to be at the Premises setting up for the nights event. Chang aggressively interrogated the Exchange LA's staff member about the scheduled event, including the type of event; start time for the event; end time for the load that was in progress; the floors on which the event is to take place; and more. The female staff member was noticeably and understandably distraught by the confrontation with Chang, particularly following the incident with an armed individual.

55.     Following the foregoing incidents, Chang showed up at the property unannounced at approximately 5 p.m. on September 2nd. This time, without any notice whatsoever, Chang insisted upon entering the leasehold Premises while the staff was setting up for the evenings event. When WERM's staff requested that he not do so, Chang responded that he is "the landlord and can enter the Premises whenever and wherever he wants." He then dared WERM's staff to stop him. Whereupon Chang trespassed onto the Premises and proceeded to take videos of the Premises and WERM's staff without the consent of Plaintiffs or the staff members.

56.     That same evening, without prior notice, written or otherwise, Chang again trespassed onto the Premises during the event. The staff attempted to prevent his access to the Premises, Chang ignored them and entered the Premises during the event without notice or consent. During his stay, Chang, among other things, interfered with staff performing their services, including interrogating Exchange LA staff members while they were trying to perform their duties and videotaping staff and patrons without authorization or consent.

57.     It should be noted that Section 10.2 of the Lease provides in applicable part as

-11-    COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

1  follows:    Landlord, its agents, contractors, servants and employees may enter the Premises

2  following at least Twenty-Four (24) hour prior <u>written</u> notice to Tenant, and Landlord's good faith

3  efforts to coordinate such entry with Tenant's on-site management so as to minimize interference

4  with Tenant's business operations (except in a case of emergency): (a) to examine the Premises; (b)

5  to perform any obligation or exercise any right or remedy of Landlord under this Lease; to perform

6  work necessary to comply with laws, ordinances, rules or regulations of any public authority or of

7  any insurance underwriter; and (d) to perform work that Landlord deems necessary to prevent

8  waste or deterioration in connection with the Premises  . . .

9       58.     Defendants' actions have already caused Plaintiffs to suffer substantial damages.

10  Unfortunately, it is clear that Defendants will continue to engage in these wrongful activities meant

11  to interfere with Plaintiffs' business and cause additional damages.

12       59.     Equitable relief is about fairness, and this Complaint is no exception.  As explained

13  more fully below, a temporary restraining order, preliminary injunction, and related declaratory

14  relief pursuant to Sections 105(a) and 362(a) of the Bankruptcy Code are necessary and appropriate

15  in order to ensure that the Plaintiffs will have a full and fair opportunity to conduct their business.

16  At the present time that goal is in peril because of the unrelenting wrongful actions by Defendants

17  that seek to interfere with Plaintiffs' ability to do business or otherwise use the Premises.

18       60.     Plaintiffs already were forced drastically scale back operations for over a year due to

19  Covid19 related protocols.  Plaintiffs have also spent an enormous amount of time, money and

20  resources to litigate the Assumption Motion, which should have put an end to Defendants' repeated

21  false claims.  Now, Plaintiffs will be required to devote additional time to seeking an injunctions

22  against Defendants.

23  **FIRST CLAIM FOR RELIEF**

24  **[Preliminary Injunction**

25  **Against All Defendants]**

26       61.     Plaintiffs re-allege and incorporates by reference each and every allegation set forth

27  in Paragraphs 1 through 61 above, inclusive, as though fully set forth herein.

28       62.     This Court should issue a preliminary injunction immediately enjoin Defendants

COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000554**

1    from, among other things:

2        a.    Engaging in any acts and/or actions that interfere with the operations of the

3            Plaintiffs and/or the business of WERM operating under the name Exchange LA;

4        b.    Engaging in any acts and/or actions that interfere with the (i) confirmed the Plan of

5            Reorganization Proposed by Debtor [filed as part of Docket Nos. 288 and 313]; (ii)

6            an modified by the Stipulated Modification to Article III.B and Supplement to

7            Articles VI.G and IX.O of the Plan of Reorganization Proposed by Debtor [Docket

8            No. 341]; and (iii)  the Order on Confirmation of Plan of Reorganization Proposed

9            by Debtor, as Modified by the Stipulated Plan Modification, entered on August 6,

10           2021 [Docket No. 391] (collectively, the "Plan");

11       c.    Trespassing or otherwise entering the Premises during non-operational hours, except

12           for proper purposes authorized under the Lease and after written notice as required

13           under Section 10.2 of the Lease;

14       d.    Trespassing or otherwise entering the Premises during hours of operation and/or

15           during events, inclusive of event preparation times;

16       e.    Interfering with the ability of staff to perform their duties, intimidating staff of

17           Exchange LA, and/or engaging in unauthorized communications with staff

18           regarding matters that do not concern them, or are beyond the scope of their

19           employment, such as matters pertaining to interpretations of the Lease terms,

20           allocation of responsibility under Lease or permissible uses under the Lease; and

21           requiring that any communications be in writing, through appropriate channels or

22           through the Parties' respective counsel.

23       f.    Dishonoring Exchange LA's no firearms policy or otherwise causing firearms to be

24           brought into the Building, with the exception of on duty police officers and sheriffs;

25       g.    Videotaping the Premises, patrons of Exchange LA and/or employees, including in

26           the common areas during hours of operation;

27       h.    Entering the Premises without providing the requisite twenty-four (24) hours' notice

28           proscribed by Section 10.2 of the Lease.

-13-    COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

000555

63.     This Court has the authority to grant the requested relief, especially given that Defendants recent actions on September 2021 show that Defendants are increasingly engaging in hostile and harmful behavior.

64.     FRBP 7065 states: Rule 65 F.R.Civ.P. applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c).

65.     FRCP 65(a) states in pertinent part as follows:  Preliminary Injunction.  (1) Notice. The court may issue a preliminary injunction only on notice to the adverse party.  (2) Consolidating the Hearing with the Trial on the Merits. Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial.

66.     LBR 7065-1 states: (a) Adversary Proceeding Required. A temporary restraining order or preliminary injunction may be sought as a provisional remedy only in a pending adversary proceeding, not in the bankruptcy case itself. An adversary complaint must be filed either prior to, or contemporaneously with, a request for issuance of a temporary restraining order (TRO) or preliminary injunction; (b)…(2) A preliminary injunction must be sought by motion in accordance with FRBP 7065.

67.     Bankruptcy Code § 105 provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

68.     In the Ninth Circuit, '[t]he standard for granting a preliminary injunction balances the plaintiff's likelihood of success against the relative hardship to the parties.'" *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. Dep't of Agriculture*, 415 F.3d 1078, 1092 (9th Cir.2005), quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir.2003).  Against this standard, the Ninth Circuit has recognized two sets of criteria that can be used to test the appropriate balance.

69.     The first is a traditional test, under which "a plaintiff must show '(1) a strong

-14-     COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000556**

1  likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if

2  preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4)

3  advancement of the public interest (in certain cases).'" *Ranchers Cattlemen*, 415 F.3d at 1092,

4  quoting *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir.2005).

5      70.    The second test requires a plaintiff to show "either a combination of probable

6  success on the merits and the possibility of irreparable injury or that serious questions are raised

7  and the balance of hardships tips sharply in his favor." *Ranchers Cattlemen*, 415 F.3d at 1092,

8  quoting *Save Our Sonoran*, 408 F.3d at 1120 (emphasis in original).

9      71.    The Ninth Circuit has repeatedly stressed that "[t]hese two formulations represent

10  two points on a sliding scale in which the required degree of irreparable harm increases as the

11  probability of success decreases.  They are not separate tests, but rather outer reaches of a single

12  continuum." *Ranchers Cattlemen*, 415 F.3d at 1092-93, quoting *Save Our Sonoran*, 408 F.3d at

13  1120.

14      72.    All of the elements for issuance of a preliminary injunction are present here.

15      73.    Irreparable harm to Plaintiffs will come from several directions.  Defendants'

16  actions threaten to continue to disrupt and interfere with the operating business of Plaintiffs, and

17  funding of the Debtor's Plan is dependent upon the continued viability of the operating business.

18      74.    Further, the actions by the Defendants are causing damages and severe potential

19  damages to Plaintiffs and to the viability of the Plan as the Defendants continue to engage in

20  activities that adversely interfere with the Plaintiffs' ability to conduct business and with events,

21  staff and patrons.  The Plaintiffs are hopeful that this harmful behavior on the part of Defendants

22  will be reduced by them being required to provide proper notice under Section 10.2 of the Lease

23  prior to entering the Premises.  Without the Injunction, the Debtor and WERM (including WERM's

24  staff and patrons) will absolutely be placed in jeopardy and irreparably harmed.

25      75.    With regard to the likelihood of success on the merits, as discussed above and as the

26  evidence in support of this Motion demonstrates, the Debtor has prevailed in its defense of these

27  actions over many years.  Chang's actions are clearly in violation of Section 10.2 of the Lease, and

28  his actions constitute illegal intimidation, trespass and an invasion of the privacy rights of staff and

COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000557**

1   patrons of Exchange LA.  In the context of a bankruptcy case, "strong likelihood of success" has

2   often been defined as the probability of a successful plan of reorganization.  *See*, *In re Kasual*

3   *Kreation, Inc*., 54 B.R. 915, 916 (Bankr.  S.D. Florida 1985).

4         76.    In the present case, prospects for success are compelling.  WERM has a viable

5   business operation that has been successful for many years.  The source of funding for the Plan will

6   be the revenue derived from that business operations by, and contribution from, the Subtenant,

7   WERM.  The actions of Defendants threaten to adversely impact the confirmed Plan

8         77.    As with the consideration of relative harm that would befall Plaintiffs, the balancing

9   of hardships clearly weighs in favor of injunctive relief.  The opportunity to implement a successful

10  Plan is one of the cornerstones of our federal bankruptcy policy. Unimpeded business operations

11  (especially during the sensitive pandemic period) are important to the Debtor's success and success

12  of the Plan.  The real and potential harm to Plaintiffs far outweighs any inconvenience to

13  Defendants in preventing them from continuing to interfere with business operations and harass

14  and intimidate staff and patrons.

15        78.    The Injunction will unequivocally advance public interest.  The public (e.g., the staff

16  and patrons) have the right to a reasonably safe environment and experience at Exchange LA, and

17  in particular, not being unreasonably exposed to the potential harm of firearms.  They have the

18  expectancy of some degree of privacy, particularly from being viewed on wireless unsecure

19  videotaping or mobile device taping by some unknown third-party without their knowledge and

20  consent.

21        79.    Accordingly, it is necessary and appropriate for this Court to enter a preliminary

22  injunction as explained in the paragraphs above.

**SECOND CLAIM FOR RELIEF**

**[Temporary Restraining Order**

**Against All Defendants]**

26        80.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth

27  in Paragraphs 1 through 79 above, inclusive, as though fully set forth herein.

28        81.    Unless this Court issues an immediate TRO, irreparable harm to Plaintiffs is

4846-0258-3803, v. 4

**000558**

virtually assured before this Court can hear and determine the merits of the contemporaneous

Motion for Preliminary Injunction (the "Plaintiffs' Motion").  Exchange LA has another event

scheduled for essentially every weekend into the near future.

82.    If a TRO is not issued, Plaintiffs and the bankruptcy estate will suffer irreparable

harm, including but not limited to substantial monetary loss by WERM and possible loss of

employees and patrons.    Monetary loss by WERM will cause losses to the Debtor as well.

83.    WERM's ability to operate and generate revenue is reduced dramatically when

Defendants: (1) enter the Premises with firearm (which obviously could also cause liability to

WERM and the Debtor by way of injuries caused by the firearm); (2) enter the Premises to harass

and bully WERM's staff and patrons (which could obviously cause a loss of business); and, (3)

enter the Premises during business operations and records guests and staff without permission.

84.    Accordingly, it is necessary and appropriate for this Court to enter temporary

restraining order, pursuant to Sections 105(a) of the Bankruptcy Code, FRBP 7065, FRCP 65(b) and

(d), and LBR 7065-1(a) and (b)(1), to immediately enjoin Defendants from, among other things:

a.    Engaging in any acts and/or actions that interfere with the operations of the
Plaintiffs and/or the business of WERM operating under the name Exchange LA;

b.    Engaging in any acts and/or actions that interfere with the (i) confirmed the Plan of
Reorganization Proposed by Debtor [filed as part of Docket Nos. 288 and 313]; (ii)
an modified by the Stipulated Modification to Article III.B and Supplement to
Articles VI.G and IX.O of the Plan of Reorganization Proposed by Debtor [Docket
No. 341]; and (iii)  the Order on Confirmation of Plan of Reorganization Proposed
by Debtor, as Modified by the Stipulated Plan Modification, entered on August 6,
2021 [Docket No. 391] (collectively, the "Plan");

c.    Trespassing or otherwise entering the Premises during non-operational hours, except
for proper purposes authorized under the Lease and after written notice as required
under Section 10.2 of the Lease;

d.    Trespassing or otherwise entering the Premises during hours of operation and/or
during events, inclusive of event preparation times;

-17-    COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

e. Interfering with the ability of staff to perform their duties, intimidating staff of Exchange LA, and/or engaging in unauthorized communications with staff regarding matters that do not concern them, or are beyond the scope of their employment, such as matters pertaining to interpretations of the Lease terms, allocation of responsibility under Lease or permissible uses under the Lease; and requiring that any communications be in writing, through appropriate channels or through the Parties' respective counsel.

f. Dishonoring Exchange LA's no firearms policy or otherwise causing firearms to be brought into the Building, with the exception of on duty police officers and sheriffs;

g. Videotaping the Premises, patrons of Exchange LA and/or employees, including in the common areas during hours of operation;

h. Entering the Premises without providing the requisite twenty-four (24) hours' notice proscribed by Section 10.2 of the Lease.

