**NOT FOR PUBLICATION**

FILED & ENTERED

APR 08 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re: | Case No.: 1:23-bk-11501-MB |
| HAWKEYE ENTERTAINMENT, LLC | Chapter 11 |
| | **MEMORANDUM DECISION RE: MOTION TO DISMISS CHAPTER 11 CASE AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY** |
| Debtor. | |

Hawkeye Entertainment, LLC ("Debtor") is the lessee under a lease of commercial property in downtown Los Angeles.  Smart Capital Investments I, LLC, Smart Capital Investments II, LLC, Smart Capital Investments III, LLC, Smart Capital Investments IV, LLC, and Smart Capital Investments V, LLC (collectively, "Smart Capital") is landlord under that lease.  Smart Capital has moved the Court: (i) to dismiss this chapter 11 case pursuant to Bankruptcy Code section 1112(b), Case Dkt. 44 (the "Dismissal Motion"), and (ii) for relief from the automatic stay pursuant to Bankruptcy Code section 362(d) to proceed with an unlawful detainer action against Debtor and to assert counterclaims against Debtor, which is the plaintiff in a civil action pending in the California Superior Court ("Superior Court") against Smart Capital.  Case Dkt. 48 (the "RFS Motion," and together with the "Dismissal Motion," the "Motions").  The gravamen of both Motions is that Debtor filed this case in bad faith.

The Motions were filed on December 19, 2023, and set for hearing on January 9, 2024.  On January 9, the Court held an initial hearing on the Motions, and thereafter continued the hearings to permit the parties to cross-examine each other's declarants.  That evidentiary hearing was originally scheduled for January 24 but, by stipulation of the parties, was rescheduled for February 14, 2024.  On February 14, 2024, the Court heard live cross examination of declarants Michael Chang and Adi McAbian, as well as oral argument.  At the conclusion of the February 14 hearing, the Court continued the hearing until February 21.

On February 16, 2024, the Court issued an order providing the parties an opportunity to supplement the record and continuing the hearings further, to facilitate the receipt of such additional evidence.  Case Docket No. 105.  The order canvassed the parties' arguments with respect to the good faith of Debtor's bankruptcy filing and identified areas in which the Court believed that additional evidence would be helpful.  The Court also continued the hearing scheduled for February 21 to March 14.

The parties thereafter submitted additional declaration testimony and documentary evidence, in support of and in opposition to the motions.  On March 14, 2024, the Court held a second evidentiary hearing at which it heard live cross-examination of declarants David Weintraub,

1  Michael Ayaz, Elizabeth Peterson-Gower and Fadi Rasheed.  The Court also heard additional legal

2  argument.

3        On March 29, 2024, the Court held a continued hearing to announce: (i) its finding that

4  Debtor filed the case in good faith, (ii) that the Court would deny the Dismissal Motion, (iii) that

5  the Court would deny Smart Capital's request for relief from stay to pursue an unlawful detainer

6  action against Debtor, and (iv) that the Court was inclined to grant Smart Capital limited relief

7  from the automatic stay to permit Smart Capital to file counterclaims against Debtor in the pending

8  Superior Court action (the "State Court Action"), provided such counterclaims were limited to the

9  liquidation of any damage claims Smart Capital might have against Debtor.

10       On the last of these issues, the Court engaged in a colloquy with the parties' counsel

11  regarding the practicalities and efficiencies of permitting Smart Capital to assert counterclaims in

12  the State Court Action, where it appears that some of the issues underlying those claims—which

13  were not specifically identified in the RFS Motion—probably would be litigated first in this chapter

14  11 case.  Accordingly, at the conclusion of the March 29 hearing, the Court indicated it would

15  withhold judgment on the question of permitting Smart Capital to assert counterclaims in the State

16  Court Action but would issue a written memorandum explaining its other rulings.  This is the

17  promised memorandum.  It constitutes the Court's findings of fact and conclusions of law pursuant

18  to Federal Rule of Bankruptcy Procedure 7052, which is applicable to these contested matters

19  under Bankruptcy Rule 9014.

20                                              **I.**

21              **JURISDICTION, ADJUDICATIVE AUTHORITY & VENUE**

22       The Court has jurisdiction over the Motions pursuant to 28 U.S.C. § 1334(b), because they

23  arise under provisions of the Bankruptcy Code, namely sections 362(d) and 1112(b).  As such, the

24  motions pertain to statutorily and constitutionally core matters, that have been properly referred to

25  this Court by the district court, and over which this Court has the adjudicative authority to enter a

26  final order.  *See Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665 (2015).  The Court also finds

27  that venue is proper under 28 U.S.C. § 1409(a) because the Motions were filed in the court where

28  Debtor's chapter 11 case is pending.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

Debtor is lessee under a lease of a portion (the "Premises") of the commercial property located at 618 South Spring Street, Los Angeles (the "Lease"), which is commonly known as the Pacific Stock Exchange Building.  Debtor subleases the Premises to its subtenant, W.E.R.M. Investments, LLC ("WERM") which operates a popular dance club and event venue on the Premises, commonly known as "Exchange LA".  Smart Capital is the current landlord of the property. The principal of Smart Capital is Michael Chang.  The predecessor owner of the property and prior landlord was an entity called New Vision Horizon, LLC ("New Vision"), whose principal is also Michael Chang.  New Vision acquired the property by foreclosure from the previous owner and landlord, Pax America.  Debtor's lease of the Premises originated in 2009, when Pax America was the owner and landlord.