85. This Court has the authority to grant the requested relief, especially given that Defendants recent actions on September 2021 show that Defendants are increasingly engaging in hostile and harmful behavior.

**THIRD CLAIM FOR RELIEF**

**[BREACH OF CONTRACT**

**AS TO SMART CAPITAL]**

86. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 85 above, inclusive, as though fully set forth herein.

87. Smart Capital is a party to the lease.

88. Article 7.1 of the Lease requires that Smart Capital timely pay and is not delinquent on property taxes for the Building.

89. Smart Capital's covenant in Article 19 of the Lease gives Hawkeye the right to "peaceably and quietly hold and enjoy the Premises."

90. Article 10 of the Lease provides for the Smart Capital's maintenance, repair and alteration obligations to the Premises.

-18-    COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

000560

1      91.     Smart Capital has breached the Lease, including, but not limited to Articles 7.1, 10,

2  19 and 20 of the Lease by:

3          a)  Being delinquent on real property taxes;

4          b)  Interfering with Plaintiff's use and enjoyment of the Premises;

5          c)  Failing to properly maintain and repair the Premises;

6          d)  Failing to secure the requisite occupancy certificate required of it from the Lease

7             and applicable laws;

8      92.     Smart Capital has breached the Lease, including, but not limited to Articles 7.1, 10,

9  19 and 20 of the Lease.

10      93.     As a direct and proximate result of Smart Capital's breach of Lease, Plaintiffs have

11  suffered and will continue to suffer damages in an amount to be determined according to proof at

12  trial, but not less than $2,000,000, plus interest thereon at the contractual and legal rate.

13      94.     Hawkeye is also entitled to attorneys' fees and costs pursuant to Article 22.11(q) of

14  the Lease.

**FOURTH CLAIM FOR RELIEF**

**[BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**AS TO SMART CAPITAL]**

18      95.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth

19  in Paragraphs 1 through 94 above, inclusive, as though fully set forth herein.

20      96.     The Lease and Sublease provides that the Plaintiffs may use the Premises "for the

21  operation of a nightclub, restaurant, entertainment venue and related lawful businesses along with

22  the storage use."

23      97.     Defendants breached the covenant of good faith and fair dealing governing the

24  Lease and Sublease by, *inter alia*;

25    (a)     intentionally interfering with the business operations of the Plaintiffs including

26         business relationships and current and prospective contracts with clients;

27    (b)    manufacturing Lease defaults for the sole purpose of terminating the Plaintiffs rights

28         under the Lease and Sublease;

-19-  COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

(c)     attempting to effectuate a forfeiture of the Lease and Sublease by serving the Three-Day Notice based upon false allegations of nonmonetary defaults;

(d)     making false reports to the ABC, Los Angeles City Attorney and Los Angeles Police Department for the sole purpose of harming the Plaintiffs;

(e)     repeated actions by the Landlord to deprive Plaintiffs the ability to make use of the Premises to generate income; and

(f)     and making false claims to the Court, government officials and third parties in efforts to cause financial strain on Plaintiffs, which included over $2,000,000 in attorneys' fees and costs.

98.     Plaintiffs have both been harmed by Landlord's breaches of the covenant of good faith and fair dealing implied in the Lease.

99.     As a direct and proximate result of Defendants' actions above, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined according to proof at trial, but not less than $2,000,000, plus interest thereon at the contractual and legal rate.

## FIFTH CLAIM FOR RELIEF

### [BREACH OF IMPLIED COVENANT OF QUIET ENJOYMENT

### AS TO SMART CAPITAL]

100.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 99 above, inclusive, as though fully set forth herein.

101.     The Lease and Sublease provides that the Plaintiffs may use the Premises "for the operation of a nightclub, restaurant, entertainment venue and related lawful businesses along with the storage use."

102.     Plaintiffs have not been permitted quietly and peacefully to occupy and enjoy the possession of the Premises, as a result of Defendants engaging in the actions outlined above to interfere with Plaintiffs' use and enjoyment of the Premises, including but not limited to:

(a)     intentionally interfering with the business operations of the Plaintiffs;

(b)     manufacturing non-material defaults for the sole purpose of terminating the Plaintiffs rights under the Lease;

-20-     COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

(c)  attempting to terminate the Lease and Sublease by serving the Three-Day Notice

based upon false allegations of nonmonetary defaults;

(d)  making false reports to the ABC, Los Angeles City Attorney and Los Angeles

Police Department; and,

(e)  repeated actions by the Landlord to deprive Plaintiffs the ability to make use of the

Premises to generate income.

103.  The menacing course of conduct of the Smart Capital interfered with the Plaintiffs

quiet enjoyment of the Premises.  The conduct of the Smart Capital injured the rights of Plaintiffs

to receive the benefits of the Lease and the Sublease.

104.  As a direct and proximate result of Defendants' actions above, Plaintiffs have

suffered and will continue to suffer damages in an amount to be determined according to proof at

trial but not less than $2,000,000, plus interest thereon at the contractual and legal rate.

**SIXTH CLAIM FOR RELIEF**

**[NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AS**

**TO DEFENDANTS]**

105.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth

in Paragraphs 1 through 104 above, inclusive, as though fully set forth herein.

106.  A cause of action exists for negligent interference with another's prospective

business advantage if the defendant acts unreasonably and wrongfully, albeit not intentionally, so

as to foreseeably disrupt a business advantage of another with whom the defendant has a special

relationship. J'Aire Corp. v. Gregory, (1979) 24 Cal. 3d 799, 808.

107.  Defendants, with knowledge, actual or constructive, of business relationships

between Plaintiffs and clients, vendors and other third parties (many of which are discussed above),

acted and conducted themselves in a negligent, careless and unlawful manner which was likely to

cause loss of prospective economic advantage for Plaintiffs by causing interference and disruption

in the relation between Plaintiffs and clients, vendors and other third parties.

108.  In so acting and conducting themselves as aforesaid, Defendants knew or should

have known that their actions were likely to and will in the future disrupt said business

COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000563**

1  relationships.

2  109.  That as a proximate result of the foregoing conduct of the Defendants, the relation

3  between Plaintiffs and clients, vendors and other third parties were wrongfully interfered with, and

4  Plaintiffs suffered, and in the future will suffer, damage and injury through lost profits, damage to

5  the reputation, loss of the good will, and such other related and consequential damages as may be

6  proven by Plaintiffs at time of trial to have been proximately caused thereby, but in an amount not

7  less than $2,000,000.

8  **SEVENTH CLAIM FOR RELIEF**

9  **[INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

10  **AS TO DEFENDANTS]**

11  110.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth

12  in Paragraphs 1 through 110 above, inclusive, as though fully set forth herein.

13  111.  A cause of action exists for intentional interference with another's prospective

14  business advantage if the defendant disrupts or diverts the business relationship of another by

15  improper methods which fall outside the boundaries of fair competition.  Baldwin v. Marina City

16  Props., Inc., (1978) 79 Cal. App. 3d 393, 406.

17  112.  Defendants had knowledge of the business relationships between WERM and

18  Hawkeye, and WERM and clients, vendors and other third parties (many of which are discussed

19  above).

20  113.  Defendants also knew of Plaintiffs' probable future economic benefit and/or

21  advantage created through such business relationships.

22  114.  However, despite said knowledge, Defendants intended to and did cause loss of

23  prospective economic advantage for Plaintiffs by acting and conducting themselves in a wrongful

24  and/or unlawful manner by causing Plaintiffs to lose business, among other things.

25  115.  Said interference was undertaken by the Defendants with the intention of interfering

26  with and disrupting the relation between Plaintiffs and clients, vendors and other third parties.

27  116.  With full knowledge of the business relationship established between WERM and

28  Hawkeye, and WERM and clients, vendors and other third parties, Defendants intended to interfere

COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000564**

1    with said business relationships and intended thereby to cause injury and damage to Plaintiffs.

2        117.    As a result of Defendants' interference, business relationships were interfered with

3    and disrupted.

4        118.    That as a proximate result of the foregoing conduct of the Defendants, Plaintiffs

5    suffered, and in the future will suffer, damage and injury through lost profits, damage to the

6    reputation, loss of the good will, and such other related and consequential damages as may be

7    proven by Plaintiffs at time of trial to have been proximately caused thereby, but in an amount not

8    less than $2,000,000.

9        119.    At all material times, Defendants' conduct was intentional, willful, done with

10    malice, fraud and oppression towards Plaintiffs, thereby entitling Plaintiffs to recover punitive and

11    exemplary damages in an amount sufficient to punish Defendants, and to deter like conduct by

12    them and others in the future.  Plaintiffs therefore request an award of punitive and exemplary

13    damages in a sum according to proof at trial.

14                        **EIGHTH CLAIM FOR RELIEF**

15        **[INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AS TO**

16                                **DEFENDANTS]**

17        120.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth

18    in Paragraphs 1 through 119 above, inclusive, as though fully set forth herein.

19        121.    One who, without privilege or justification, intentionally induces a party to a

20    contract to not perform that contract is liable in tort to such party. Dryden v. Tri-Valley Growers,

21    65 Cal. App. 3d 990, 994, 135 Cal. Rptr. 720 (1977); Augustine v. Trucco, 124 Cal. App. 2d 229,

22    244, 268 P.2d 780 (1954). This cause of action covers inducement of breach of contract and

23    interference with contractual relations. See CACI 2200, 2201.

24        122.    That at all times pertinent hereto, there was in force and effect valid contracts

25    between Plaintiffs and  clients, vendors and other third parties, including those listed above.

26        123.    Plaintiffs invested years of time, effort and resources cultivating the reputation,

27    skills, and network to secure said valid contracts.

28        124.    Upon information and belief, Defendants knew of the existence of these contracts

-23-    COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

**000565**

1  yet knowingly interfered with the contracts with the intent to disrupt and end the contractual

2  relationships between Plaintiffs and  clients, vendors and other third parties.

3        125.    That in so acting and conducting themselves, Defendants acted wrongfully and

4  unlawfully and did actually disrupt and interfere with the valid contracts.  As a proximate result of

5  the actions of the Defendants, Plaintiffs suffered, and in the future will suffer, damage and injury

6  through lost profits, damage to the reputation, loss of the good will, and such other related and

7  consequential damages as may be proven by Plaintiffs at time of trial to have been proximately

8  caused thereby, but in an amount not less than $2,000,000

9        126.    At all material times, Defendants' conduct was intentional, willful, done with

10  malice, fraud and oppression towards Plaintiffs, thereby entitling Plaintiffs to recover punitive and

11  exemplary damages in an amount sufficient to punish Defendants, and to deter like conduct by

12  them and others in the future.  Plaintiffs therefore request an award of punitive and exemplary

13  damages in a sum according to proof at trial.

14                            **PRAYER FOR RELIEF**

15        **WHEREFORE,** Plaintiffs pray for a judgment on this Complaint, as it may be amended

16  from time to time, as follows:

17        1.    For damages, compensatory, incidental, and/or consequential, in a sum according to

18  proof;

19        2.    For prejudgment interest at the maximum rate permitted by law;

20        3.    For attorney's fees and costs;

21        4.    For punitive damages according to proof;

22        5.    For a preliminary injunction to immediately enjoin Defendants from, among other

23  things:

24            a.    Engaging in any acts and/or actions that interfere with the operations of the

25                Plaintiffs and/or the business of WERM operating under the name Exchange

26                LA;

27            b.    Engaging in any acts and/or actions that interfere with the (i) confirmed the Plan

28                of Reorganization Proposed by Debtor [filed as part of Docket Nos. 288 and

                                                    -24-    COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
                                                            AND TEMPORARY RESTRAINING ORDER

000566

313]; (ii) an modified by the Stipulated Modification to Article III.B and Supplement to Articles VI.G and IX.O of the Plan of Reorganization Proposed by Debtor [Docket No. 341]; and (iii) the Order on Confirmation of Plan of Reorganization Proposed by Debtor, as Modified by the Stipulated Plan Modification, entered on August 6, 2021 [Docket No. 391] (collectively, the "Plan");

    c.  Trespassing or otherwise entering the Premises during non-operational hours, except for proper purposes authorized under the Lease and after written notice as required under Section 10.2 of the Lease;

    d.  Trespassing or otherwise entering the Premises during hours of operation and/or during events, inclusive of event preparation times;

    e.  Interfering with the ability of staff to perform their duties, intimidating staff of Exchange LA, and/or engaging in unauthorized communications with staff regarding matters that do not concern them, or are beyond the scope of their employment, such as matters pertaining to interpretations of the Lease terms, allocation of responsibility under Lease or permissible uses under the Lease; and requiring that any communications be in writing, through appropriate channels or through the Parties' respective counsel.

    f.  Dishonoring Exchange LA's no firearms policy or otherwise causing firearms to be brought into the Building, with the exception of on duty police officers and sheriffs;

    g.  Videotaping the Premises, patrons of Exchange LA and/or employees, including in the common areas during hours of operation;

    h.  Entering the Premises without providing the requisite twenty-four (24) hours' notice proscribed by Section 10.2 of the Lease;

  6.    For a temporary restraining order injunction to immediately enjoin Defendants from, among other things:

    a.  Engaging in any acts and/or actions that interfere with the operations of the

  COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

000567

1     Plaintiffs and/or the business of WERM operating under the name Exchange LA;

2  b. Engaging in any acts and/or actions that interfere with the (i) confirmed the Plan of

3    Reorganization Proposed by Debtor [filed as part of Docket Nos. 288 and 313]; (ii)

4    an modified by the Stipulated Modification to Article III.B and Supplement to

5    Articles VI.G and IX.O of the Plan of Reorganization Proposed by Debtor [Docket

6    No. 341]; and (iii)  the Order on Confirmation of Plan of Reorganization Proposed

7    by Debtor, as Modified by the Stipulated Plan Modification, entered on August 6,

8    2021 [Docket No. 391] (collectively, the "Plan");

9  c. Trespassing or otherwise entering the Premises during non-operational hours, except

10    for proper purposes authorized under the Lease and after written notice as required

11    under Section 10.2 of the Lease;

12  d. Trespassing or otherwise entering the Premises during hours of operation and/or

13    during events, inclusive of event preparation times;

14  e. Interfering with the ability of staff to perform their duties, intimidating staff of

15    Exchange LA, and/or engaging in unauthorized communications with staff

16    regarding matters that do not concern them, or are beyond the scope of their

17    employment, such as matters pertaining to interpretations of the Lease terms,

18    allocation of responsibility under Lease or permissible uses under the Lease; and

19    requiring that any communications be in writing, through appropriate channels or

20    through the Parties' respective counsel.