Since that acquisition, Debtor and its landlords—New Vision, and thereafter Smart Capital—have been at loggerheads.  Between 2009 and 2013, Debtor withheld nearly $1 million in rents under the Lease, alleging the landlord failed to make certain improvements required by the Lease.  Debtor filed two lawsuits against New Vision – one in 2011 and one in 2013.  On September 20, 2013, New Vision responded with a notice of default for failure to pay the withheld rental amount and five days to cure the deficiency. On September 30, 2013, Debtor filed its first chapter 11 bankruptcy case, which was assigned to my colleague, Hon. Maureen Tighe, in this division.  Case No. 1:13-bk-16307-MT.

The disputes between Debtor and New Vision ultimately were resolved, and the Lease assumed, pursuant to a comprehensive settlement agreement, which was approved by order entered in the first chapter 11 case, on September 12, 2014.  Among other things, the settlement agreement voided certain amendments to the Lease, implemented certain other amendments to the Lease and conferred mutual releases on the parties.  On June 20, 2016, the Court entered an order confirming a chapter 11 plan for Debtor, which order also "confirmed" the assumption of the Lease.  The Clerk of the Court entered a final decree in, and closed, Debtor's first bankruptcy case on April 28, 2017.

The peace achieved pursuant to the settlement agreement in the first case, however, was short-lived.  On August 5, 2019, Smart Capital delivered a letter asserting non-monetary defaults under the Lease.  Despite Debtor's efforts to address and obtain more specific information on the nature of the alleged defaults, Smart Capital thereafter issued a three-day notice to quit the premises.  Not long after, on August 21, 2019, Debtor commenced its second chapter 11 case, Case No. 1:19-bk-12102-MT.  In that case, Debtor moved to assume the Lease pursuant to Bankruptcy Code section 365 and Smart Capital opposed.  After a multi-day trial, the Court approved Debtor's assumption of the Lease.  The Ninth Circuit Court of Appeals later affirmed that decision.  *Smart Cap. Invs. I, LLC v. Hawkeye Ent., LLC (In re Hawkeye Ent., LLC)*, 49 F.4th 1232 (9th Cir. 2022). Debtor confirmed a chapter 11 plan in its second case, by order entered on August 6, 2021.  That case has not yet been closed.  On January 23, 2024, the case was reassigned to the undersigned and redesignated as Case No. 1:19-bk-12102-MB.

Unfortunately, the conflict between Debtor and Smart Capital has continued.  On September 20, 2021, Debtor commenced an adversary proceeding in its second bankruptcy case, alleging various breaches of the Lease by Smart Capital, including efforts to interfere with Debtor and WERM's use and quiet enjoyment of the Premises.  Adv. No. 1:21-ap-01064-MT.  Judge Tighe, however, dismissed that adversary proceeding on jurisdictional grounds, concluding that the Court's post-confirmation jurisdiction in the second case did not include the disputes alleged in Debtor's complaint.  *See* Adv. Dkt. 24, 30.  The dismissal order was without prejudice to Debtor refiling its claims with a court of competent jurisdiction.  On August 29, 2022, Debtor and WERM filed the State Court Action in the Superior Court, which action seeks a variety of relief for alleged breaches of the Lease by Smart Capital.  The State Court Action remains pending.

One of the ongoing disputes between Debtor and Smart Capital surrounds the efforts of WERM to renew its conditional use approval by the City of Los Angeles for the sale of alcoholic beverages (the "CUB").  Among other licenses, WERM is required by Los Angeles ordinance to maintain a CUB to sell alcoholic beverages at the Premises.  The sale of alcoholic beverages is essential to WERM's operation of the Premises as a successful nightclub and event venue.  To

4

1  renew its existing CUB, WERM was required to submit a renewal application prior to expiration of

2  the CUB, in February or March of 2023.

3      Where the holder of a CUB is the tenant (or subtenant) of a property, a CUB renewal

4  application requires written acknowledgment of the property owner that the application is being

5  submitted.   Smart Capital and its principal Michael Chang refused to provide such an

6  acknowledgment.  To compel their cooperation, Debtor and WERM were required to obtain two

7  orders from the Superior Court in the State Court action.  In the first order, the Superior Court

8  ordered Michael Chang, among other things, to sign and notarize the CUB renewal application.

9  Mr. Chang apparently did so, but rather than deliver it to Debtor and WERM, Mr. Chang lodged it

10  with clerk of the Superior Court.  Debtor and WERM thereafter were required to obtain a second

11  order from the Superior Court providing that the CUB renewal application be released.

12      The CUB renewal application thereafter was filed with the Los Angeles Planning

13  Department (the "Planning Department") but was initially rejected.  It appears the Planning

14  Department rejected the application because Mr. Chang and/or his representatives had

15  communicated with department, alleging wrongdoing by Debtor and/or WERM in connection with

16  the Lease, the operation of the Premises and the CUB application process. *See* Case Dkt. 73 at ¶ 31

17  (McAbian Declaration).  Shortly before or after the CUB renewal application was ultimately

18  accepted, Mr. Chang, through this agent, appears to have reiterated those allegations in an email to

19  the Planning Department.   Case Dkt. 73 at ¶¶ 32-33.[1]  The CUB renewal application remains

20  pending.