21  f. Dishonoring Exchange LA's no firearms policy or otherwise causing firearms to be

22    brought into the Building, with the exception of on duty police officers and sheriffs;

23  g. Videotaping the Premises, patrons of Exchange LA and/or employees, including in

24    the common areas during hours of operation;

25  h. Entering the Premises without providing the requisite twenty-four (24) hours' notice

26    proscribed by Section 10.2 of the Lease; and

27    ///

28    ///

COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION,
AND TEMPORARY RESTRAINING ORDER

4846-0258-3803, v. 4

000568

7.    For such other and further relief as the Court deems just and proper.

Dated:  September 20, 2021                    LEECH TISHMAN FUSCALDO & LAMPL, INC.


                                              By: /s/ Sandford L. Frey
                                              Sandford L. Frey
                                              Philip A. Toomey
                                              Fadi K. Rasheed
                                              Attorneys for Plaintiffs Hawkeye Entertainment, LLC
                                              and W.E.R.M INVESTMENTS, LLC

4846-0258-3803, v. 4

**000569**

# EXHIBIT I

Sandford L. Frey (State Bar No. 117058)
Philip A. Toomey (State Bar No. 89598)
Dennette A. Mulvaney (State Bar No. 133423)
Fadi K. Rasheed (State Bar No. 267175)
**LEECH TISHMAN FUSCALDO & LAMPL, INC.**
200 S. Los Robles Avenue, Suite 300
Pasadena, California 91101
Telephone: (626) 796-4000; Facsimile: (626) 795-6321
E-mail: *sfrey@leechtishman.com*
        *ptoomey@leechtishman.com;*
        *dmulvaney@leechtishman.com*
        *frasheed@leechtishman.com*

Reorganization Attorneys for Hawkeye Entertainment, LLC
Debtor and Debtor-in-Possession

**FILED & ENTERED**

**NOV 22 2021**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY egonzale DEPUTY CLERK

**CHANGES MADE BY COURT**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO DIVISION**

| | |
|---|---|
| In re | Bankruptcy Case No.1:19-bk-12102-MT |
| **HAWKEYE ENTERTAINMENT, LLC** | **Chapter 11** |
| | **ORDER RE DEFENDANT'S MOTION TO DISMISS** |
| Debtor and Debtor-in-Possession. | |
| **HAWKEYE ENTERTAINMENT, LLC, and W.E.R.M. INVESTMENTS, LLC,** | Adversary Case No. 1:21-ap-01064-MT |
| Plaintiffs, | |
| v. | |
| **MICHAEL CHANG, an individual; SMART CAPITAL INVESTMENTS I, LLC; SMART CAPITAL INVESTMENTS II, LLC; SMART CAPITAL INVESTMENTS III, LLC; SMART CAPITAL INVESTMENTS IV, LLC; SMART CAPITAL INVESTMENTS V, LLC; TOP PROPERTIES CORPORATION; AND DOES 1-25** | |
| Defendants. | |

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 South Los Robles Avenue, Suite 300
Pasadena, California 91101
626.796.4000

1

ORDER RE DEFENDANT'S MOTION TO DISMISS

4865-2276-0708, v. 1

1   On September 20, 2021, Hawkeye Entertainment, LLC (the "Reorganized Debtor"), and

2   W.E.R.M. Investments, LLC ("WERM", and together with the Reorganized Debtor, "Plaintiffs")

3   filed a complaint (the "Complaint") [Adv. Dkt. No. 1] against Michael Chang ("Chang"), Smart

4   Capital Investments I, LLC, Smart Capital Investments II, LLC, Smart Capital Investments III, LLC,

5   Smart Capital Investments IV, LLC, and Smart Capital Investments V, LLC (collectively, "Smart

6   Capital"), and Top Properties Corporation ("Top Properties", and together with Chang and Smart

7   Capital, "Defendants"), commencing the above-captioned adversary proceeding.

8   In response to the Complaint, on October 20, 2021, Defendants filed a motion to dismiss the

9   Complaint (the "Dismissal Motion") [Adv. Dkt. No. 14]. On October 27, 2021, Plaintiffs filed an

10  opposition (the "Opposition") [Adv. Dkt No. 21] to the Dismissal Motion. On November 2, 2021,

11  Defendants filed a reply (the "Reply") [Adv. Dkt No. 23] to the Opposition.

12  The Dismissal Motion came on for hearing before the Court on November 10, 2021, at 1:00

13  p.m. David S. Kupetz of SulmeyerKupetz, a professional corporation, appeared at the hearing on

14  behalf of the Defendants. Fadi K. Rasheed of Leech Tishman Fuscaldo & Lampl, Inc., appeared at

15  the hearing for the Plaintiffs. Prior to the hearing, the Court issued a tentative ruling to grant the

16  Dismissal Motion. At the hearing, the Court adopted it tentative ruling as its findings of fact and

17  conclusions of law with regard to the Dismissal Motion. Following the hearing on the Dismissal

18  Motion, the Court filed its tentative ruling (the "Notice of Tentative Ruling") [Adv. Dkt. No. 24].

19  The Court considered the Dismissal Motion, the Opposition, the Reply, and the arguments of

20  counsel made at the hearing on the Dismissal Motion. Based on the foregoing, the Courts' findings

21  of fact and conclusions of law set forth in the Notice of Tentative Ruling, and good cause appearing

22  therefore,

23  IT IS HEREBY ORDERED that the Dismissal Motion is granted and the Complaint is

24  hereby dismissed for lack of subject matter jurisdiction without prejudice to refiling the complaint

25  ///

26  ///

27  ///

28  ///

LEECH TISHMAN FUSCALDO & LAMPL, INC.
2ND SOUTH LOS ROBLES AVENUE, SUITE 300
PASADENA, CALIFORNIA 91101
626.796.4000

2
**ORDER RE DEFENDANT'S MOTION TO DISMISS**

000571

1  | in a court with subject matter jurisdiction.

2  |  ###



Date: November 22, 2021

Maureen A. Tighe
United States Bankruptcy Judge

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 300
PASADENA, CALIFORNIA 91101
626.796.4000

3

**ORDER RE DEFENDANT'S MOTION TO DISMISS**

4865-2276-0708, v. 1

**000572**

FILED & ENTERED

NOV 10 2021

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY egonzale DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>Hawkeye Entertainment, LLC<br><br><br><br><br>Debtor(s).<br>――――――――――――――――<br>Hawkeye Entertainment, LLC,  WERM<br>Investments LLC<br><br>Plaintiff(s),<br>v.<br><br>Michael Chang,  Smart Capital<br>Investments I, LLC, Smart Capital<br>Investments II, LLC, Smart Capital<br>Investments III, LLC, Smart Capital<br>Investments IV, LLC, and Smart Capital<br>Investments V LLC,  Top Properties<br>Corporation<br><br>Defendant(s). | CHAPTER 11<br><br>Case No.:  1:19-bk-12102-MT<br>Adv No:   1:21-ap-01064-MT<br><br>**NOTICE OF TENTATIVE RULING ON<br>MOTION TO DISMISS**<br><br>Date: November 10, 2021<br>Time: 1:00 pm<br>Courtroom:  302 (Via ZoomGov) |

On November 10, 2021, the Court conducted a hearing on Defendants' motion to

-1-

000573

1 | dismiss. Appearances were noted on the record. The Court adopted its tentative ruling.

2 | A copy of the Court's tentative ruling is attached to this cover page.

3 | //

4 | //

5 | //

6 | //

7 | //

8 | //

9 | //

10 | //

11 | //

12 | //

13 | //

14 | //

15 | //

16 | //

17 | //

18 | //

19 | //

20 | //

21 | //

22 | //

23 | //

24 | //

25 | //

26 | //

27 | //

28 | //

000574

On July 17, 2009, Hawkeye Entertainment, LLC (the "Reorganized Debtor") entered into a lease agreement ("Lease Agreement") with Pax America Development, LLC. Pursuant to the terms of the Lease, the Debtor was entitled to use the first four floors and the basement of a building located at 618 South Spring Street, Los Angeles, California, more commonly referred to as the Pacific Stock Exchange Building (the "Property"). The Property is now owned by Smart Capital, LLC ("Smart Capital"), and there have been ongoing disputes between Smart Capital and the Reorganized Debtor for years. These disputes directly caused the Reorganized Debtor to file for bankruptcy under chapter 11 of the Bankruptcy Code on August 21, 2019 (Case No. 1:19-bk-12102-MT). After a contentious bankruptcy case, which included five-day trial on a lease assumption motion ("Assumption Motion"), the Reorganized Debtor confirmed a plan ("Plan"). See Docket No. 391.

The disputes between the Reorganized Debtor and Smart Capital continued. On September 20, 2021, the Reorganized Debtor and WERM Investments LLC (collectively "Plaintiffs") filed an adversary complaint ("Complaint") against Michael Chang (the owner of Smart Capital) and Smart Capital (collectively "Defendants") for: 1) preliminary injunctive relief; 2) temporary restraining order; 3) breach of contract; 4) breach of implied covenant of good faith and fair dealing; 5) breach of implied covenant of quiet enjoyment; 6) negligent interference with prospective economic advantage; 7) intentional interference with prospective economic advantage; and 8) intentional interference with contractual relations. The Plaintiff's also filed an emergency motion for a temporary restraining order and for issuance of an order to show cause why a preliminary injunction should not be issued. Docket No. 2. The Court denied the Plaintiff's emergency motion. Docket No. 13.

Defendants' filed a motion to dismiss the Complaint and the Plaintiffs oppose.

Motion to Dismiss Standard:

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, challenges the subject matter jurisdiction of a court. "Subject matter jurisdiction can never be forfeited or waived and federal courts have a continuing independent obligation to determine whether subject-matter jurisdiction exists." Leeson v. Transamerica Disability Income Plan, 671 F.3d 969, 975 n.12 (9th Cir. 2012). On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it is the plaintiff's burden to establish the existence of subject matter jurisdiction. Kingman Reef Atoll Invs., LLC v. United States, 541 F.3d 1189, 1197 (9th Cir.

000575

2008).

A party challenging the court's subject matter jurisdiction under Rule 12(b)(1) may bring a facial challenge or a factual challenge. *See* White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000). "'In deciding a Rule 12(b)(1) facial attack motion, a court must assume the facts alleged in the complaint to be true and construe them in the light most favorable to the nonmoving party.'" Torrey Pines Logic, Inc. v. Gunwerks, LLC, 2020 U.S. Dist. LEXIS 193228, 2020 WL 6106814, at *4 (S.D. Cal. July 14, 2020) (quoting Strojnik v. Kapalua Land Co. Ltd., 379 F. Supp. 3d 1078, 1082 (D. Haw. 2019) (citing Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003))). In contrast, a factual challenge to subject matter jurisdiction "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Id. (citing Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004)).

The Defendants believe that, assuming all the factual assertions are true for purposes of this motion, this Court does not have subject matter jurisdiction. They argue that since the  Plan has been confirmed, the Court's jurisdiction over related matters significantly shrinks and the causes of action in the Complaint would not be included in the Court's more limited jurisdiction. The Plaintiffs argue the Court has subject matter jurisdiction because the causes of action affect the viability of the Plan.

*Arising Under and Arising In Subject Matter Jurisdiction*:

Like all federal courts, the jurisdiction of the bankruptcy courts is created and limited by statute. Celotex Corp. v. Edwards, 514 U.S. 300, 307, 115 S. Ct. 1493, 131 L. Ed. 2d 403 (1995); Battle Ground Plaza, LLC v. Ray (In re Ray), 624 F.3d 1124, 1130 (9th Cir. 2013). Bankruptcy courts have subject matter jurisdiction over proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b); *see also id*. 28 U.S.C. § 157(b)(1).

"Arising under" and "arising in" are terms of art. Harris v. Wittman *(*In re Harris*)*, 590 F.3d 730, 737 (9th Cir. 2000). Proceedings "arising under" title 11 involve causes of action created or determined by a statutory provision of that title. Id. Similarly, proceedings "arising in" title 11 are not those created or determined by the bankruptcy code, but which would have no existence outside of a bankruptcy case. Maitland v. Mitchell *(*In re Harris Pine Mills*)*, 44 F.3d 1431, 1435-37 (9th Cir. 1995).