21      In the meantime, on October 16, 2023, Smart Capital served on Debtor three different

22  notices under California Civil Procedure Code section 1161(4) purporting to terminate the Lease,

23

24  _____

[1] A copy of this email was offered as an Exhibit to the supplemental Declaration of Fadi K.

25  Rasheed.  *See* Case Dkt. 121 at 2 & Exhibit A.  Upon cross-examination, Mr. Rasheed, who
    purported to authenticate the document in his declaration, was unable to authenticate it.

26  Accordingly, Smart Capital moved to strike it.  The Court hereby grants that motion.  This ruling,
    however, does not change the Court's analysis because the contents of the email were admitted by

27  way of Adi McAbian's declaration testimony—as to which there was no objection, timely or

28  otherwise.

declaring a forfeiture of the leasehold, and giving Debtor and its subtenant three days to vacate the Premises (the "Three-Day Notices").  *See* Case Dkt. 45-7 (Ex. M).  The Three-Day Notices allege that Debtor and/or its subtenant breached the Lease by committing or permitting to exist a nuisance on the Premises and using the Premises for an illegal or unlawful purpose.  Debtor denies these allegations.  Rather than wait for the expiration of the three-day period provided under the Three-Day Notices and permit Smart Capital to commence an unlawful detainer action in state court, Debtor commenced this case on October 18, 2023.

### III.

### MOTION TO DISMISS

**A.    Legal Authority**

Bankruptcy Code section 1112(b) provides that the bankruptcy court shall convert or dismiss a chapter 11 case upon a showing of "cause."  The bankruptcy court has broad discretion to determine what constitutes "cause" under § 1112(b).  *See Sullivan v. Harnisch (In re Sullivan),* 522 B.R. 604, 614 (B.A.P. 9th Cir. 2014)*; Chu v. Syntron Bioresearch, Inc. (In re Chu),* 253 B.R. 92, 95 (S.D. Cal. 2000).

Section 1112(b)(4) sets out a long but non-exclusive list of examples of cause. While that list does not include a lack of good faith, numerous courts have found a lack of good faith (i.e., bad faith) to be grounds for dismissal or conversion under § 1112(b). *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994); *see also In re Sullivan*, 522 B.R. at 614.

The bad faith analysis focuses on whether a debtor is attempting "to effect a speedy, efficient reorganization on a feasible basis" or "to unreasonably deter and harass creditors." *In re Marsch*, 36 F.3d at 828.  A petition is filed in bad faith if a debtor seeks to "achieve objectives outside the legitimate scope of the bankruptcy laws." *Id*.  A filing may also be in bad faith if it is "an apparent two-party dispute that can be resolved outside of the Bankruptcy Court's jurisdiction." *In re Sullivan*, 522 B.R. at 616 (emphasis omitted).

Bad faith depends on an amalgam of factors and no specific factor is determinative. *Idaho Dep't of Lands v. Arnold (In re Arnold)*, 806 F.2d 937, 939 (9th Cir. 1986). A bankruptcy court

1  may consider any factor which demonstrates an abuse of the bankruptcy process and the purpose of

2  reorganization. *Marshall v. Marshall (In re Marshall)*, 721 F.3d 1032, 1048 (9th Cir. 2013).

3       A finding of bad faith is made on a case-by-case basis, there is no list of factors that must be

4  present in each case to make the finding, and the weight given to any factor depends on the

5  circumstances of the individual case.  *Legal Serv. Bureau, Inc. v. Orange Cnty. Bail Bonds, Inc.*

6  *(In re Orange Cnty. Bail Bonds)*, 638 B.R. 137, 149 (B.A.P. 9th Cir. 2022) (citations omitted).  In

7  general, the moving party bears the burden of establishing by a preponderance of the evidence that

8  cause exists for relief under section 1112(b).  *In re Sullivan*, 522 B.R. at 614.

9       If, however, the motion asserts a lack of good faith by a debtor as cause, the burden of proof

10  is a shifting one.  The moving party bears the initial burden of making a prima facie case to support

11  its allegations of bad faith.  *In re Mense*, 509 B.R. 269, 277 (Bankr. C.D. Cal. 2014).  If that

12  showing is made, the burden shifts to the debtor to establish that its chapter 11 case was filed in

13  good faith.  *Id.*  The ultimate burden of demonstrating good faith is on the debtor.  *See In re*

14  *Marshall*, 721 F.3d at 1048 ("A '[d]ebtor bears the burden of proving that the petition was filed in

15  good faith.'") (quoting *Leavitt v. Soto (In re Leavitt),* 209 B.R. 935, 940 (B.A.P. 9th Cir. 1997)).

16      **B.**    **Analysis**

17       Smart Capital argues that Debtor lacked good faith in filing this chapter 11 case and that the

18  case should therefore be dismissed. The Court disagrees.  The Court finds, by a preponderance of

19  the evidence, that Debtor filed this case in good faith.

20       Smart Capital's first line of argument is that that Debtor has only one asset, no ongoing

21  business, few genuine creditors, and no legitimate need for reorganization under chapter 11.  Smart

22  Capital argues that this is particularly true because Debtor availed itself of chapter 11 twice before

23  within the last 10 years.  The Court is not persuaded.  "The two recognized policies underlying

24  Chapter 11 [are] preserving going concerns and maximizing property available to satisfy

25  creditors…." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 453

26  (1999) (citing *Toibb v. Radloff*, 501 U.S. 157, 163 (1991)).