The Complaint alleges that this is a core proceeding as defined by 28 USC 157(b)(2)(A),

000576

(G), and (O); this is incorrect. Once a plan is confirmed, the debtor-in-possession becomes the reorganized debtor, and as a general rule, the bankruptcy estate usually ceases to exist after a reorganization plan is confirmed. *See* 11 U.S.C.A. § 1141(b); *see also* Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 587 (9th Cir. 1993) (stating that confirmation terminates the existence of the bankruptcy estate unless the plan provides for the estate to continue); Tighe v. Celebrity Home Entm't, Inc (In re Celebrity Home Entm't, Inc.) 210 F.3d 995, 998 (9th Cir. 2000); Nobel Grp., Inc v. Bank (In re Nobel Grp., Inc.), 529 B.R. 284 (Bankr. N.D. Cal. 2015). The Plan does not provide for the bankruptcy estate to remain; thus, there is no bankruptcy estate to administer assets and there is no automatic stay in effect. Accordingly, the Plaintiffs' contention that this is a core proceeding is incorrect.

None of the causes of action in the Complaint are specifically provided for in the Bankruptcy Code and all of the causes of action in the Complaint exist outside the context of a bankruptcy proceeding. Accordingly, this Court does not have "arising under" or "arising in" subject matter jurisdiction.


*"Related To" Jurisdiction*:

The final basis for jurisdiction is what is known as "related to" jurisdiction. With respect to 28 U.S.C. § 1334(b), the statutory grant of "related to" is quite broad. Courts in the Ninth Circuit generally apply the "conceivable effect" test to determine whether an action is related to bankruptcy. In re Fietz. 852 F.2d 455, 457 (9th Cir. 1988) The test for post-confirmation "related to" jurisdiction was modified from the seminal pre-confirmation Pacor test for "related to" jurisdiction, which had been previously adopted by the Ninth Circuit in Fietz v. Great W. Savings (In re Fietz), 852 F.2d 455, 457 (9th Cir. 1988) (citing Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)). Under the Pacor test, jurisdiction depends on whether "'the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy. . . . [I]f the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the bankrupt estate'" was "somewhat overbroad in the post-confirmation context." Montana v. Goldin (In re Pegasus Gold Corp.), 394 F.3d 1189, 1193 -94 (9th Cir. 2005).

Post-confirmation bankruptcy court jurisdiction is necessarily more limited than pre-confirmation, and the Pacor formulation is somewhat overbroad in the post-confirmation context.

000577

Id. at 1194. The Ninth Circuit adopted the Third Circuit's "close nexus" test. See Willshire Courtyard v. Cal. Franchise Tax Bd (In re Courtyard), 729 F.3d 1279, 1287 (9th Cir. 2013). The "close nexus" test determines the scope of bankruptcy court's post-confirmation "related to" jurisdiction. Pegasus Gold Corp., 394 F.3d at 1194. Under the "close nexus" standard, the Court evaluates the nexus between the claims asserted and the bankruptcy plan or proceeding to determine whether it is sufficiently close to uphold bankruptcy court jurisdiction over the matter. Pegasus Gold, 394 F.3d at 1194. The test encompasses matters "affecting the 'interpretation, implementation, consummation, execution, or administration of the confirmed plan.'" Id. (quoting Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.), 372 F.3d 154, 166-67 (3d Cir. 2004)). The close nexus test "recognizes the limited nature of post-confirmation jurisdiction but retains a certain flexibility." Id.

The Plaintiffs' assert that the "close nexus" test has been satisfied because the causes of action affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan because the Defendants are interfering with the Reorganized Debtor's ability to generate revenue and certain orders and the Plan are at the heart of this complaint. This position is not persuasive.

The causes of action laid out in the Complaint are all state law causes of action that have nothing to do with the Plan or any of the orders this Court may have entered. The Defendants' alleged actions have very little to do with the motions this Court addressed previously nor does the case require any interpretation of the Plan and there will not be substantial impact on the implementation, consummation, execution, or administration of the confirmed plan. The only real impact here is that revenues may be diminished due to the Defendants' actions and therefore the Reorganized Debtor may not be able to make Plan payments. This is not enough to invoke subject matter jurisdiction in this Court after the Plan was confirmed – it is even a bit of a stretch under the Pacor test. It should be recognized that this Court is familiar with the parties, the tension between the parties, and the background facts, but judicial economy does not justify federal jurisdiction. JTS Communities, Inc. v. ZB, N.A. (In re Int'l Mfg. Grp., Inc.), 574 B.R. 717, 720 (E.D. Cal. 2017).

The Court's post-confirmation jurisdiction is much more limited now that the Plan has been confirmed, and the close nexus test recognizes this. While the close nexus test recognizes the need to be flexible, the term "close nexus" suggests that for a bankruptcy court to retain post-confirmation jurisdiction the causes of action have to be intimately involved with the Plan in

000578

some capacity. Every cause of action that could in some way affect a reorganized debtor is insufficient to give bankruptcy courts subject matter jurisdiction, only those causes of action that are so closely related to a plan afford bankruptcy courts subject jurisdiction post-confirmation.

Just about every conceivable cause of action could end up affecting a reorganized debtor's revenue stream. If the Plaintiffs' position were adopted here, then there would really not be limited jurisdiction in bankruptcy courts post-confirmation, which is inconsistent with case law. There may be instances where affecting a rehabilitated debtor's ability to generate income could warrant bankruptcy courts to retain jurisdiction; however, there needs to be more interpretation, implementation, consummation, execution, or administration of the confirmed plan in order for a bankruptcy court to have jurisdiction. Merely saying that the ability of a reorganized debtor to generate revenue so that it can pay creditors according to a confirmed plan is not enough.

Plaintiffs argue that the Plan provides for this Court to exercise jurisdiction. Because bankruptcy court jurisdiction is conferred by statute, parties to litigation cannot confer subject matter jurisdiction where none exists.

> Retention of jurisdiction provisions will be given effect, assuming there is bankruptcy court jurisdiction. But neither the bankruptcy court nor the parties can write their own jurisdictional ticket. Subject matter jurisdiction "cannot be conferred by consent" of the parties. Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement, even in a plan of reorganization. Similarly, if a court lacks jurisdiction over a dispute, it cannot create that jurisdiction by simply stating it has jurisdiction in a confirmation or other order. Bankruptcy courts can only act in proceedings within their jurisdiction. If there is no jurisdiction under 28 U.S.C. § 1334 or 28 U.S.C. § 157, retention of jurisdiction provisions in a plan of reorganization or trust agreement are fundamentally irrelevant. But if there is jurisdiction, we will give effect to retention of jurisdiction provisions.

In re Nobel Grp., Inc, 529 B.R. 284, 291 (Bankr. N.D. Cal. 2015) (quoting Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 161 (3rd Cir. 2003). Even though the Plan provides for this Court to retain jurisdiction for a plethora of issues, the law limits this Courts subject matter jurisdiction post-confirmation; therefore, whether the plan allows for the causes of action in the Complaint to be adjudicated in this Court is irrelevant.

For all the reasons, this Court does not have subject matter jurisdiction to adjudicate this case.

000579

*Abstention:*

28 U.S.C. § 1334(c)(1) allows for the Bankruptcy Court to "abstain[] from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11" when it is "in the interest of justice, or in the interest of comity with State courts or respect for State law." Winding Creek Solar LLC v. Pac. Gas & Elec. Co., 2021 U.S. Dist. LEXIS 132282 (N.D. Cal. 2021). The factors considered by courts are:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted 'core' proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

In re Eastport Assoc., 935 F.2d 1071, 1075-76 (9th Cir. 1991).

In the event the Court had subject matter jurisdiction, abstention would be appropriate. First, most of the causes of action are based on state law – the only federal law mentioned in the Complaint is for temporary restraining order and preliminary injunction which can also be sought in the state court. Second, there is no bankruptcy issues present. Third, there is no bankruptcy estate to administer since the confirmation of the Plan terminated the bankruptcy estate. Fourth, the claims are remote from the main bankruptcy case. At its heart, this is the latest battle in a prolonged war between a landlord and tenant. This Court became involved when the tenant filed for bankruptcy and sought to assume the lease pursuant to the Bankruptcy Code; thereby, requiring this Court to adjudicate the matter within the confines of the Assumption Motion. Now that the Assumption Motion is over and the Plan has confirmed, this Court no longer has a reason to preside over what is essentially a landlord tenant issue. Finally, there are concerns this maybe forum shopping and the Defendants have indicated that they will request a jury. Even if the Court had subject matter jurisdiction, abstention would be appropriate here.

Even though this Court is familiar with all the facts surrounding these parties, there really is no reason for this case to be in the bankruptcy court. For all of these reasons, the motion to

000580

1  dismiss is GRANTED. The Plaintiffs may file refile their complaint in court that has subject
2  matter jurisdiction.

3

4                                              ###

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Date: November 10, 2021

                                              Maureen A. Tighe
26                                             United States Bankruptcy Judge

27

28

                                              -9-

000581

# EXHIBIT J

# MASTER LAND USE PERMIT APPLICATION
### LOS ANGELES CITY PLANNING DEPARTMENT

**Planning Staff Use Only**

| ENV No. 2012-3046-CE | Existing Zone C2-4D | District Map 127.5 A 211 |
|---|---|---|
| APC Central | Community Plan Central City | Council District 14 |
| Census Tract 2073.02 | APN 5144001018 | Case Filed With [DSC Staff] R. Avila | Date 10-31-2012 |

CASE No. **ZA 1995-830 - PA4**

APPLICATION TYPE Plan Approval

*(zone change, variance, conditional use, tract/parcel map, specific plan exception, etc.)*

## 1. PROJECT LOCATION AND SIZE

Street Address of Project **618 S. Spring Street**          Zip Code **90014**

Legal Description: Lot **9**    Block **16**    Tract **Ord's Survey**

Lot Dimensions **80 x 138**    Lot Area (sq. ft.) **11,334**    Total Project Size (sq. ft.) **14,011 sf**

## 2. PROJECT DESCRIPTION

Describe what is to be done: **Plan Approval of CUP ZA-1995-0830-CUB-PA3 show condition compliance, request**
**modification of Condition #8, request 50 all-ages events per year, and request modification of Condition #9**
**to include updated occupancy to be determined by LAFD.**

Present Use: **Club/dance hall**          Proposed Use: **No change**

Plan Check No. (if available) _____    Date Filed: _____

Check all that apply:
- ☐ New Construction
- ☐ Change of Use
- ☐ Alterations
- ☐ Demolition
- ☒ Commercial
- ☐ Industrial
- ☐ Residential
- ☐ Tier 1 LA Green Code

Additions to the building:
- ☐ Rear
- ☐ Front
- ☐ Height
- ☐ Side Yard

No. of residential units:    Existing _____    To be demolished _____    Adding _____    Total _____

## 3. ACTION(S) REQUESTED

Describe the requested entitlement which either authorizes actions **OR** grants a variance:

Code Section from which relief is requested: _____    Code Section which authorizes relief: **12.24 M**

**\*\*SEE ATTACHMENT 1\*\***

Code Section from which relief is requested: _____    Code Section which authorizes relief: _____

Code Section from which relief is requested: _____    Code Section which authorizes relief: _____

*For information regarding the Public Hearing date, or the name & phone no. of the Zoning Investigator assigned to this case call (213) 978-1318*

List related or pending case numbers relating to this site: _____

000582

## 4. OWNER/APPLICANT INFORMATION

Applicant's name: Adi McAbian                Company: _____

Address: 14242 Ventura Blvd., Suite 212    Telephone: ( 818 ) 644-1300    Fax: ( )_____

Sherman Oaks                Zip: 91423    E-mail: adi@exchangela.com

Property owner's name (if different from applicant): Pax America Development, LLC

Address: 2333 Beverly Boulevard    Telephone: ( )_____    Fax: ( )_____

Los Angeles, CA    Zip: 90057    E-mail: _____

Contact person for project information: Elizabeth Peterson    Company: Elizabeth Peterson Group, Inc.

Address: 400 S. Main Street, #808    Telephone: ( 213 ) 620-1904    Fax: ( 213 ) 620-1587

Los Angeles, CA 90013    Zip: 90013    E-mail: elizabeth@epgla.com

## 5. APPLICANT'S AFFIDAVIT

Under penalty of perjury the following declarations are made:

a. The undersigned is the owner or lessee if entire site is leased, or authorized agent of the owner with power of attorney or officers of a corporation (submit proof). (NOTE: for zone changes lessee may not sign).

b. The information presented is true and correct to the best of my knowledge.

c. In exchange for the City's processing of this Application, the undersigned Applicant agrees to defend, indemnify and hold harmless the City, its agents, officers or employees, against any legal claim, action, or proceeding against the City or its agents, officers, or employees, to attack, set aside, void or annul any approval given as a result of this Application.

Signature _____        Print: Adi McPbian

ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of Los Angeles

On 8/22/2012 before me, DILIP C. PATEL "NOTARY PUBLIC"
(Insert Name of Notary Public and Title)

personally appeared ADI Jaco B NicHBian, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf on which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

D. Patel
Signature        (Seal)

OFFICIAL SEAL
DILIP C. PATEL
NOTARY PUBLIC - CALIFORNIA
COMMISSION #1953808
LOS ANGELES COUNTY
My Comm. Exp. Oct 22, 2015

## 6. ADDITIONAL INFORMATION/FINDINGS

In order for the City to render a determination on your application, additional information may be required. Consult the appropriate Special Instructions handout. Provide on attached sheet(s) this additional information using the handout as a guide.