27       These policies are clearly implicated here.  Debtor is in the business of leasing the Premises

28  to WERM for its use as a nightclub and event space.  Debtor's principal assets in this regard are the

1  Lease and Debtor's sublease to WERM (the "Sublease").  Debtor's business is not particularly

2  complicated, but it *is* a business.  And it *is* a going concern.

3        Under the Sublease, Debtor must continue to ensure that the Premises are available to

4  WERM for their intended purpose and that Debtor fulfills all its other obligations to WERM under

5  that agreement.  In exchange, WERM is obligated to pay Debtor rent.  If Debtor loses its leasehold

6  or fails to meet its other obligations, WERM will have no obligation to pay rent.  Likewise, if

7  WERM is unable to continue to operate the Premises as a nightclub and event space as it currently

8  does (i.e., selling alcoholic beverages), it is doubtful WERM would have the *ability* to pay rent.  If

9  Debtor does not receive rent, it will lose its only source of revenue and the only means by which it

10  can repay its substantial debts to creditors.

11        Thus, the Court is persuaded that Debtor filed this case for the legitimate purposes of

12  preserving its business as a going concern and maximizing the value of its principal assets—the

13  Lease and Sublease.  Specifically, Debtor filed this case to prevent the precipitous termination of

14  the Lease under the Three-Day Notices, avoid any resulting disruption to (i) the Planning

15  Department's consideration of the pending CUB renewal application, (ii) WERM's ability to

16  continue selling alcohol during the consideration of that renewal, and (iii) Debtor's ability to satisfy

17  its debts utilizing future rental payments from WERM.

18        Those debts are substantial.  Debtor's schedules, filed under penalty of perjury, reveal a

19  secured claim of $150,200.34 and unsecured nonpriority claims of $2,640,919.23.  *See* Case Dkt.

20  16 at 8-11.  They also show $35,231.95 in unrestricted cash in two bank accounts, and another

21  $484,404.16 on deposit in a rental trust fund account created by order of the District Court in Case

22  No. 2:21-cv-04768-FLA.  Debtors schedules and statements of financial affairs, which are

23  unrefuted, (i) show that Debtor does not have adequate liquidity to satisfy its debts and (ii) support

24  Debtor's contention that it is relying on future revenues from the Sublease (and, indirectly, from the

25  continued operations of its subtenant) to meet its obligations.

26        Smart Capital argues that several of Debtor's unsecured claims are held by insiders and

27  therefore are not legitimate.  But none of the evidence adduced by Smart Capital refutes Debtor's

28  statements, under penalty of perjury, that these are genuine debt obligations.  Even debts held by

1  insiders are debts for purposes of demonstrating good faith.  *See In re Walden Ridge Dev., LLC,*

2  292 B.R. 58, 64 (Bankr. D.N.J. 2003) ("[E]ven the claims of insiders are considered in evaluating

3  good faith since they remain a liability of the Debtor.");  *see also In re S. Beach Sec., Inc.,* 341 B.R.

4  853, 858 (N.D. Ill. 2006).

5        Smart Capital also argues that several of Debtor's unsecured debts *should* have been paid

6  pursuant to Debtor's prior chapter 11 plan.  In other words, Smart Capital suggests that Debtor

7  intentionally failed to pay those debts so that it could justify filing another bankruptcy case.  But

8  there is no evidence to substantiate this argument either.[2]  Instead, it appears from the totality of the

9  circumstances that Debtor has a genuine need for bankruptcy relief.  That Debtor has obtained

10  bankruptcy relief in the past is not by itself disqualifying. *See In re Bowers Inv. Co., LLC*, 553 B.R.

11  762, 770-71 (Bankr. D. Alaska 2016) (filing of successive bankruptcies not per se bad faith; court

12  must look to the totality of the circumstances to determine if cause exists to dismiss); *see also PNC*

13  *Mortg. v. Deed and Note Traders, LLC (In re Deed and Note Traders, LLC)*, No. 2012 WL

14  1191891, at *6-7 (B.A.P. 9th Cir. April 5, 2012) (serial chapter 11 filings not per se impermissible)

15  (unpublished).[3]

16        Smart Capital's second line of argument is that Debtor filed this chapter 11 case as an

17  improper litigation tactic and an exercise in forum shopping, in what is essentially a "two-party

18  dispute."  Smart Capital contends that the only problem facing Debtor is a run-of-the-mill lease

19  dispute with its landlord, which can and should be determined in Superior Court.  The argument is

---

22  [2] The plan confirmed in the last bankruptcy case provided for installment payments over time to the holders of unsecured claims.  Debtor has stated under penalty of perjury that it has been unable to make these payments because it is has had to divert substantial funds to unexpected legal expenses in respect of Smart Capital's conduct. *See* Case Dkt. 1 at 5.  Given the history of continued legal disputes between Debtor, WERM, and Smart Capital, the Court finds Debtor's explanation for the nonpayment of these plan obligations eminently plausible.

26  [3] That the prior chapter 11 case has not yet been closed likewise does not prove bad faith under the circumstances.  The issuance of a final decree in and closure of a chapter 11 case is a largely ministerial act.  Here, the prior chapter 11 case remains open because an appeal from an order entered in that case remains pending.  This fact has no bearing on Debtor's good faith in commencing this case.

unavailing for numerous reasons.