NOTE: All applicants are eligible to request a one time, one-year only freeze on fees charged by various City departments in connection with your project. It is advisable only when this application is deemed complete or upon payment of Building and Safety plan check fees. Please ask staff for details or an application.

| Planning Staff Use Only | | |
|---|---|---|
| Base Fee $5754 | Reviewed and Accepted by [Project Planner] | Date |
| Receipt No. 9198 | Deemed Complete by [Project Planner] | Date |

CP-7771 (09/09/2011)

# EXHIBIT K

11/27/23, 4:15 PM                                   License Details | Alcoholic Beverage Control





---

**Report Date:** Tuesday, November 28, 2023

---

## LICENSE INFORMATION

**License Number:** 484148 **Primary Owner:** W E R M INVESTMENTS LLC

**Office of Application:** 04 - LA/METRO

## BUSINESS NAME

EXCHANGE LA

## BUSINESS ADDRESS

618 S SPRING ST , LOS ANGELES, CA, 90014

**County:** LOS ANGELES **Census Tract:** 2073.08

---

## LICENSEE INFORMATION

**Licensee:** W E R M INVESTMENTS LLC

**Company Information**

OFFICER: MCABIAN, ADI JACOB (MANAGING MEMBER)

MEMBER: MCABIAN, ADI JACOB

---

## LICENSE TYPES

Allow up to six weeks for expiration date updates after fee waiver or renewal fee
submittal.

**000584**

License Details | Alcoholic Beverage Control

## 48 - ON-SALE GENERAL PUBLIC PREMISES

**License Type Status:** ACTIVE **Status Date:** 30-APR-2010 **Term:** 12 Month(s)

**Original Issue Date:** 30-APR-2010 **Expiration Date:** 31-MAR-2024 **Master:** Y **Duplicate:** 0

From License Number: 48-444677

**Fee Code:** P40 **Transfers:** Transferred On: 30-APR-2010

## 58 - CATERER PERMIT

**License Type Status:** ACTIVE **Status Date:** 16-DEC-2013 **Term:** 12 Month(s)

**Original Issue Date:** 18-DEC-2013 **Expiration Date:** 31-MAR-2024 **Master:** N **Duplicate:** 1

From License Number: 48-444677

**Fee Code:** P40 **Transfers:** Transferred On: 30-APR-2010

## 68 - PORTABLE BAR

**License Type Status:** ACTIVE **Status Date:** 21-APR-2023 **Term:** 12 Month(s)

**Original Issue Date:** 10-MAY-2023 **Expiration Date:** 31-MAR-2024 **Master:** N **Duplicate:** 1

From License Number: 48-444677

**Fee Code:** P40 **Transfers:** Transferred On: 30-APR-2010

## 77 - EVENT PERMIT

**License Type Status:** ACTIVE **Status Date:** 16-DEC-2013 **Term:** 12 Month(s)

**Original Issue Date:** 18-DEC-2013 **Expiration Date:** 31-MAR-2024 **Master:** N **Duplicate:** 1

From License Number: 48-444677

**Fee Code:** P40 **Transfers:** Transferred On: 30-APR-2010

## OPERATING RESTRICTIONS:

*Operating Restrictions exist. For more information, please see our Guidelines for Access to Records.

**000585**

11/27/23, 4:15 PM                                     License Details | Alcoholic Beverage Control

## DISCIPLINARY ACTION:

No Active Disciplinary Action found

---

## DISCIPLINARY HISTORY:

No Disciplinary History found.

---

## HOLDS:

No Active Holds found

## ESCROWS:

No Escrow found

**000586**

# EXHIBIT L

Electronically FILED by Superior Court of California, County of Los Angeles on 08/29/2022 12:00 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk
22STCV28003

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Robert Draper

Sandford L. Frey (State Bar No. 117058)
 sfrey@leechtishman.com
Philip A. Toomey (Bar No. 89598)
 ptoomey@leechtishman.com
Fadi K. Rasheed (Bar No. 267175)
 frasheed@leechtishman.com
**LEECH TISHMAN FUSCALDO & LAMPL, INC.**
2041 Rosecrans Avenue, Suite 300
El Segundo, California 90245
Telephone:    424.738.4400
Facsimile:    424.738.5080

Attorneys for Plaintiffs, W.E.R.M. Investments LLC and Hawkeye Entertainment, LLC

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| HAWKEYE ENTERTAINMENT, LLC, a California Limited Liability Company; and W.E.R.M. INVESTMENTS, LLC, a California Limited Liability Company,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL CHANG, an individual; SMART CAPITAL INVESTMENTS I, LLC, a California Limited Liability Company, SMART CAPITAL INVESTMENTS II, LLC, a California Limited Liability Company, SMART CAPITAL INVESTMENTS III, LLC, SMART CAPITAL INVESTMENTS IV, LLC, a California Limited Liability Company, and SMART CAPITAL INVESTMENTS V LLC, California Limited Liability Company; and TOP PROPERTIES CORPORATION, a California corporation; and DOES 1 through 50,<br><br>Defendants. | Case No.:  22STCV28003<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. **BREACH OF CONTRACT**<br>2. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>3. **BREACH OF IMPLIED COVENANT OF QUIET ENJOYMENT**<br>4. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>5. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>6. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>7. **SPECIFIC PERFORMANCE** |

**COMPLAINT FOR DAMAGES**

**000587**

Plaintiffs, HAWKEYE ENTERTAINMENT, LLC and W.E.R.M. INVESTMENTS, LLC hereby files their complaint for damages, specific performance and declaratory relief (the "Complaint"), as follows:

**PARTIES**

1.      Plaintiff HAWKEYE ENTERTAINMENT, LLC ("Hawkeye") is a California limited liability company with its headquarters in Los Angeles, California.  Hawkeye conducts its business in Los Angeles County.

2.      Plaintiff W.E.R.M. Investments, LLC ("WERM") (Hawkeye and WERM collectively, "Plaintiffs") is a California limited liability company conducting business in Los Angeles County.

3.      Plaintiffs are informed and believe and based thereon, allege that Defendant Smart Capital Investment I, LLC ("Smart Capital I"), is now, and was at the time of the filing of this Complaint and at all intervening times, a California limited liability company, duly organized under the laws of California, with its principal place of business in Los Angeles County.

4.      Plaintiffs are informed and believe and based thereon, allege that Defendant Smart Capital Investment II, LLC ("Smart Capital II"), is now, and was at the time of the filing of this Complaint and at all intervening times, a California limited liability company, duly organized under the laws of California, with its principal place of business in Los Angeles County.

5.      Plaintiffs are informed and believe and based thereon, allege that Defendant Smart Capital Investment III, LLC ("Smart Capital III"), is now, and was at the time of the filing of this Complaint and at all intervening times, a California limited liability company, duly organized under the laws of California, with its principal place of business in Los Angeles County.

6.      Plaintiffs are informed and believe and based thereon, alleges that Defendant Smart Capital Investment IV, LLC ("Smart Capital IV"), is now, and was at the time of the filing of this Complaint and at all intervening times, a California limited liability company, duly organized under the laws of California, with its principal place of business in Los Angeles County.

7.      Plaintiffs are informed and believe and, based thereon, alleges that Defendant Smart Capital Investment V, LLC, ("Smart Capital V") (Smart Capital I, Smart Capital II, Smart Capital

-2-
**COMPLAINT FOR DAMAGES**

III, Smart Capital IV, and Smart Capital V collectively, "Smart Capital" or "Landlord") is now, and was at the time of the filing of this Complaint and at all intervening times, a California limited liability company, duly organized under the laws of California, with its principal place of business in Los Angeles County.

8.    Plaintiffs are informed and believe and based thereon, allege that Defendant, Michael Chang ("Chang") is now, and was at the time of the filing of this Complaint and at all intervening times, a resident of Los Angeles California and the managing member of Smart Capital and the sole shareholder of Defendant Top Properties Corporation.

9.    Plaintiffs are informed and believe and based thereon, alleges that Defendant Top Properties Corporation ("Top Properties") (Smart Capital, Top Properties and Chang collectively "Defendants"), is now, and was at the time of the filing of this Complaint and at all intervening times, a California corporation, duly organized under the laws of California, with its principal place of business in Los Angeles County.

10.    Plaintiffs are informed and believes and, based thereon, alleges that at all times mentioned herein, each of the defendants sued herein, including those sued as DOES 1 through 50, inclusive, were agents, servants, employees and/or alter egos of each of the other remaining defendants and in doing the things hereinafter alleged was acting within the full scope and course of said agency, service and/or employment and with the full knowledge and consent, express or implied, of each of the other defendants.

11.    Plaintiffs are informed and believes and based thereon, allege that, at all times mentioned herein, all of the acts done by the defendants, including those sued herein as DOES 1 through 50, inclusive, were so done at the specific instance and request of the other defendants and each is responsible in some manner for the occurrences herein alleged.

## JURISDICTION

12.    This Court has jurisdiction over this matter by virtue of the fact that the amount in controversy exceeds $25,000.00 and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and the real properties at issue are in this judicial district.

13.    Personal jurisdiction exists over Defendants because Defendants conduct business in

-3-
**COMPLAINT FOR DAMAGES**

California and in this judicial district, or otherwise avail themselves of the privileges and

protections of the laws of the State of California, such that this Court's assertion of jurisdiction

over Defendants do not offend traditional notions of fair play and due process.

**GENERAL ALLEGATIONS**

**A.  Summary of Relationship Between the Parties**

14.     On or about July 17, 2009, Hawkeye entered into a lease for certain portions of the

Building with Pax America Development, LLC ("2009 Lease"), the then owner and landlord of the

Building.  A true and correct copy of the 2009 Lease is attached as **Exhibit A**.

15.     On or about October 1, 2009, Hawkeye entered into the *Standard Sublease* with

WERM for the Premises ("Sublease").  A true and correct copy of the sublease between Hawkeye

and WERM is attached as **Exhibit B**.

16.     Pax America Development, LLC, subsequently transferred through a foreclosure

process the Building to New Vision Horizon, LLC, who assumed the obligations of landlord under

the 2009 Lease.  Chang was the managing member of New Vision Horizon, LLC.

17.     On or about August 19, 2014, New Vision Horizon, LLC, as landlord and owner of

the Building, and Hawkeye, as tenant, entered into First Amendment to Lease Agreement ("First

Amendment").  A true and correct copy of the First Amendment is attached hereto as **Exhibit C.**

18.     Contemporaneously with the execution of the First Amendment, New Vision

Horizon, LLC, as landlord, and Hawkeye, as debtor and debtor in possession in a then-pending

Bankruptcy action, entered into a Settlement Agreement resolving certain claims between them and

approving the sublease by Hawkeye to WERM, subject to the Bankruptcy Court's approval of

Hawkeye's assumption of the 2009 Lease and sublease with WERM ("Settlement Agreement")

(the 2009 Lease as modified by the First Amendment, along with any and all options and

extensions thereunder and related thereto, and the Settlement Agreement collectively, the "Lease").

A true and correct copy of the Settlement Agreement is attached as **Exhibit D**.

19.     The Bankruptcy Court approved Hawkeye's assumption of the 2009 Lease and

Sublease with WERM and approved the Settlement Agreement.

20.     The condition precedent to the Settlement Agreement having been fulfilled,

-4-

**COMPLAINT FOR DAMAGES**

WERM's sublease and assignment of the 2009 Lease and First Amendment by Hawkeye was approved, and WERM became the assignee to Hawkeye under the 2009 Lease and First Amendment.

21.     Eventually, the Building was conveyed to Smart Capital, and it assumed the responsibilities of landlords under the Lease.

**B.  Defendants' Wrongful Acts**

22.     At the time that Hawkeye entered into the 2009 Lease and prior to Smart Capital's acquisition, the Premises had substantial deferred maintenance (including non-compliance with the City or Los Angeles High Rise Retrofit Ordinance for fire life safety systems) and was in deplorable condition.

23.     Plaintiffs spent millions of dollars for renovations and building compliance, which included the cost of certain renovations to the Building to obtain a temporary certificate of occupancy and the conditional use permit for the on-site sale of alcoholic beverages for the Premises ("CUB"), and to make the Premises code compliant for its intended use.  As a result of Plaintiffs' substantial efforts and investment, WERM opened, developed and operates an extremely successful entertainment venue from the Premises, which WERM has named "Exchange LA."  The CUB was issued in 2010 and a subsequent CUB issued on or about February 25, 2013.

24.     Except for the Premises and portions of the first-floor lobby and basement that had a temporary Certificate of Occupancy secured by Hawkeye, Plaintiffs are informed and belief and thereupon allege that the Building currently does not have a valid Certificate of Occupancy.  In fact, the portions of the Building that did not have a temporary Certificate of Occupancy are virtually unusable.  Defendants have failed to provide a Certificate of Occupancy for the Premises and Building, despite agreeing to provide one following the Settlement Agreement and Defendants have hindered efforts by Hawkeye to secure one.  To make matters worse, Defendants have testified that an active Certificate of Occupancy for the Building exists, which Plaintiffs contend is a false statement.  As of the date of this complaint, Plaintiffs have still not been provided a full Certificate of Occupancy.

25.     Plaintiffs are and have been current with all of its obligations under the Lease.  This

-5-
**COMPLAINT FOR DAMAGES**

was verified by the Bankruptcy Court following an evidentiary hearing ("Evidentiary Hearing") on a Motion to Assume Lease and Sublease ("Assumption Motion") filed by Hawkeye and opposed by Smart Capital, which was conducted by the Court on October 13, 14, 15 and 16, 2020.   The Bankruptcy Court made extensive findings of fact and conclusions of law as fully set forth on the Bankruptcy Court Court's official record of the Evidentiary Hearing, which found, among other things, that Smart Capital failed to prove the existence of any material default or breach under the Lease.