First, the argument ignores the fact that Debtor has creditors holding substantial secured and unsecured debts that Debtor will be unable to satisfy without the tools of chapter 11.  In other words, there are more than two parties in this case.  Smart Capital insists this is not so because none of Debtor's creditors is currently pursuing or threatening legal action against Debtor.  But this is not a prerequisite to utilizing chapter 11 and it is not what the cases mean when they refer to a "two party" dispute.

What the case law means by a "two-party dispute" is the sort of situation where the only problem facing a debtor is its pending litigation with another party and where the bankruptcy case is commenced unfairly, solely as a tactic to gain unfair advantage in that litigation.  Here, there are numerous creditors with substantial economic interests at stake in (i) preventing a forfeiture of the Lease, (ii) preventing possible disruption to the pending CUB renewal process and/or loss of the pending CUB application, and (iii) the preservation of the subtenant's operations, which are the Debtor's only source of income to satisfy those debts.

In addition to the scheduled unsecured creditors referenced earlier, WERM is itself a contingent creditor under the Sublease and a party whose interests are impacted by the Sublease— regardless of the fact that WERM shares some common ownership with Debtor.

This case is simply *not* a two-party dispute.  But even if it were otherwise, "'[p]etitions in bankruptcy arising out of a two-party dispute do not per se constitute a bad-faith filing by the debtors.'"  *In re Sullivan*, 522 B.R. at 616 (quoting *In re Stolrow's, Inc.*, 84 B.R. 167, 171 (B.A.P. 9th Cir. 1988)).  "Courts that find bad faith based on two-party disputes do so where 'it is an apparent two-party dispute *that can be resolved outside the Bankruptcy Court's jurisdiction.*'"  *In re Sullivan*, 522 B.R. at 616 (emphasis in original) (quoting *Oasis at Wild Horse Ranch LLC v. Sholes (In re Oasis at Wild Horse Ranch, LLC)*, 2011 WL 4502102, at *10 (B.A.P. 9th Cir. August 26, 2011)).

To be sure, the Superior Court is the forum where landlord-tenant disputes are typically adjudicated.  But permitting the notice period to expire under the Three-Day Notices, and allowing Smart Capital thereafter to proceed with an unlawful detainer action in Superior Court, would have

1  had adverse consequences beyond the outcome of the litigation itself.  Doing so would have

2  (i) resulted in the immediate termination of the Lease under California law and (ii) thereby

3  jeopardized the ability of Debtors' subtenant, WERM, to continue selling alcoholic beverages and

4  timely renew its CUB.

5      The Ninth Circuit's decision in *In re Windmill Farms, Inc.*, 841 F.2d 1467 (9th Cir. 1988)

6  teaches that under California law a lease is terminated at least by the time: (i) a landlord serves a

7  notice to quit that declares a forfeiture of the lease, (ii) the notice period expires, and (iii) the

8  landlord commences an unlawful detainer action.  The leasehold ultimately may be restored if the

9  tenant is successful in the unlawful detainer action, but until and unless that happens, the lease

10  remains terminated under California law.

11      Herein lies the problem for Debtor and its subtenant.  There is currently pending with the

12  City of Los Angeles an application to renew the CUB under which WERM is permitted to sell

13  alcoholic beverages at the Premises.  Doing so is essential to maintaining WERM's operations as a

14  premiere night club and event venue.  While the renewal application is pending a final disposition,

15  WERM is permitted to continue selling alcoholic beverages.  But if the renewal application is

16  denied or withdrawn, WERM will have to discontinue selling alcoholic beverages and a new

17  application will need to be initiated.

18      The Court is persuaded by the testimony of Elizabeth Peterson-Gower—whom the Court

19  found both credible and persuasive—that if the current application were denied or withdrawn, the

20  process of obtaining a new CUB would take at least 18 months from the time of submission of an

21  application, *plus* additional time to prepare such application prior to submission.  During that time,

22  WERM would not be permitted to sell alcoholic beverages.  The Court finds that this would have a

23  negative impact on WERM and Debtor and jeopardize the future of their businesses.

24      The Court also is persuaded that following termination of the Lease, Smart Capital would

25  be reasonably likely to attempt to withdraw the pending CUB renewal application.  Mr. Chang has

26  demonstrated his intent to obstruct renewal of the CUB (e.g., by his repeated failure to deliver to

27  Debtor and/or WERM his written acknowledgement of the renewal application) and made

28  concerted efforts over many years to remove Debtor and WERM from the Premises.  Although the

1    Court expresses no opinion at this point regarding the merits of the defaults alleged in the Three-

2    Day Notices, the Court observes that Mr. Chang's efforts have been persistent and, to date,

3    unsuccessful.  Debtor's expectation that Mr. Chang would seek withdrawal or denial of the pending

4    CUB renewal are reasonable and well-founded.

5        Smart Capital contends that there is no risk to Debtor or WERM because neither Smart

6    Capital nor Mr. Chang would ultimately succeed in that effort.  Smart Capital argues that the Los

7    Angeles ordinance governing the application process refers only to the withdrawal of an

8    application by the applicant—in this case WERM—and does not permit withdrawal by the property

9    owner leased premises.  Smart Capital also offers the testimony of David Weintraub, a former

10   supervisor in the Los Angeles planning department, who testified that during his extensive career

11   there he was not aware of any case where an application was denied or withdrawn at the request of

12   a landlord based upon an unlawful detainer dispute.