26.    On October 27, 2020, the Court entered the Assumption Order which provided:  (1) the Assumption Motion was granted; (2) the Lease is assumed; (3) the Sublease is assumed; (3) that WERM is a properly authorized subtenant, and the Sublease is a properly authorized sublease under and pursuant to the terms of the Lease with the express consent of the Landlord; (4) the Lease and Sublease are deemed current and reinstated as if no default exists or ever existed; and, (5) that no cure payment or compensation need by paid to the Landlord or any other party in connection with the assumption of the Lease and/or Sublease ("Assumption Order").

27.    Following an appeal commenced by Smart Capital, the Bankruptcy Court's Assumption Order was affirmed by the United States District Court.

28.    The Bankruptcy Court also found that Chang's testimony was less that truthful and stated that: *"He [referring to Chang] understandable is very upset.  He's got an under-market lease… but I thought he was using immaterial issues, or manufacturing issues that hadn't been there, as an attempt to characterize them as a default, and the bottom line is, there was no preponderance of evidence on any of these issues to convince me there's a default."*

29.    Moreover, on June 6, 2019, Smart Capital and Chang, acting through its "manager" Chang, executed an AIR CRE standard estoppel certificate ("Estoppel Certificate") as part of an effort to refinance the Building, leverage the Building to buyout Chang's co-owners of the Building and secure additional monies that Smart Capital and Chang falsely claimed were for improvements

-6-
**COMPLAINT FOR DAMAGES**

to the Building[1].  In the Estoppel Certificate, Chang affirmatively represented that Landlord had no knowledge of any uncured defaults of Hawkeye.  Chang also affirmatively represented that there were no disputes between Smart Capital and Hawkeye concerning the Lease, the Premises, or the improvements on the Premises.

30.    Therefore, it was adjudicated by the Bankruptcy Court that Hawkeye and WERM were in full compliance with the Lease, and laws and permits applicable to them.

31.    WERM operates the Premises as an event venue, for concerts, private parties, corporate events, live entertainment, fashion shows, and more.  WERM's event venue was recently ranked the second best in the United States and within the top ten worldwide.

32.    During its subtenancy and because of WERM's operations, the Premises has undergone significant renovation by Plaintiffs, resulting in a substantial increase in value to Smart Capital.  In contrast, upon information and belief, Defendants have been unable to obtain the permits necessary to reasonably use the other portions of the Building.

33.    Despite the Assumption Order, Defendants have been wrongfully engaging in a campaign to harass, bully and otherwise interfere with WERM's quiet enjoyment of the Premises and ability to conduct business.  Defendants' efforts to sabotage Plaintiffs are ongoing, resulting in tremendous expense and damage to the Plaintiffs.  In fact, most recently, Defendants have been engaging in wrongful actions to prevent Plaintiffs from renewing the CUB, which include direct encouragement to public officials and agencies for the purpose of preventing a renewal of the CUB.

34.    Upon information and belief, Defendants' campaign to cause Plaintiffs' harm are motivated, at least in part, by Chang and Smart Capital's efforts to conceal misrepresentations made to lenders, punish Plaintiffs for the Assumption Order, and force Plaintiffs to satisfy Smart Capital and Chang's requirements under city and/or county rules and regulations to prevent

---

[1] Upon information and belief, Smart Capital and Chang did not use the vast majority of loan amounts earmarked for improvements to the Building on improvements to the Building.  In fact, upon information and belief, Defendants represented that certain portions of the Building above the Premises were leased by a third-party entity, which was in fact a third-party entity owned and/or controlled by Chang that did not conduct genuine business.

**COMPLAINT FOR DAMAGES**

additional substantial business interruptions to Plaintiffs, such as forced closures of WERM's operations.

35.    On information and belief, the egregious acts of the Defendants include, but are not limited to, intentionally and wrongfully (1) engaging in a pattern of interfering with Plaintiffs' ability to make use of the Premises for their intended purposes; (2) failing to cooperate with the Plaintiffs' efforts to renew the CUB without justification and for the improper purpose of the intentionally interfering with the Plaintiffs businesses and preventing use of the Premises for their intended purpose under the Lease (3) manufacturing erroneous defaults; (4) contacting various regulatory agencies without justification and for the improper purpose of the intentionally interfering with the Plaintiffs businesses and preventing use of the Premises for their intended purpose under the Lease; (5) contacting the Los Angeles Police Department without justification and for the improper purpose of the intentionally interfering with the Plaintiffs businesses and preventing use of the Premises for their intended purpose under the Lease; (6) contacting business Plaintiffs' business relationship without justification and for the improper purpose of the intentionally interfering with the Plaintiffs businesses and preventing use of the Premises for their intended purpose under the Lease; (7) failing to take reasonable steps to secure the Premises from crime-related activities resulting in numerous acts of theft and vandalism to Plaintiffs' Premises and property; (8) trespassing onto the Premises without permission of Plaintiffs during hours of business operations, interfering with employees trying to perform services and filming employees and patrons without their authorization; (9) failing to otherwise maintain the Building in as required under the Lease; and (10) intentionally failing to cooperate with Plaintiffs to renew the CUB. Indeed, such actions thereby put the Premises and the Plaintiffs' business at risk.  In fact, such failures have required Plaintiffs to expend much time, money and resources in efforts to satisfy obligations that are the responsibility of Smart Capital in order to mitigate damages and save its business from further losses.

36.    Additional wrongful actions by Defendants include making false claims to public officials and agencies, as well as Plaintiffs' clients, vendors, employees, and permitting agencies and public officials and agencies, and permitting agencies concerning Plaintiffs' ability to do

-8-
**COMPLAINT FOR DAMAGES**

business with them and Plaintiffs' use of the Premises.

37.    Additional examples of Defendants wrongful acts include:

a.    Defendants falsely informed WERM's former longtime client, Fearless LA, that Fearless LA's use of the Premises and arrangement with Plaintiff was a default of the Lease and in violation of the CUB in efforts to interfere with the Plaintiffs' contractual rights to use the Premises to do business with Fearless LA. Such actions by Defendants eventually caused WERM and Fearless LA's longtime business relationship to come to an end.

b.    Defendants also made similar false claims to the Los Angeles City Attorney by informing them that Plaintiffs were in violation of laws and/or permits in hopes that the Los Angeles City Attorney interfere with Plaintiffs' business.

c.    Defendants did the same with respect to Film LA, who WERM uses to procure filming permits.   Defendants informed Film LA that Plaintiffs have committed numerous violations of the Lease and CUB.

d.    Defendants also made and continues to make false reports and claims claiming that WERM is violating the CUB or liquor license.  These false reports and claims have been made by Defendants to third parties, public officials and agencies.

e.    Defendants did not stop there as Defendants reached out to one of WERM's largest clients, Insomniac Holdings, LLC, to interfere in their business together.

f.    Defendants made false reports and claims to the Los Angeles Police Department without reasonable basis and justification.

g.    Defendants also wrongfully pursued payments from Hawkeye for taxes owed by Defendants.

38.    Despite these false accusations from Defendants, Smart Capital still has not provided the requisite occupancy certificate required of it under the Lease and applicable laws.

39.    Evidencing the falsity of Defendants' statements above, the Bankruptcy Court (as affirmed by the District Court on appeal) held that Plaintiffs were not in violation of any laws or

-9-
**COMPLAINT FOR DAMAGES**

permits alleged by Defendants.[2]

40.     Not surprisingly, the Bankruptcy Court found Chang to lack credibility.  This is especially true since it is clear that Chang constantly seeks to conjure up claims he knew to be false in efforts to harass and bully Plaintiffs.

41.     Defendants have also made little efforts to prevent break-ins[3],  installed cameras within portions of Building that are exclusively used by Plaintiffs and appear to be for the purpose of unauthorized spying on Plaintiffs and their operations, and trespassed onto the Premises to interfere with their business by, among other things, harassing and bullying WERM's clients and staff.

42.     Defendants have engaged in a pattern of harassing Plaintiff and its employees.  For example, on September 1, 2021, Defendant, Chang, called the Director of Operations for Exchange LA and stated he was going to test the generator at the premises on September 2, 2021.  In response, WERM informed Chang that it was not a convenient day because Exchange LA had an event scheduled for the evening of September 2, 2021, whereupon Chang vociferously argued with the Director of Operations that Exchange LA is not permitted to have "special events."

43.     The Director of Operations is not the appropriate person with whom Chang should be discussing interpretations of the Lease terms, allocation of responsibility under Lease or permissible uses under the Lease.  Those type of discussions are more appropriately had directly with the principals of WERM or between the attorneys for the parties (particularly given the overlap with pending litigation at the time).

44.     Defendants have engaged in a pattern of refusing to respect Plaintiffs ongoing business operations.  For example, Plaintiffs received only approximately fifteen hours written notice of Defendant, Chang's intention to test the generator.  To that end, Defendant, Chang

---

[2] In fact, no enforcement agencies have cited Plaintiffs for their use of the Premises.

[3] Defendants' workers and/or agents continuously failed to lock the door, which caused numerous break-ins.  While Defendants did change the locks on the Building, this did not resolve the break-in issue as the lock was inadequate and repeatedly failed.

-10-
**COMPLAINT FOR DAMAGES**

refused to disclose the type of test that he intended to perform despite Hawkeye's requests, which is critically important.  If it is a regular run test, it should not be impactful.  However, a reg 4 test or any testing requiring shutting down of the power to the Building to test the generator's ability to automatically engage and power the emergency systems potentially has a materially adverse effect upon Exchange LA's equipment and business operations.  By way of example, on at least one previous occasion when the power was shut down for generator testing by Chang, it caused a fuse to burn leaving the Premises without power on the night of a scheduled event, causing WERM to incur substantial costs, including having to rent a temporary generator, so as to avoid cancelation of the scheduled event (a cost which Chang agreed to reimburse, but never did).  In addition, whenever the power is shut down, Hawkeye and WERM need to, among other things, power down their servers and computer equipment and take other precautions to avoid damage.

45.    Another instance of harassment and intimidation of Plaintiffs staff occurred on September 2, 2022.  Defendant, Chang, arrived at the Premises on September 2nd at 8 a.m.  Shortly before Defendant, Chang, entered the Premises, another individual arrived to meet Chang at the Building, who was openly carrying a firearm.  This resulted in intervention by WERM's unarmed security, who requested the individual remove the gun from the premises.  When Chang arrived, the situation escalated with Chang insisting that the individual retain his weapon on the Premises.

46.    Additionally, Defendant, Chang's armed individual violated Plaintiff's strict policy of no firearms in the Building, except for on duty police officers and sheriffs.  There is a sound reason for this policy apart from the intimidation factor posed by the single armed individual.  In light of the business location, security issues, vandalism and the number of guests visiting the Building, it is too risky to permit firearms in the Building that are exposed to being grabbed with potential life-threatening results to staff and public in general. Visitors, staff and patrons of the Building are entitled to enjoy as safe of an environment and experience as reasonably possible.

47.    Later, Plaintiffs determined that the armed individual appeared at the Premises three weeks prior at the direction of Defendant, Chang.  Said individual trespassed onto the Premises and videotaped the Premises and WERM's staff without consent.

48.    Immediately following the incident with the armed individual, Defendant, Chang,

-11-

**COMPLAINT FOR DAMAGES**

then confronted an Exchange LA female staff member, who happened to be at the Premises setting up for the nights event.  Defendant, Chang, aggressively interrogated the Exchange LA's staff member about the scheduled event, including the type of event; start time for the event; end time for the load that was in progress; the floors on which the event is to take place; and more.  The female staff member was noticeably and understandably distraught by the confrontation with Defendant, Chang, particularly following the incident with an armed individual.

49.     Following the foregoing incidents, Defendant, Chang, showed up at the property unannounced at approximately 5 p.m. on September 2nd.  This time, without any notice whatsoever, Chang insisted upon entering the leasehold Premises while the staff was setting up for the evenings event.  When WERM's staff requested that he not do so, Defendant, Chang responded that he is "the landlord and can enter the Premises whenever and wherever he wants."  He then dared WERM's staff to stop him.  Whereupon Defendant, Chang trespassed onto the Premises during business hours and proceeded to take videos of the Premises, WERM's staff and patrons without the consent of Plaintiffs or the staff members.

50.     That same evening, without prior notice, written or otherwise, Defendant, Chang, again trespassed onto the Premises during the event.  The staff attempted to prevent his access to the Premises, Chang ignored them and entered the Premises during the event without notice or consent. During his stay, Chang, among other things, interfered with staff performing their services, including interrogating Exchange LA staff members while they were trying to perform their duties and videotaping staff and patrons without authorization or consent.

51.     Section 10.2 of the Lease provides in applicable part as follows:   *"Landlord, its agents, contractors, servants and employees may enter the Premises following at least Twenty-Four (24) hour prior <u>written</u> notice to Tenant, and Landlord's good faith efforts to coordinate such entry with Tenant's on-site management so as to minimize interference with Tenant's business operations (except in a case of emergency): (a) to examine the Premises; (b) to perform any obligation or exercise any right or remedy of Landlord under this Lease; to perform work necessary to comply with laws, ordinances, rules or regulations of any public authority or of any insurance underwriter; and (d) to perform work that Landlord deems necessary to prevent waste or*

-12-
**COMPLAINT FOR DAMAGES**

*deterioration in connection with the Premises…"*

52.    Within the last two months, among other things, Plaintiffs were informed by a police officer that someone working for Defendant Chang was "investigating" Plaintiffs and making disparaging allegations.  After further inquiries into the matter, Plaintiffs have ascertained that the foregoing report was made by some or all of the Defendants.  This report is consistent with Defendants' decades long pattern of fabricating fictitious defaults in his unrelenting efforts to (a) destroy Plaintiffs' business; (b) harass Plaintiffs, their employees and customers; (c) interfere with Plaintiffs business operation; (d) fabricate reports to government agencies to agitate them to take action; and (e) disparage Plaintiffs' reputation and business.