13       The Court has no reason to doubt the credibility of Mr. Weintraub or his experience.  But

14   the Court is not persuaded by Smart Capital's contention that this is a legally and practically

15   *impossible* result.  The Court found more persuasive the testimony/legal analysis of Michael Ayaz,

16   an attorney who handles CUB applications in Los Angeles and elsewhere, who explained that a

17   tenant-applicant's right to apply for a CUB is specific to the location where it is sought and derives

18   from the tenant-applicant's rights in the premises.  If the tenant-applicant loses the right to occupy

19   the premises because a lease has been terminated, the City of Los Angeles may be justified in

20   denying the application or permitting the owner of the property (who at that point would be the

21   only party with a legal interest in the property) to withdraw it.  This conclusion is bolstered by the

22   repeated argument of counsel for Smart Capital—with which Debtor appears to agree—that the

23   CUB is tied to and runs with the land.

24       That Smart Capital might seek to withdraw the pending application based on termination of

25   the Lease—and might succeed—is further supported by the Lease itself.  *See* Case Dkt. 45-1 at 11.

26   Section 5.4 of the Lease states in its entirety: "The entire rights under the CUP shall belong to

27   Landlord following the expiration of the Term or earlier termination of this Lease."  *Id.*  Based on

28   this language, and Mr. Chang's conduct to date, the Court finds that Debtor was justified in its

1  concern that Smart Capital might—absent commencement of this case invocation of the automatic

2  stay—seek to withdraw the pending CUB application and might succeed in doing so.

3     None of this is to say with 100% certainty that without the bankruptcy filing Smart Capital

4  would have sought withdrawal of the CUB and that it would have succeeded in doing so.  But this

5  is to say that Debtor did not lack good faith when it filed this chapter 11 case and invoked the

6  automatic stay, rather than risking an uncertain outcome.  Debtor's decision not to wait around to

7  see what might happen to its business was entirely justified under the circumstances.  Furthermore,

8  the power to cure and assume an unexpired lease pursuant to Bankruptcy Code section 365, under

9  the protection of the automatic stay arising from Bankruptcy Code section 362, are tools that

10 Congress made available only in bankruptcy.  They are not available in the Superior Court.

11    Under the totality of the circumstances presented, litigating Smart Capital's allegations

12 regarding breaches of the Lease in the context of lease assumption under Bankruptcy Code section

13 365 is a reasonable and appropriate means of preserving the rights of all involved (including Smart

14 Capital), while maximizing the value of Debtor's assets for the benefit of its creditors.    This is not

15 forum shopping.  And it is not bad faith.  This is the legitimate use of chapter 11 by a debtor

16 seeking to preserve the viability of its business.

17    Finally, the Court notes that Smart Capital offered a substantial amount of declaration

18 testimony from Michael Chang regarding alleged defaults by Debtor and WERM under the Lease.

19 Among other things, Mr. Chang contends that that these breaches involve fraudulent and/or

20 criminal conduct.  As best the Court can tell, this testimony was offered to suggest that Debtor is a

21 bad actor and that the filing of this case is just the latest in a long line of bad faith conduct.

22    Whether and to what extent Debtor or WERM breached the Lease is more germane to

23 whether there are defaults under the Lease and whether the Lease may be assumed under

24 Bankruptcy Code section 365.  As noted above, the Court is not adjudicating those alleged

25 breaches by way of this ruling.  Nevertheless, to the extent Smart Capital sought by Mr. Chang's

26 testimony to establish a pattern of bad faith conduct by Debtor or WERM, it failed.  Based on the

27 live cross-examination of Mr. Chang, the Court finds that Mr. Chang's testimony was neither

28 credible nor persuasive.   The Court found that Mr. Chang was not a particularly candid witness

and that his allegations of wrongdoing were not well-founded.

The Court emphasizes that its findings regarding Mr. Chang's testimony pertain only to the testimony he offered in support of the Dismissal Motion and RFS Motion.  The Court will, as it is duty-bound to do, keep an open mind with respect to any testimony that Mr. Chang may offer in opposition to the other pending motions, which the Court has not yet considered.  But the Court cautions Smart Capital that the Court does not take lightly allegations of fraudulent or criminal conduct.  (Indeed, the Court seriously questions the purpose of alleging conduct as "criminal" in this Court, which has no jurisdiction over criminal matters.)  If Smart Capital persists in making such allegations, the Court expects it to produce credible, persuasive, and admissible evidence to substantiate its claims.  So far, the Court is not impressed.

## IV.

### RELIEF FROM STAY MOTION

As the Court announced on March 29, 2024, the Court will deny the RFS Motion to the extent Smart Capital seeks relief from the automatic stay to pursue an unlawful detainer action and obtain possession of the Premises.  The reasons for that decision follow.  To the extent Smart Capital seeks relief under the RFS Motion to assert a counterclaim against Debtor in the State Court Action, the Court reserves judgment and will hear further argument (or entertain a stipulation between the parties) at the hearing scheduled for April 16, 2024.[4]

**A. Legal Authority**

Debtor's commencement of its chapter 11 case gave rise to an automatic stay.  11 U.S.C. § 362(a).  Among other things, the automatic stay applies to the

commencement or continuation, including the issuance or employment of process,

---

[4] To the extent the RFS Motion seeks relief from the automatic stay to assert damage claims against non-debtor parties, the Court declines to grant relief because it has not been presented with a justiciable controversy.  The automatic stay does not protect non-debtor parties from the assertion of prepetition damage claims.  *See, e.g.,* 11 U.S.C. § 362(a)(1) (applying stay to "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding *against the debtor* that was or could have been commenced before the commencement of the case under this title, or to recover a claim *against the debtor* that arose before the commencement of the case under this title) (emphasis added).