53.    Defendants' actions have already caused Plaintiffs to suffer substantial damages. Unfortunately, it is clear that Defendants will continue to engage in these wrongful activities meant to interfere with Plaintiffs' business and cause additional damages.

54.    Plaintiffs already were forced drastically scale back operations for over a year due to Covid19 related protocols.  Plaintiffs have also spent an enormous amount of time, money and resources to litigate the Assumption Motion, which should have put an end to Defendants' repeated false claims.

## FIRST CAUSE OF ACTION

### [BREACH OF CONTRACT AS TO SMART CAPITAL AND DOES 1-50]

55.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 54 above, inclusive, as though fully set forth herein.

56.    Smart Capital and Hawkeye are parties to the Lease.

57.    Article 7.1 of the Lease requires that Smart Capital timely pay and is not delinquent on property taxes for the Building.

58.    Article 19 of the Lease gives Hawkeye the right to "peaceably and quietly hold and enjoy the Premises."

59.    Article 10 of the Lease provides for the Smart Capital's maintenance, repair and alteration obligations to the Premises.

-13-
**COMPLAINT FOR DAMAGES**

60.    Smart Capital has breached the Lease, including, but not limited to Articles 7.1, 10, 19 and 20 of the Lease by:

    a)  Being delinquent on real property taxes;

    b)  Interfering with Plaintiff's use and enjoyment of the Premises;

    c)  Failing to properly maintain and repair the Premises;

    d)  Failing to secure the requisite occupancy certificate required of it from the Lease and applicable laws; and

    e)  Seeking to prevent a renewed or new CUB.

61.    Smart Capital has breached the Lease, including, but not limited to Articles 7.1, 10, 19 and 20 of the Lease.

62.    As a direct and proximate result of Smart Capital's breach of Lease, Hawkeye has suffered and will continue to suffer damages in an amount to be determined according to proof at trial, but not less than $104,000,000, plus interest thereon at the contractual and legal rate.

63.    Hawkeye is also entitled to attorneys' fees and costs pursuant to Article 22.11(q) of the Lease.

**SECOND CAUSE OF ACTION**

**[BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**AS TO SMART CAPITAL AND DOES 1-50]**

64.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 63 above, inclusive, as though fully set forth herein.

65.    The Lease and Sublease provides that the Plaintiffs may use the Premises "for the operation of a nightclub, restaurant, entertainment venue and related lawful businesses along with the storage use."

66.    Defendants breached the covenant of good faith and fair dealing governing the Lease and Sublease by, *inter alia*;

    (a) intentionally interfering with the business operations of the Plaintiffs including business relationships and current and prospective contracts with clients;

    (b) manufacturing Lease defaults for the sole purpose of terminating the Plaintiffs rights

-14-
**COMPLAINT FOR DAMAGES**

under the Lease and Sublease;

(c) attempting to effectuate a forfeiture of the Lease and Sublease by serving the Three-Day Notice based upon false allegations of nonmonetary defaults;

(d) making false reports to public officials and agencies for the sole purpose of harming the Plaintiffs and terminating the Lease;

(e) repeated actions by the Landlord to deprive Plaintiffs the ability to make use of the Premises to generate income;

(f) and making false claims to the Court, government officials and third parties in efforts to cause financial strain on Plaintiffs, which included over $2,000,000 in attorneys' fees and costs;

(g) Seeking to prevent a renewed or new CUB.

67.    Plaintiffs have both been harmed by Landlord's breaches of the covenant of good faith and fair dealing implied in the Lease.

68.    As a direct and proximate result of Defendants' actions above, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined according to proof at trial, but not less than $104,000,000, plus interest thereon at the contractual and legal rate.

## THIRD CAUSE OF ACTION

### [BREACH OF IMPLIED COVENANT OF QUIET ENJOYMENT

### AS TO SMART CAPITAL AND DOES 1-50]

69.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 68 above, inclusive, as though fully set forth herein.

70.    The Lease and Sublease provides that the Plaintiffs may use the Premises "for the operation of a nightclub, restaurant, entertainment venue and related lawful businesses along with the storage use."

71.    Plaintiffs have not been permitted quietly and peacefully to occupy and enjoy the possession of the Premises, as a result of Defendants engaging in the actions outlined above to interfere with Plaintiffs' use and enjoyment of the Premises, including but not limited to:

(a) intentionally interfering with the business operations of the Plaintiffs;

-15-
**COMPLAINT FOR DAMAGES**

(b) manufacturing non-material defaults for the sole purpose of terminating the Plaintiffs rights under the Lease;

(c) attempting to terminate the Lease and Sublease by serving the Three-Day Notice based upon false allegations of nonmonetary defaults;

(d) making false reports to public officials and agencies;

(e) repeated actions by the Landlord to deprive Plaintiffs the ability to make use of the Premises to generate income; and

(f) Seeking to prevent a renewed or new CUB.

72.     The menacing course of conduct of the Smart Capital interfered with the Plaintiffs quiet enjoyment of the Premises.  The conduct of the Smart Capital injured the rights of Plaintiffs to receive the benefits of the Lease and the Sublease.

73.     As a direct and proximate result of Defendants' actions above, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined according to proof at trial but not less than $104,000,000, plus interest thereon at the contractual and legal rate.

## FOURTH CAUSE OF ACTION

### [NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AS TO DEFENDANTS AND DOES 1-50]

74.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 73 above, inclusive, as though fully set forth herein.

75.     A cause of action exists for negligent interference with another's prospective business advantage if the defendant acts unreasonably and wrongfully, albeit not intentionally, so as to foreseeably disrupt a business advantage of another with whom the defendant has a special relationship. J'Aire Corp. v. Gregory, (1979) 24 Cal. 3d 799, 808.

76.     Defendants, with knowledge, actual or constructive, of business relationships between Plaintiffs and clients, vendors, public agencies and other third parties (many of which are discussed above), acted and conducted themselves in a negligent, careless and unlawful manner which was likely to cause loss of prospective economic advantage for Plaintiffs by causing interference and disruption in the relation between Plaintiffs and clients, vendors, public agencies

-16-
**COMPLAINT FOR DAMAGES**

and other third parties.

77.    In so acting and conducting themselves as aforesaid, Defendants knew or should have known that their actions were likely to and will in the future disrupt said business relationships.

78.    That as a proximate result of the foregoing conduct of the Defendants, the relation between Plaintiffs and clients, vendors, public agencies and other third parties were wrongfully interfered with, and Plaintiffs suffered, and in the future will suffer, damage and injury through lost profits, damage to the reputation, loss of the good will, and such other related and consequential damages as may be proven by Plaintiffs at time of trial to have been proximately caused thereby, but in an amount not less than $104,000,000.

## FIFTH CAUSE OF ACTION

### [INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AS TO DEFENDANTS AND DOES 1-50]

79.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 78 above, inclusive, as though fully set forth herein.

80.    A cause of action exists for intentional interference with another's prospective business advantage if the defendant disrupts or diverts the business relationship of another by improper methods which fall outside the boundaries of fair competition.  Baldwin v. Marina City Props., Inc., (1978) 79 Cal. App. 3d 393, 406.

81.    Defendants had knowledge of the business relationships between WERM and Hawkeye, and WERM and clients, vendors, public agencies and other third parties (many of which are discussed above).

82.    Defendants also knew of Plaintiffs' probable future economic benefit and/or advantage created through such business relationships.

83.    However, despite said knowledge, Defendants intended to and did cause loss of prospective economic advantage for Plaintiffs by acting and conducting themselves in a wrongful and/or unlawful manner by causing Plaintiffs to lose business, among other things.

84.    Said interference was undertaken by the Defendants with the intention of interfering

-17-
**COMPLAINT FOR DAMAGES**

000603

with and disrupting the relation between Plaintiffs and clients, vendors, public agencies and other third parties.

85.     With full knowledge of the business relationship established between WERM and Hawkeye, and WERM and clients, vendors, public agencies and other third parties, Defendants intended to interfere with said business relationships and intended thereby to cause injury and damage to Plaintiffs.

86.     As a result of Defendants' interference, business relationships were interfered with and disrupted.

87.     That as a proximate result of the foregoing conduct of the Defendants, Plaintiffs suffered, and in the future will suffer, damage and injury through lost profits, damage to the reputation, loss of the good will, and such other related and consequential damages as may be proven by Plaintiffs at time of trial to have been proximately caused thereby, but in an amount not less than $104,000,000.

88.     At all material times, Defendants' conduct was intentional, willful, done with malice, fraud and oppression towards Plaintiffs, thereby entitling Plaintiffs to recover punitive and exemplary damages in an amount sufficient to punish Defendants, and to deter like conduct by them and others in the future.  Plaintiffs therefore request an award of punitive and exemplary damages in a sum according to proof at trial.

**SIXTH CAUSE OF ACTION**

**[INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AS TO DEFENDANTS AND DOES 1-50]**

89.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 88 above, inclusive, as though fully set forth herein.

90.     One who, without privilege or justification, intentionally induces a party to a contract to not perform that contract is liable in tort to such party. Dryden v. Tri-Valley Growers, 65 Cal. App. 3d 990, 994, 135 Cal. Rptr. 720 (1977); Augustine v. Trucco, 124 Cal. App. 2d 229, 244, 268 P.2d 780 (1954). This cause of action covers inducement of breach of contract and interference with contractual relations. See CACI 2200, 2201.

-18-
**COMPLAINT FOR DAMAGES**

91.     That at all times pertinent hereto, there was in force and effect valid contracts between Plaintiffs and clients, vendors, public agencies and other third parties, including those listed above.

92.     Plaintiffs invested years of time, effort and resources cultivating the reputation, skills, and network to secure said valid contracts.

93.     Upon information and belief, Defendants knew of the existence of these contracts yet knowingly interfered with the contracts with the intent to disrupt and end the contractual relationships between Plaintiffs and clients, vendors, public agencies and other third parties.

94.     That in so acting and conducting themselves, Defendants acted wrongfully and unlawfully and did actually disrupt and interfere with the valid contracts.  As a proximate result of the actions of the Defendants, Plaintiffs suffered, and in the future will suffer, damage and injury through lost profits, damage to the reputation, loss of the good will, and such other related and consequential damages as may be proven by Plaintiffs at time of trial to have been proximately caused thereby, but in an amount not less than $104,000,000

95.     At all material times, Defendants' conduct was intentional, willful, done with malice, fraud and oppression towards Plaintiffs, thereby entitling Plaintiffs to recover punitive and exemplary damages in an amount sufficient to punish Defendants, and to deter like conduct by them and others in the future.  Plaintiffs therefore request an award of punitive and exemplary damages in a sum according to proof at trial.

## SEVENTH CAUSE OF ACTION

### [SPECIFIC PERFORMANCE AS TO SMART CAPITAL AND DOES 1-50]

96.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 95 above, inclusive, as though fully set forth herein.

97.     Section 1.17 of the Lease provides as follows "[t]he Premises shall be used solely for the operation of a **nightclub, restaurant, entertainment venue and related lawful businesses** along with the storage use (collectively, the "Permitted Use"). The First Amendment to Lease Agreement, dated August 19, 2014, also provides in Section 9 that "[t]he Initial Term of this Lease shall be eleven (11) Lease Years commencing January 1, 2015, and expiring December 31, 2025,

-19-
**COMPLAINT FOR DAMAGES**

and Section 10 provides that '[t]enant shall have the option ("Option") to extend the Initial Term for one (1) period of five (5) Lease Years." [Emphasis added].

98.    Exchange LA cannot operate without a CUB, and Smart Capital's failure to cooperate with renewal of the CUB will frustrate the use provision and the entire purpose of the Lease and Sublease as well as the renewal option.

99.    Furthermore, Section 1.13 of the Lease provides that the rent commencement date is "[t]he earlier of (i) Tenant's grand opening in the Premises, or the date on which all of the following has occurred: (a) Tenant has obtained the CUP (as defined in Section 5.3). Section 5.3 provides in pertinent part that the Tenant must perform "improvement work required by Tenant to be performed in the Premises in order to operate the Permitted Use, including, but not limited to, the procurement of a Conditional Use Permit ("CUP") from the appropriate governmental agencies for the use of the Premises as a nightclub and/or restaurant, and the procurement of the required ABC license ("ABC License") from the appropriate governmental agencies." Additionally, Section 5.4 states: "Rights to CUP. The entire rights under the CUP shall belong to Landlord following the expiration of the Term or earlier termination of this Lease."

100.    Article 19 provides in pertinent part that the "Landlord covenants that Tenant shall peaceably and quietly hold and enjoy the Premises from and after delivery thereof to Tenant . . . subject, however, to all matters of record to which this Lease is subject; provided that none of such matters of record shall diminish the rights or increase the obligations of Tenant under this Lease, or interfere with or prevent the use of the Premises for the use specified in Section 1.17."

101.    Furthermore, Article 20 states that "Landlord covenants not to enter into or permit any amendment or modification of the Agreements which interferes with or prevents Tenant from using the Premises for the use set forth in Section 1.17, or diminishes the rights or increases the obligations of Tenant under this Lease."

102.    Because Smart Capital is the lessor, they are required to sign and notarize the application for the CUB, which they have wrongfully failed to do so.