1   of a judicial, administrative, or other action or proceeding against the debtor that

2   was or could have been commenced before the commencement of the case under

3   this title, or to recover a claim against the debtor that arose before the

4   commencement of the case under this title.

5   11 U.S.C. § 362(a)(1).  It also applies to "any act to obtain possession of property of the estate or of

6   property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

7   An unlawful detainer action with respect to the Premises implicates both of these provisions.

8      Smart Capital seeks relief from the automatic stay to pursue an unlawful detainer action

9   under Bankruptcy Code section 362(d)(1).  In relevant part, that statute provides that "[o]n request

10  of a party in interest and after notice and a hearing, the court shall grant relief from the stay

11  provided under subsection (a) of this section, such as by terminating, annulling, modifying, or

12  conditioning such stay—for cause. . . ."  11 U.S.C. § 362(d)(1).  The meaning of "cause" for

13  purposes of this statute is decided on a case-by-case basis. *Christensen v. Tucson Estates, Inc. (In*

14  *re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990); *see also Piombo Corp. v. Castlerock*

15  *Props. (In re Castlerock Props.)*, 781 F.2d 159, 163 (9th Cir. 1986).

16      As a general matter, the filing of a bankruptcy case in bad faith may constitute cause to

17  grant relief from the automatic stay.  *See In re Arnold,* 806 F.2d at 939; *In re Mense*, 509 B.R. at

18  276.  Where the specific question presented is whether to grant relief from stay to allow a state

19  court action to proceed, courts consider matters such as judicial economy and the expertise of the

20  state court, *see Mac Donald v. Mac Donald (In re Mac Donald)*, 755 F.2d 715, 717 (9th Cir. 1985),

21  as well as prejudice to the parties and whether exclusively bankruptcy issues are involved, *see Ozai*

22  *v. Tabuena (In re Ozai)*, 34 B.R. 764, 766 (B.A.P. 9th Cir. 1983).

23      These considerations have been articulated in a non-exclusive list of factors commonly

24  known as the *Curtis* factors.  *See Truebro, Inc. v. Plumberex Specialty Prods., Inc. (In re*

25  *Plumberex Specialty Prods., Inc.),* 311 B.R. 551, 559-60 (Bankr. C.D. Cal. 2004) (adopting *In re*

26  *Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984)); *see also Merriman v. Fattorini (In re*

27  *Merriman),* 616 B.R. 381, 389-90 (B.A.P. 9th Cir. 2020) (approving bankruptcy court's

28  consideration of relevant *Curtis* factors in weighing the equities):

1.  Whether the relief will result in a partial or complete resolution of the issues;

2.  The lack of any connection with or interference with the bankruptcy case;

3.  Whether the foreign proceeding involves the debtor as a fiduciary;

4.  Whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases;

5.  Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;

6.  Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question;

7.  Whether the litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties;

8.  Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c);

9.  Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f);

10. The interests of judicial economy and the expeditious and economical determination of litigation for the parties;

11. Whether the foreign proceedings have progressed to the point where the parties are prepared for trial, and

12. The impact of the stay on the parties and the "balance of hurt."

*In re Plumberex Specialty Prods., Inc.,* 311 B.R. at 559.

"Not all of the twelve *Curtis* factors are relevant in every case" and a bankruptcy court is not "required to give each of the *Curtis* factors equal weight in making its determination." *Id.* at 560; *see also In re Am. Spectrum Realty, Inc.*, 540 B.R. 730, 737 (Bankr. C.D. Cal. 2015). Further,

the burden of proof on a motion to modify the automatic stay is a shifting one. To obtain relief from the automatic stay, the party seeking relief must first establish a prima facie case 11 that "cause" exists for relief under § 362(d)(1). Once a prima

1    facie case has been established, the burden shifts to the debtor to show that relief

2    from the stay is unwarranted. If the movant fails to meet its initial burden to

3    demonstrate cause, relief from the automatic stay should be denied.

4    *In re Plumberex Specialty Prods., Inc.*, 311 B.R. at 557 (citations omitted).

5    **B. Analysis.**

6    As discussed in Section III of this Memorandum, Debtor has demonstrated by a

7    preponderance of the evidence that its case was filed in good faith.  Thus, to the extent the RFS

8    Motion seeks relief to proceed with an unlawful detainer proceeding based on Debtor's alleged lack

9    of good faith in filing this case, it will be denied.  To the extent that request is premised other

10    considerations—a reflected in the *Curtis* factors—it also will be denied.  The Court briefly

11    addresses below each of the *Curtis* factors that it believes is relevant to the question presented.