103.    By failing to cooperate with renewal of the CUB, Smart Capital have breached the contact and the implied covenant of good faith and fair dealing. Smart Capital should be

**COMPLAINT FOR DAMAGES**

compelled to specifically perform the Lease by signing the CUB application.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Defendants and DOES 1-50 as follows:

### FIRST AND SECOND CAUSES OF ACTION

1.  For damages, compensatory, incidental, and/or consequential, in a sum according to proof;

2.  For prejudgment interest at the maximum rate permitted by law;

3.  For attorneys' fees and costs;

4.  For such other and further relief as the Court deems just, equitable and proper.

### THIRD AND FOURTH CAUSES OF ACTION

1.  For damages, compensatory, incidental, and/or consequential, in a sum according to proof law;

2.  For prejudgment interest at the maximum rate permitted by law;

2.  For costs; and

3.  For such other and further relief as the Court deems just, equitable and proper.

### FIFTH AND SIXTH CAUSES OF ACTION

1.  For damages, compensatory, incidental, and/or consequential, in a sum according to proof;

2.  For prejudgment interest at the maximum rate permitted by law;

3.  For punitive damages;

4.  For costs; and

5.  For such other and further relief as the Court deems just, equitable and proper.

### SEVENTH CAUSE OF ACTION

1.  For damages, compensatory, incidental, and/or consequential, in a sum according to proof;

2.  For prejudgment interest at the maximum rate permitted by law;

3.  For punitive damages;

-21-
**COMPLAINT FOR DAMAGES**

4.    For attorneys' fees and costs; and

5.    For such other and further relief as the Court deems just, equitable and proper.

### SIXTH CAUSE OF ACTION

1.    For specific performance directing Smart Capital's prompt execution of the renewal of the CUB.

Dated:  August 28, 2022          LEECH TISHMAN FUSCALDO & LAMPL, INC.

By: _____
Sandford L. Frey
Philip A. Toomey
Fadi K. Rasheed
Attorneys for Plaintiffs Hawkeye Entertainment, LLC
and W.E.R.M INVESTMENTS, LLC

-22-
**COMPLAINT FOR DAMAGES**

# EXHIBIT M

# THREE-DAY NOTICE TO QUIT
## (Code Civ. Proc. § 1161(4))

**TO:  HAWKEYE ENTERTAINMENT, LLC; W.E.R.M. INVESTMENTS, LLC
DBA EXCHANGE LA; and ALL OCCUPANTS IN POSSESSION OF
THE PREMISES**

**PLEASE TAKE NOTICE** that you are hereby requested to quit, and deliver up to the undersigned the possession of the premises now held and occupied by you, being the premises located at: 618 S. Spring Street, 1st, 2nd, 3rd, 4th floors, and basement, Los Angeles, CA 90014 (the "Premises"), at the expiration of **THREE (3) DAYS** after service of this notice upon you (excluding Saturdays, Sundays and other judicial holidays).

The reason for terminating your tenancy is because you are committing or permitting to exist a nuisance in the Premises and using the Premises for an unlawful purpose.

Beginning in or about October of 2022 and continuing to the present, the undersigned learned that you have committed or permitted to exist a nuisance in the Premises and used the Premises for an unlawful purpose.  These instances include, but are not limited to, the following:

| January 29, 2020 | Patron's sexual assault of another patron |
| July 21, 2020 | Staff's sexual assault of patron |
| July 10, 2022 | Staff's sexual assault of patron |
| August 20, 2022 | Staffs' physical battery of patron |
| November 13, 2022 | Patrons' use of drugs |
| November 15, 2022 | Staff's theft of patron's money |
| November 28, 2021 | Staff's physical battery of patron |
| February 25, 2023 | Patrons' use of drugs |
| May 23, 2023 | Staff's theft of patron's money |
| July 2, 2023 | Staff's sale of drugs |
| July 23, 2023 | Patrons' use of drugs |
| September 2, 2023 | Staff's sale of drugs and patrons' use of drugs |

The names of the witnesses are Aaron C., Calisha C., Christian F., Emilia R., Nathan J., Kay H., Marii Q., Daniela C., Emily V.

**PLEASE TAKE NOTICE** that you must vacate the Premises and deliver possession of the Premises at the expiration of **THREE (3) DAYS** after service of this notice upon you (excluding Saturdays, Sundays and other judicial holidays) to undersigned c/o Schorr Law, A Professional Corporation, located at 1901 Avenue of the Stars, Suite 615, Los Angeles, California 90067, telephone number (310) 954-1877, between the hours of 8:30 a.m. and 5:00 p.m.

000609

If you fail to timely vacate the Premises and deliver possession of the Premises as requested herein within the designated period, the undersigned will commence legal proceedings against you to recover possession of the Premises and recover damages for each day that you occupy the premises after the periods covered by this notice, plus statutory damages, attorney's fees, and the costs of suit.

State law permits former tenants to reclaim abandoned personal property left at the former address of the tenant, subject to certain conditions. You may or may not be able to reclaim property without incurring additional costs, depending on the cost of storing the property and the length of time before it is reclaimed. In general, these costs will be lower the sooner you contact your former landlord after being notified that property belonging to you was left behind after you moved out.

To the extent applicable, the undersigned declares the forfeiture of any purported lease under which you claim to hold possession of the Premises.

Nothing contained herein shall be construed as a waiver of any of the landlord's rights and remedies at law and in equity, all if which are expressly reserved.

DATED: October _13_, 2023

Smart Capital Investments I, LLC, a California limited liability company

By: _____
Name:    Michael S. Chang
Its:       Manager

DATED: October _13_, 2023

Smart Capital Investments II, LLC, a California limited liability company

By: _____
Name:    Michael S. Chang
Its:       Manager

DATED: October _13_, 2023

Smart Capital Investments III, LLC, a California limited liability company

By: _____
Name:    Michael S. Chang
Its:       Manager

THREE-DAY NOTICE TO QUIT
(Code Civ. Proc. § 1161(4))

000610

DATED: October _13_, 2023

Smart Capital Investments IV, LLC, a
California limited liability company

By: _____

Name:   Michael S. Chang

Its:    Manager

DATED: October _13_, 2023

Smart Capital Investments V, LLC, a
California limited liability company

By: _____

Name:   Michael S. Chang

Its:    Manager

THREE-DAY NOTICE TO QUIT
(Code Civ. Proc. § 1161(4))

000611

# THREE-DAY NOTICE TO QUIT
## (Code Civ. Proc. § 1161(4))

**TO**:  **HAWKEYE ENTERTAINMENT, LLC; W.E.R.M. INVESTMENTS, LLC DBA EXCHANGE LA; and ALL OCCUPANTS IN POSSESSION OF THE PREMISES**

**PLEASE TAKE NOTICE** that you are hereby requested to quit, and deliver up to the undersigned the possession of the premises now held and occupied by you, being the premises located at: 618 S. Spring Street, 1st, 2nd, 3rd, 4th floors, and basement, Los Angeles, CA 90014 (the "Premises"), at the expiration of **THREE (3) DAYS** after service of this notice upon you (excluding Saturdays, Sundays and other judicial holidays).

The reason for terminating your tenancy is because you are committing or permitting to exist a nuisance in the Premises through your illegal use of the Premises.

On or about March 11, 2013, Los Angeles City Planning issued you a conditional use permit to sell a full line of alcoholic beverages in conjunction with an existing nightclub at the Premises. You fraudulently obtained the conditional use permit by including the prior owner in the Master Land Use Permit Application, signing the application as the owner or lessee if the entire site is leased when you are not the owner or lessee of the entire site, and signing the Master Covenant and Agreement as the property owner. As you obtained the conditional use permit fraudulently, it is currently void, and you are illegally selling a full line of alcoholic beverages in conjunction with an existing nightclub at the Premises.

Furthermore, you used the fraudulently obtained conditional use permit to renew your several Alcoholic Beverage Control licenses. Thus, as you obtained these licenses based on a void conditional use permit, you are illegally serving alcohol at the Premises.

**PLEASE TAKE NOTICE** that you must vacate the Premises and deliver possession of the Premises at the expiration of **THREE (3) DAYS** after service of this notice upon you (excluding Saturdays, Sundays and other judicial holidays) to undersigned c/o Schorr Law, A Professional Corporation, located at 1901 Avenue of the Stars, Suite 615, Los Angeles, California 90067, telephone number (310) 954-1877, between the hours of 8:30 a.m. and 5:00 p.m.

If you fail to timely vacate the Premises and deliver possession of the Premises as requested herein within the designated period, the undersigned will commence legal proceedings against you to recover possession of the Premises and recover damages for each day that you occupy the premises after the periods covered by this notice, plus statutory damages, attorney's fees, and the costs of suit.

State law permits former tenants to reclaim abandoned personal property left at the former address of the tenant, subject to certain conditions. You may or may

000612

not be able to reclaim property without incurring additional costs, depending on the cost of storing the property and the length of time before it is reclaimed. In general, these costs will be lower the sooner you contact your former landlord after being notified that property belonging to you was left behind after you moved out.

To the extent applicable, the undersigned declares the forfeiture of any purported lease under which you claim to hold possession of the Premises.

Nothing contained herein shall be construed as a waiver of any of the landlord's rights and remedies at law and in equity, all if which are expressly reserved.

DATED: October _13_, 2023

Smart Capital Investments I, LLC, a
California limited liability company

By:
Name:    Michael S. Chang
Its:         Manager

DATED: October _13_, 2023

Smart Capital Investments II, LLC, a
California limited liability company

By:
Name:    Michael S. Chang
Its:         Manager

DATED: October _13_, 2023

Smart Capital Investments III, LLC, a
California limited liability company

By:
Name:    Michael S. Chang
Its:         Manager

DATED: October _13_, 2023

Smart Capital Investments IV, LLC, a
California limited liability company

By:
Name:    Michael S. Chang
Its:         Manager

Page 2 of 3

THREE-DAY NOTICE TO QUIT
(Code Civ. Proc. § 1161(4))

DATED: October $\underline{13}$, 2023

Smart Capital Investments V, LLC, a
California limited liability company

By: _____
Name:    Michael S. Chang
Its:         Manager

THREE-DAY NOTICE TO QUIT
(Code Civ. Proc. § 1161(4))

**000614**

# THREE-DAY NOTICE TO QUIT
## (Code Civ. Proc. § 1161(4))

**TO**:  **HAWKEYE ENTERTAINMENT, LLC; W.E.R.M. INVESTMENTS, LLC DBA EXCHANGE LA; and ALL OCCUPANTS IN POSSESSION OF THE PREMISES**

**PLEASE TAKE NOTICE** that you are hereby requested to quit, and deliver up to the undersigned the possession of the premises now held and occupied by you, being the premises located at: 618 S. Spring Street, 1st, 2nd, 3rd, 4th floors, and basement, Los Angeles, CA 90014 (the "Premises"), at the expiration of **THREE (3) DAYS** after service of this notice upon you (excluding Saturdays, Sundays and other judicial holidays).

The reason for terminating your tenancy is because you are committing or permitting to exist a nuisance in the Premises through your illegal use of the Premises.

In or about 2010, you obtained several licenses from the California Department of Alcoholic Beverage Control based on a forged lease.  As you obtained these licenses based on your submission of a forged lease, they are currently void, and you are illegally serving alcohol at the Premises.

In or about 2012, you submitted a master land use permit application to the Los Angeles City Planning based on a forged lease.  On or about March 11, 2013, Los Angeles City Planning issued you a conditional use permit to sell a full line of alcoholic beverages in conjunction with an existing nightclub at the Premises based on your application with the forged lease.  As you obtained the conditional use permit based on your submission of a forged lease, it is currently void, and you are illegally selling a full line of alcoholic beverages in conjunction with an existing nightclub at the Premises.

**PLEASE TAKE NOTICE** that you must vacate the Premises and deliver possession of the Premises at the expiration of **THREE (3) DAYS** after service of this notice upon you (excluding Saturdays, Sundays and other judicial holidays) to undersigned c/o Schorr Law, A Professional Corporation, located at 1901 Avenue of the Stars, Suite 615, Los Angeles, California 90067, telephone number (310) 954-1877, between the hours of 8:30 a.m. and 5:00 p.m.

If you fail to timely vacate the Premises and deliver possession of the Premises as requested herein within the designated period, the undersigned will commence legal proceedings against you to recover possession of the Premises and recover damages for each day that you occupy the premises after the periods covered by this notice, plus statutory damages, attorney's fees, and the costs of suit.

State law permits former tenants to reclaim abandoned personal property left at the former address of the tenant, subject to certain conditions. You may or may not be able to reclaim property without incurring additional costs, depending on the

000615

cost of storing the property and the length of time before it is reclaimed. In general, these costs will be lower the sooner you contact your former landlord after being notified that property belonging to you was left behind after you moved out.

To the extent applicable, the undersigned declares the forfeiture of any purported lease under which you claim to hold possession of the Premises.

Nothing contained herein shall be construed as a waiver of any of the landlord's rights and remedies at law and in equity, all if which are expressly reserved.

DATED: October 13, 2023

Smart Capital Investments I, LLC, a
California limited liability company

By:

Name:   Michael S. Chang
Its:       Manager

DATED: October 13, 2023

Smart Capital Investments II, LLC, a
California limited liability company

By:

Name:   Michael S. Chang
Its:       Manager

DATED: October 13, 2023

Smart Capital Investments III, LLC, a
California limited liability company

By:

Name:   Michael S. Chang
Its:       Manager

DATED: October 13, 2023

Smart Capital Investments IV, LLC, a
California limited liability company

By:

Name:   Michael S. Chang
Its:       Manager

Page 2 of 3

THREE-DAY NOTICE TO QUIT
(Code Civ. Proc. § 1161(4))

000616

DATED: October 13, 2023

Smart Capital Investments V, LLC, a
California limited liability company

By: _____
Name:    Michael S. Chang
Its:        Manager

Page 3 of 3

000617