12    *Partial or Complete Resolution of the Issues.*  Permitting Smart Capital to pursue an

13    unlawful detainer action in Superior Court would certainly allow for an adjudication of whether

14    Debtor and/or WERM breached the Lease under California law.  What it would not determine is

15    whether Debtor is entitled—and if so, under what circumstances—to assume the Lease under

16    Bankruptcy Code section 365, notwithstanding any such breaches.  The Court finds, therefore, that

17    granting the requested relief would not facilitate a complete resolution of the issues between Smart

18    Capital and Debtor.  Likewise, it would not resolve Debtor's need to address its substantial secured

19    and unsecured debt.

20    *Connection to the Bankruptcy Case.*  An unlawful detainer action with respect to the

21    Premises has a very strong connection to the bankruptcy case.  If the Court were to permit such a

22    proceeding to move forward, the Superior Court might issue a judgment for possession in favor of

23    Smart Capital, irrespective of Debtor's rights under Bankruptcy Code section 365.  Debtor

24    ultimately may or may not succeed in its effort to assume the Lease under section 365; this matter

25    has not been adjudicated yet.  But the entry of a judgment by the Superior Court terminating

26    Debtor's right to possession has the potential of conflicting and/or interfering with this Court's

27    adjudication of Debtor's rights to assume the Lease under section 365.  Further, as discussed above,

28    permitting the expiration of a three-day notice and allowing Smart Capital to commence an

unlawful detainer proceed would potentially harm Debtor and WERM with regard to the pending CUB renewal process and, in turn, Debtor's prospects for reorganization. The Court finds that the relief requested in the RFS Motion therefore has a strong connection to this case.

*Specialized Tribunal*. This factor is a mixed bag. The Superior Court is the court of general jurisdiction in California and has substantial expertise adjudicating unlawful detainer claims and determining breaches under a lease. This fact favors relief. On the other hand, this Court also has experience adjudicating claims of contractual breach—pursuant to a lease or otherwise. Furthermore, as between the two fora, this Court is the only forum with jurisdiction to adjudicate the rights of Debtor and Smart Capital pursuant to Bankruptcy Code section 365. These facts favor denial of the requested relief.

*Prejudice to the Interests of Other Creditors*. If the Court were to permit the expiration of a three-day notice and allow Smart Capital to proceed with an unlawful detainer action in Superior Court, other creditors may be prejudiced. First, for the reasons discussed above in Section III of this Memorandum, doing so would permit the legal termination of the Lease under California law. Even if Debtor were ultimately successful in defending the unlawful detainer action and obtaining an order restoring it to lawful possession, termination of the Lease in the interim would expose WERM to the possibility that its CUB renewal application might be withdrawn by Smart Capital or simply denied. This would impair its ability to operate in the manner it presently enjoys. Debtors' creditors likewise would suffer prejudice because their ability to be made whole depends on WERM's ability to operate and pay rent. The Court finds, therefore, that the relief requested has the potential of very serious prejudice to the creditors of Debtor.

*Judicial Economy*. There undoubtedly would be overlap between the issues adjudicated in the Superior Court in respect of an unlawful detainer proceeding and the issues to be adjudicated here in respect of assumption under Bankruptcy Code section 365. Both proceedings would likely involve a determination of the nature and extent of the breaches alleged by Smart Capital in its Three-Day Notices. If Debtor were successful in an unlawful detainer action in demonstrating that no defaults occurred, then there would be no defaults to cure as a prerequisite to assumption under the Bankruptcy Code. *See* 11 U.S.C. 365(b). The problem is that we do not know today what the

outcome of that litigation would be.  If it turns out that Debtor (or WERM, as its subtenant) breached the Lease, a court must determine whether such breach precludes assumption under section 365.  This Court is the only court of the two authorized to do so.  So, as a matter of judicial economy, it makes better sense to deny relief and permit the question of lease defaults to be adjudicated here.

*Readiness for Trial.*  The Court has no evidence suggesting the parties were ready for a trial in an unlawful detainer proceeding at the time Debtor filed its petition.  To the contrary, the Three-Day Notices had not expired and Smart Capital had not yet filed its unlawful detainer action.  This factor favors denial of relief.

*Impact on the Parties and Balance of Hurt.*  As discussed above, granting Smart Capital relief to proceed with an unlawful detainer action would have potentially adverse impacts on Debtor and its creditors.  On balance, this impact is far more serious than the impact on Smart Capital.  Denying the relief requested by Smart Capital effectively would require Smart Capital to litigate here the breaches of the Lease alleged in the Three-Day Notices, rather than in the Superior Court.  But Smart Capital *would* get its day in Court.  If the Court grants relief and permits Smart Capital to pursue an unlawful detainer action in Superior Court, Debtor (and its economic stakeholders) may lose the value of its assets and its viability as a going concern.

Balancing the foregoing circumstances, the Court concludes that denying Smart Capital relief from the automatic stay to pursue an unlawful detainer action in respect of the Premises is the most appropriate outcome.

///

///

///

///

///

///

///

///

1

## V.

## CONCLUSION

For the reasons set forth above, the Court will enter an order: (i) denying the Dismissal Motion, and (ii) denying the RFS Motion to the extent it seeks relief to proceed with an unlawful detainer action with respect to the Premises.  The Court reserves judgment on whether, and under what conditions, it should grant relief from stay to permit Smart Capital to assert counterclaims against Debtor in the State Court Action.

# # #

Date: April 8, 2024

Martin R Barash
United States Bankruptcy Judge