# FOR PUBLICATION

FILED & ENTERED

DEC 08 2025

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>HAWKEYE ENTERTAINMENT, LLC,<br><br>                  Debtor-in-Possession. | Case No.: 1:23-bk-11501-MB<br><br>Chapter 11<br><br>**MEMORANDUM OF DECISION RE: DEBTOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>               **Hearing Held:**<br>Date:   November 4, 2025<br>Time:   1:30 p.m.<br>Place:  Courtroom 303<br>         21041 Burbank Blvd.,<br>         Woodland Hills, CA 91367 |

## I.    INTRODUCTION

The debtor is lessee of a portion of the historic Pacific Stock Exchange Building in downtown Los Angeles, California. It subleases the premises to a non-debtor affiliate, which operates a popular nightclub and concert venue known as "L.A. Exchange." When the debtor's current landlord (and the prior landlord) acquired the building, it was subject to a long-term lease in favor of the debtor. The landlord and its predecessor, however, have other plans for the building and have sought for many years to declare defaults and terminate the lease. The debtor has resisted these efforts.

The result has been over a decade of litigation, both in state court and in the bankruptcy court. This is the debtor's third chapter 11 case.[1] In the prior cases, the debtor successfully assumed the subject lease under Bankruptcy Code section 365(a).[2] In the first chapter 11 case,[3] the debtor did so pursuant to a settlement with the landlord.  In the second chapter 11 case,[4] the debtor did so after extensive litigation and a lengthy evidentiary hearing over the nature and existence of defaults under the lease.

Pursuant to Bankruptcy Code section 365(b), to assume a lease, a debtor in possession must cure existing defaults, compensate for pecuniary loss resulting from those defaults, and provide adequate assurance of future performance with respect to such defaults. Whether and to what extent a lease is in default is the central issue in a motion to assume a lease. In the last bankruptcy case, the landlord had the opportunity to litigate the existence and significance of all defaults then existing under the lease. Notwithstanding its efforts, the Court approved assumption of the lease, which the Ninth Circuit Court of Appeals affirmed.

In connection with its effort to assume the same lease in the present case, the debtor seeks—by way of partial summary judgment—to limit the universe of defaults that may be alleged by the landlord in opposition to that relief. The debtor relies on (i) the collateral attack doctrine, (ii) the doctrine of res judicata (or "claim preclusion"), (iii) the doctrine of collateral estoppel (or "issue preclusion"), and (iv) the application of a consensual release between the parties and/or their predecessors in interest. The

---

[1] Case No. 1:23-bk-11501-MB (the "Third Bankruptcy Case" or "Bk III").

[2] References herein to the "Bankruptcy Code" refer to title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

[3] Case No. 1:13-bk-16307-MT (the "First Bankruptcy Case" or "Bk I").

[4] Case No. 1:19-bk-12102-MT (the "Second Bankruptcy Case" or "Bk II").

landlord rejects these arguments, contending that *all* past defaults are fair game. Based on this premise, the landlord has launched a barrage of discovery aimed at identifying defaults that either were litigated or could have been litigated in the prior case.

After careful consideration of the applicable legal standards, and the circumstances presented, the Court concludes (i) the collateral attack doctrine, claims preclusion doctrine and issue preclusion doctrine are applicable here and each independently precludes the landlord from asserting and litigating the existence of any default under the lease prior to entry of the assumption order in the prior case; and (ii) the voluntary release granted by the landlord's predecessor is binding on the landlord and precludes the assertion of any default existing under the lease at the time the release was granted. Accordingly, the Court will enter a separate order granting partial summary judgment in favor of the debtor, limiting the scope of the defaults that may be asserted in connection with the lease assumption.

## II.    JURISDICTION, ADJUDICATIVE AUTHORITY & VENUE

The Court has jurisdiction over the debtor's motion for partial summary judgment pursuant to 28 U.S.C. § 1334(b), because it arises under Bankruptcy Code section 365 and involves issues unique to this and prior bankruptcy cases. *See* Bk III Dkt. 236 (the "MPSJ"). As such, the MPSJ pertains to statutorily and constitutionally core matters over which this Court has the adjudicative authority to enter final orders. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). The Court also finds that venue is proper under 28 U.S.C. § 1409(a) because the MPSJ was filed in the court where the Third Bankruptcy Case is pending.

## III.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Lease and Sublease

In 2009, PAX America Development, LLC ("PAX") was the owner of the historic twelve-story commercial building located at 618 S. Spring Street, Los Angeles, CA 90014, known as the Pacific Stock Exchange Building. The habitable and leasable portions of the building are the first four floors and the basement, specifically the south end of the basement (the "Premises").

On July 17, 2009, PAX entered into a long-term lease of the Premises to Hawkeye Entertainment, LLC (the "Debtor"). Bk III Dkt. 237 at Ex. A (the "Lease"). The Lease is guaranteed by

Adi McAbian and W.E.R.M. Investments, LLC ("WERM"), a non-debtor affiliate. *Id.* at Ex. A, Ex. G

thereto. McAbian is the principal of the Debtor. *Id.* at ¶ 1.

On October 1, 2009, the Debtor subleased the Premises to WERM. *Id.* at Ex. B (the "Sublease").

WERM uses the Premises to operate a nightclub and entertainment venue under the name "Exchange

LA."

**B.      New Vision Acquires the Premises, Disputes Arise**

On December 20, 2010, New Vision Horizon, LLC ("New Vision") acquired the Premises from

PAX at a non-judicial foreclosure sale. Michael Chang was the managing member of New Vision. Bk III

Dkt. 247-1 at ¶ 4 n.1.

**C.      The First Bankruptcy Case**

Between 2009 and 2013, the Debtor withheld nearly $1 million in rents under the Lease, alleging

that New Vision failed to make certain improvements required by the Lease. The Debtor filed two

lawsuits against New Vision—one in 2011 and one in 2013. On September 20, 2013, New Vision

responded with a notice of default for failure to pay the withheld rental amount and five days to cure the

deficiency. On September 30, 2013, the Debtor filed a chapter 11 petition, initiating the First Bankruptcy

Case, over which the Hon. Maureen Tighe presided.

The Debtor moved to assume the Lease, which New Vision opposed. Bk I Dkt. 40 (the "First

Assumption Motion"); Bk I Dkt. 57. Following mediation, in August 2014, the Debtor and New Vision

reached a global resolution of their disputes. Bk I Dkt. 226 at Ex. A (the "New Vision Settlement"); Bk I

Dkt. 233 ("Stipulation for Assumption of Lease"); Bk I Dkt. 242 (the "2014 Assumption Order"); Bk I

Dkt. 257 (the "2014 Settlement Order"). Among other things, the New Vision Settlement voided certain

alleged amendments to the Lease, implemented certain other amendments to the Lease[5] and conferred

mutual releases on the parties.

The New Vision Settlement states, in relevant part:
10. <u>General Releases</u>:

(a) On the Effective Date, except as otherwise provided in this Agreement, and except as
to the Parties' rights and obligations under the Lease and the First Amendment, the Parties,
on behalf of themselves and each of their predecessors, successors, assigns, officers,

---

[5] Bk III Dkt. 237 at Ex. C ("First Amendment to Lease Agreement," dated August 19, 2014).

4

directors, members, agents, and all other persons or entities acting on their behalf, hereby fully and forever release each other, and each of their respective predecessors, successors, assigns, officers, directors, members, agents, employees, insurers, representatives and attorneys, from any and all claims, actions or causes of action, damages, demands, costs, expenses, losses, and attorneys' fees, which they have, or could claim to have against each other arising from or related to: (1) all claims alleged in the First or Second State Court Actions; (2) all claims alleged in, or related to the [First] Assumption Motion, including claims related to the Rent Commencement Date and any offsets to rent allegedly owed to [the Debtor] by New Vision; (3) all claims related to the validity and enforceability of the Lease; (4) all claims related to the validity and enforceability of the Sublease; (5) all claims related to any Rent owed from the period July 17, 2009 through October 31, 2014; and (6) all the Claims of New Vision arising under or related to POC No. 2. It is the parties' mutual intent that by this <u>SETTLEMENT AGREEMENT AND MUTUAL RELEASE OF CLAIMS the parties are resolving all disputes between them</u>. Notwithstanding the foregoing, nothing herein is intended to nor shall release claims, if any, that any Party may have against Pax or its principals.

(b) It is the intention of the Parties that the releases provided in this Agreement, will be effective to bar all claims, demands, controversies, causes of action, liabilities, costs, expenses, attorneys' fees, and damages of whatever character, nature and kind, known or unknown, suspected or unsuspected against one another. [New Vision and the Debtor] expressly waive any and all rights and benefits conferred upon them by California Civil Code section 1542, which states:

> A general release does not extend to claims which the creditor does-not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.;

(c) The Parties acknowledge and agree that this Agreement, including without limitation the foregoing waiver of the provisions of California Civil Code section 1542, is intended to effectuate a full and complete release of any and all claims for relief, whether known or unknown, that may be asserted by them against each other; and

(d) The Parties acknowledge that the foregoing waiver of the provisions of California Civil Code section 1542 is separately bargained for and expressly consented to, and that this Agreement shall be given full force and effect in accord with each and all of its terms and provisions, including those terms and provisions relating to known and unknown claims.

[…]

14. <u>Legal Construction</u>.

(a) This Agreement shall be governed in all respects, including validity, interpretation, and effect, by the Bankruptcy Code and the laws of the State of California, without giving effect to the principles of choice of law or conflicts of law thereof[.]

Bk I Dkt. 226-1 at 6-8.

The order approving the parties' stipulation for assumption of the Lease provides, in relevant part:

> [T]he Lease and Sublease shall be deemed current and reinstated as if no default exists or ever existed, and that any and all monetary and non-monetary defaults alleged by New Vision are deemed cured, satisfied and/or waived ab initio…; … the Debtor is in full and

complete compliance each and every provision of Bankruptcy Code § 365(b)(1) (A), (B) and (C)[.]

Bk I Dkt. 242 at 4.

On June 20, 2016, Judge Tighe issued an order confirming the Debtor's chapter 11 plan, which order also confirmed the assumption of the Lease. *See* Bk I Dkt. 363 at ¶ 2. On April 28, 2017, the clerk of the Court entered a final decree in, and closed, the First Bankruptcy Case. Bk I Dkt. 392.

### D.    Smart Capital Acquires the Premises

On January 24, 2018, Smart Capital Investment I, LLC, Smart Capital Investments II, LLC, Smart Capital Investments III, LLC, Smart Capital Investments IV, LLC and Smart Capital Investments V, LLC (collectively "Smart Capital") acquired the Premises from New Vision via recordation of a grant deed. Bk III Dkt. 247-1 at ¶ 4 n.1. Chang is the managing member of Smart Capital. *Id.*

### E.    The Second Bankruptcy Case

On August 5, 2019, Smart Capital delivered to the Debtor a letter asserting non-monetary defaults under the Lease. Bk III Dkt. 237 at ¶ 11 and Ex. H. Despite the Debtor's efforts to obtain more specific information on the nature of the alleged defaults, Smart Capital then issued a three-day notice to quit the Premises. *Id.* at ¶ 13. Shortly thereafter, on August 21, 2019, the Debtor filed a second chapter 11 petition initiating the Second Bankruptcy Case, over which Judge Tighe also presided.

In October 2019, the Debtor moved to assume the Lease pursuant to Bankruptcy Code section 365, which Smart Capital opposed. Bk II Dkt. 21 (the "Second Assumption Motion"); Bk II Dkt. 26. From October 2019 to September 2020, i.e., for approximately one year, the parties conducted extensive discovery on issues related to the Second Assumption Motion. *See* Bk II Dkt. 111 (setting August 28, 2020 as deadline to complete discovery); Bk II Dkt. 164 (ordering production of additional information); *In re Hawkeye Ent., LLC*, 625 B.R. 745, 757 (Bankr. C.D. Cal. 2021) (Tighe, J.) (describing discovery efforts as "extensive"). In October 2020, the Court conducted a four-day evidentiary hearing over the nature and extent of alleged defaults under the Lease. Bk II Dkts. 266, 269, 270, 271 (transcripts of evidentiary hearing).

On October 15, 2020, the Court approved the Debtor's assumption of the Lease; in relevant part, Judge Tighe's oral ruling was as follows:

6

> [Regarding the alleged defaults raised by Smart Capital,] [t]he details of the default just appeared manufactured, and minor, and made-up, sometimes. [Chang] understandably is very upset. He's got an under-market lease, allegedly, [for] an historic building with all sorts of restrictions that he's got to work closely with his tenant.
>
> […]
>
> They're the kind of issues you work out in that kind of building, if they're real issues, but I thought he was using immaterial issues, or manufacturing issues that hadn't been there, as an attempt to characterize them as a default, and the bottom line is, there was no preponderance of evidence on any of these issues to convince me there's a default.

Bk II Dkt. 269 at 110-101.

> The defaults that I found occurred I found were not material, and I didn't find Mr. Chang credible on them, … he was exaggerating them, and he had already certified that everything was fine when he signed the estoppel, that there were no defaults, and then he kept moving the target.
>
> So I didn't find that there were any defaults … that weren't cured, and the curing of the late payment … I don't know that you can characterize that as a default, where the lease itself provides … you pay the late fee, and that was done.

Bk II Dkt. 271 at 55; *see also* Bk II Dkt. 230 (the "2020 Assumption Order") at 3:7-8 ("the Lease and Sublease shall be deemed current and reinstated as if no default exists or ever existed.").

Smart Capital appealed the 2020 Assumption Order, which the Ninth Circuit Court of Appeals affirmed. *Smart Cap. Invs. I, LLC v. Hawkeye Ent., LLC (In re Hawkeye Ent., LLC)*, 49 F.4th 1232 (9th Cir. 2022). The Court of Appeals held that the Court had incorrectly limited the curative requirements of section 365(b)(1) to "material" defaults rather than all defaults. *Id.* at 1237. The Court of Appeals concluded, however, that the error was harmless because (i) the Court had determined that all defaults by the Debtor had been cured as of the time of assumption, and (ii) any adequate assurance required by the statute in respect of the Debtor's defaults would not have implicated Smart Capital's substantive rights:

> [T]he record establishes that the bankruptcy court determined that any default was cured as of the time of assumption, and that many of the alleged defaults were either not defaults in the first place or were only minor deviations from the contract terms. Thus, any adequate assurance responsive to the alleged defaults would be little more than simple promises not to deviate from the contract terms again.

*Id*. at 1240–41.

On August 6, 2021, the Court confirmed the Debtor's chapter 11 plan in the Second Bankruptcy Case. Bk II Dkt. 391. The Second Bankruptcy Case has not yet been closed. On January 23, 2024, it was

1  reassigned to the undersigned judicial officer and redesignated as case no. 1:19-bk-12102-MB. Bk II

2  Dkt. 493.

3  **F.    The CUB Dispute**

4        One of the ongoing disputes between the Debtor and Smart Capital involved the efforts by

5  WERM, the Debtor's subtenant, to renew the approval by the Los Angeles Department of City Planning

6  (the "Planning Department") for a conditional use of the Premises for the sale of alcoholic beverages (a

7  "CUB"). WERM is required by city ordinance to maintain a CUB to sell alcoholic beverages at the

8  Premises.[6] To operate at the Premises as a nightclub and event venue, the Lease requires that WERM

9  obtain a CUB. Bk III Dkt. 237 at 14 (Lease Section 5.3).

10       On February 25, 2013, the Planning Department granted approval of WERM's plans to continue

11  on-site sales of a full line of alcoholic beverages. Bk III Dkt. 112 at Ex. A (the "CUB-PA4"); *see*

12  Planning Department case no. ZA-1995-830-CUB-PA4. Condition no. 47 of the CUB-PA4 provided that

13  in order to renew the Planning Department's authorization, WERM was required to submit a renewal

14  application before the CUB-PA4 expired, i.e., before March 12, 2023 (the "CUB-PA5 Application"). *Id.*

15  at 8. After expiry of an administrative appeal period, the CUB-PA4 became final and effective for a term

16  of ten years beginning on March 12, 2013.

17       WERM operated under the CUB-PA4 for the entirety of its term and, in 2022, began the process

18  to submit the CUB-PA5 Application. Over the course of approximately a year, Smart Capital refused to

19  provide the property owner with an affidavit necessary for WERM to submit the CUB-PA5 Application.[7]

20  Bk III Dkt. 237 at ¶ 16; Bk III Dkt. 247-1 at ¶ 29. So, the Debtor and WERM sought and obtained relief

21  from the Superior Court of California for the County of Los Angeles (the "Superior Court") compelling

22  Chang to sign and notarize the property owner affidavit. Bk III Dkt. 52 at ¶¶ 25-29.[8]

23

24  _____

[6] *See* L.A.M.C. § 12.24.W.1 (2025), https://codelibrary.amlegal.com/codes/los_angeles/latest/lapz/0-0-0-7378.

25
[7] Where the holder of a CUB is the tenant (or subtenant) of a property, a CUB renewal application requires that the property

26  owner sign a property owner affidavit "to verify the application is being filed with their knowledge." *Application Instructions (CP13-7810)*, Los Angeles Department of City Planning (July 29, 2025), https://planning.lacity.gov/odocument/8d67e245-e104-404a-8d07-efc8da8923dc/CP13-7810_DCP_Application_Filing_Instructions_10.31.23.pdf.

27
[8] Notably, this Court previously found that Chang's refusal to provide the property owner affidavit demonstrated an intent to

28  obstruct WERM from timely submitting the CUB-PA5 Application. Bk III Dkt. 137 at 11:24-28.

On March 8, 2023, WERM submitted its renewal application (the "CUB-PA5 Application"). *See* Planning Department case no. ZA-19950830-CUB-PA5. On November 22, 2024, the Planning Department issued a determination approving the CUB-PA5 Application, i.e., the Planning Department approved WERM's sale of alcoholic beverages on the Premises. Bk III Dkt. 237 at Ex. I (the "Planning Decision").

Due to the nature of the parties' ongoing disputes, the Planning Department's consideration of the CUB-PA5 Application "engendered a large amount of correspondence and testimony." *Id.* at 16. "Large" is an understatement—the Planning Department's summary of the correspondence it received, and the testimony and arguments it heard, spanned over 18 pages in single-spaced 12-point font. *Id.* at 20-38. In relevant part, Smart Capital and its various representatives asserted that the CUB-PA5 Application could not "be granted because the … CUB-PA4 was granted in error and is invalid due to [McAbian], instead of [Smart Capital], having signed the [CUB-PA4] application and covenant and agreement." *Id.* at 43; *see also id.* at 22-24, 29-31 (summarizing correspondence from various representatives of Smart Capital, each making the same assertion); *id.* at 33-36 (summarizing comments made by Smart Capital at public hearing, making the same assertion).

The Planning Department refused to invalidate the CUB-PA4, which had been in effect for 10 years and expired by its terms:

> [T]he discussion on the validity of the CUB-PA4 … is moot. The [CUB-PA4] was issued on February 25, 2013, having an appeal period that ended on March 12, 2013, with no appeals filed. The opportunity to challenge [the CUB-PA4] and how the [CUB-PA4] covenant was signed prior to its recordation against the [Premises] has long passed. Further, the term of the [CUB-PA4] was limited to 10 years, and that term has ended. [The Debtor] has been operating the [Premises], utilizing the privileges of that grant, for 10 years….

*Id.* at 43.

### G.    The Quiet Title Action

On November 20, 2024, two days before the Planning Decision was issued, Smart Capital filed a complaint to quiet title to the Premises against McAbian in the Superior Court, initiating case no. 24STCV30709 (the "Quiet Title Action"). Bk III Dkt. 282 at Ex. D. In the complaint, Smart Capital alleges that on March 13, 2013, McAbian fraudulently executed a *Master Covenant and Agreement* (the "Master Covenant") as the purported owner of the Premises and caused the Master Covenant to be

1    recorded against the Premises. Bk III Dkt. 284 at Ex. A. The complaint acknowledges that the Master

2    Covenant recordation was ancillary to the Planning Department's issuance of the CUB-PA4.[9] To date,

3    the Quiet Title Action remains pending. *See* Bk III Dkts. 327, 334.[10]

4    **H.    The Third Bankruptcy Case**

5    On October 16, 2023, Smart Capital served on the Debtor three different notices under California

6    Civil Procedure Code § 1161(4) purporting to terminate the Lease, declare a forfeiture of the leasehold,

7    and give the Debtor and its subtenant three days to vacate the Premises (the "Three-Day Notices"). *See*

8    Bk III Dkt. 45-7 at Ex. M. The Three-Day Notices allege that the Debtor breached the Lease by

9    committing or permitting to exist a nuisance on the Premises and using the Premises for an illegal or

10    unlawful purpose. The Debtor denies these allegations. On October 18, 2023, rather than wait for Smart

11    Capital to commence an unlawful detainer action in the Superior Court following expiration of the three-

12    day period provided under the Three-Day Notices, the Debtor filed a chapter 11 petition, commencing

13    this Third Bankruptcy Case.

14    **1.    The Motion to Dismiss and RFS Motion**

15    On December 19, 2023, Smart Capital filed: (1) a motion to dismiss the Third Bankruptcy Case

16    as a bad faith filing under section 1112(b), and (2) a motion for relief from the automatic stay pursuant

17    to section 362(d) to proceed with an unlawful detainer action against the Debtor and to assert

18    counterclaims against the Debtor in the Superior Court. Bk III Dkt. 44 (the "Motion to Dismiss"); Bk III

19    Dkt. 48 (the "RFS Motion"). On February 14 and March 14, 2024, the Court held evidentiary hearings

20    on the Motion to Dismiss and RFS Motion. Bk III Dkts. 107, 133. On March 29, 2024, the Court held a

21    continued hearing in which it announced its decision to deny the Motion to Dismiss and to deny in part

22    the RFS Motion to the extent Smart Capital sought relief to proceed with an unlawful detainer action

23    regarding the Premises. Bk III Dkt. 156. On April 8, 2024, the Court issued a memorandum of decision

24    regarding the Motion to Dismiss and the RFS Motion. Bk III Dkt. 137; *see also* Bk III Dkts. 143, 197.

25

26    [9] Condition no. 48 of the CUB-PA4 provided that within 60 days of its effective date, a form covenant acknowledging and agreeing to comply with all the terms and conditions of the CUB-PA4 must be recorded against the Premises. Bk III Dkt. 112 at Ex. A.

27    [10] This Court previously ruled that Smart Capital's prosecution of the Quiet Title Action does not violate the Debtor's automatic stay in the Third Bankruptcy Case. Bk III Dkt. 296.

28

**2.      The Third Assumption Motion**

In the Third Bankruptcy Case, the Debtor filed a "Motion for an Order (1) Authorizing the Assumption of Non-Residential Real Property Lease and Sublease, and (2) Determining the Debtor and Sublessor Not to Be in Breach or Default, thereby Deeming them in Compliance with 11 U.S.C. section 365(b)(1)(A) and Excusing the Debtor from any Additional Compliance with 11 U.S.C section 365(b)(1)(B) and (C); or alternatively, Extending the Time Period within which the Debtor May Assume or Reject Unexpired Non-Residential Leases and Executory Contracts." Bk III Dkt. 52 (the "Third Assumption Motion").[11]

**3.      The Adversary Proceeding**

On June 25, 2024, the Debtor filed a complaint against Smart Capital and Chang, commencing adversary proceeding no. 1:24-ap-01031-MB (the "Adversary Proceeding"). Bk III Dkt. 168; Adv. Dkt. 1 (the "Complaint").

**a.      The Complaint and First Injunction Motion**

In the Complaint, the Debtor seeks issuance of: (1) a declaratory judgment that Smart Capital's and Chang's alleged interference with the Debtor's and WERM's rights to operate pursuant to the CUB-PA4 constitutes a violation of the automatic stay; and (2) a permanent injunction against Smart Capital and Chang, enjoining them from interfering with the Debtor's and WERM's rights under the CUB-PA4, including its efforts to renew the CUB-PA4 via the CUB-PA5 Application. The Debtor also filed a motion for a preliminary injunction regarding the same. Adv. Dkt. 2 (the "First Injunction Motion").

**b.      The Counterclaims and Second Injunction Motion**

On July 22, 2024, Smart Capital filed counterclaims against the Debtor and WERM. Adv. Dkt. 34 (the "Counterclaims"). In the Counterclaims, Smart Capital asserted causes of action for, among others: (1) breach of the Lease; (2) breach of the implied covenant of good faith and fair dealing; and (3) declaratory and injunctive relief regarding the purported alterations the Debtor and WERM caused to be

---

[11] The Debtor also filed a "Motion for an (1) Order Deeming Debtor in Compliance with 11 U.S.C. section 365(d)(3) and (2) Authorizing the Debtor to Pay All Monetary Obligations Pursuant to the Lease into the Rental Trust Account." Bk III Dkt. 57. The continued hearings on that pending motion have trailed the hearings on the Third Assumption Motion.

made to the Premises. Smart Capital also filed a motion for a preliminary injunction against the Debtor and WERM regarding the same. Adv. Dkt. 44 (the "Second Injunction Motion").

### c.    The Third Injunction Motion

On July 22, 2024, the Debtor filed a motion for a preliminary injunction against Smart Capital and Chang, this time seeking to enjoin them from interfering with the Debtor's attempts to remedy ventilation and air conditioning problems on the Premises. Adv. Dkt. 37 (the "Third Injunction Motion" and, together with the First and Second Injunction Motions, the "Injunction Motions").

* * *

As discussed below, all discovery pertaining to the Injunction Motions is stayed pending adjudication of the MPSJ. *See* Adv. Dkt. 100; Bk III Dkt. 233.

### 4.    The Discovery Disputes

On September 4, 2024, the Court entered an order that, among other things, set a deadline of November 27, 2024, for the parties to complete discovery in connection with the Complaint, the Counterclaims, the Third Assumption Motion and the Injunction Motions. Bk III Dkt. 181; Adv. Dkt. 72.

Smart Capital sought discovery from various parties pursuant to Federal Rule of Civil Procedure 26, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014(c)(1). Specifically, Smart Capital sought information related to several categories of alleged defaults by the Debtor under the Lease:

(1) the Debtor's purported violation of Lease section 2.6 by using the common area of the Premises for revenue-generating events without Smart Capital's prior written consent, including: "a photo shoot in September of 2021," a "Christmas event in December of 2023," a "Dungeons and Dragons event in May of 2024," and "boxing, sumo wrestling, [and] bikini contests" on date(s) uncertain. Bk III Dkt. 247-1 at ¶¶ 55.b, 55.e, Ex. 14.

(2) the Debtor's purported violation of Lease section 10.2 by interfering with Smart Capital's right of entry on multiple occasions in 2024. *Id.* at ¶ 55.d, Ex. 15.

(3) the Debtor's purported violation of Lease section 10.3 by failing to maintain tenant utility facilities in good condition and failure to repair or make replacements necessary to keep the Premises in good condition; namely:

    a.  failing to maintain the interior ceilings, including damage to an "historic mosaic ceiling tile" that purportedly fell on January 20, 2024. *Id.* at ¶¶ 30, 50-51, 58; Bk III Dkt. 247-2 at ¶¶ 20-24, Exs. 12 and 18. Smart Capital also contends this constitutes a violation of Lease section 9.4.

    b.  failing to perform requisite maintenance to the HVAC system since execution of the Lease in 2009. Bk III Dkt. 247-1 at ¶¶ 52-55.c; Bk III Dkt. 212 (Smart Capital's RFA no. 107: "Admit that during the period of January 1, 2009 to the present, there were times when YOU did not keep the HVAC system at the PREMISES in good condition and repair."). Smart Capital also contends this constitutes a violation of Lease section 5.7.

    c.  potential damage to the sump pump in the basement since execution of the Lease in 2009. Bk III Dkt. 247-1 at ¶ 55.a.

    d.  failing to provide adequate lighting on date(s) uncertain. *Id.* at ¶ 55.d.

(4) the Debtor's purported violation of Lease section 10.5 by performing alterations to the Premises without prior notice to Smart Capital and without Smart Capital's prior written consent, including: (a) retaining structural engineers, (b) receiving structural analyses in July 2022 and December 2023, and (c) submitting a building permit application to LADBS in April 2024, all "regarding the installation of temporary rigging components at the Premises." *Id.* at ¶¶ 38-49, 59-64, Exs. 11 and 19.

(5) the Debtor's purported violation of Lease section 11.3 by making changes to the common area of the Premises; namely, the Debtor's alleged covering of Smart Capital's security cameras in the common area during occasions since execution of the Lease in 2009. *Id.* at ¶ 55.f; Bk III Dkt. 212 (Smart Capital's RFA no. 89: "Admit that on at least one occasion

1   during the period of January 1, 2009 to the present, YOU obstructed [Smart Capital] from

2   controlling the COMMON AREA.").

3   (6) the Debtor's purported violation of paragraph 6 of the First Amendment to the Lease by using

4   the basement for non-storage purposes without Smart Capital's authorization, specifically

5   using the basement as a WERM employee breakroom. Bk III Dkt. 247-1 at ¶ 55.a; Bk III

6   Dkt. 247-6 at Ex. 17; Adv. Dkt. 94 (Smart Capital's RFA no. 61: "Admit that on at least one

7   occasion during the period of January 1, 2009 to the present, YOU used the basement of the

8   BUILDING for non-storage purposes.").

9   (7) the Debtor's purported violation of unidentified provision(s) of the Lease by:

10      a.   obtaining the CUB-PA4, which Smart Capital contends was invalid because the

11          Debtor obtained it allegedly by misrepresenting that the Debtor was the owner of the

12          Premises. Bk III Dkt. 247-1 at 5-6 (¶¶ 25-29). Smart Capital's arguments regarding

13          the various CUBs have evolved considerably over time and across different forums.

14          In its current form, Smart Capital argues that the Debtor and WERM have illegally

15          sold alcohol at the Premises pursuant to the CUB-PA5, which purportedly is invalid

16          because the CUB-PA4 Application was obtained by fraud (i.e., McAbian signed the

17          Master Covenant as the purported owner of the Premises). *See id.* at ¶ 56.

18      b.   on date(s) uncertain, walking through areas "outside the Premises for fire/life safety

19          inspections with the Los Angeles Fire Department without Smart Capital's knowledge

20          or consent." *Id.* at ¶ 55.g; Adv. Dkt. 96 at Ex. A (Peterson Deposition Transcript) at

21          pp. 76-77 ("Q: Did you see … any entity … occupying any space other than the

22          [Premises]? … A: … I saw Adi McAbian in other parts of the building, with the Fire

23          Department, because I did a tour.").

24  *See also* Bk III Dkt. 247 at 12:6-16:7; Bk III Dkt. 34.

25          In October and November 2024, the Debtor and Smart Capital filed numerous motions regarding

26  discovery disputes in the Third Bankruptcy Case and the Adversary Proceeding (collectively, the

27  "Discovery Disputes"):

28

14

(1) the Debtor's motion to quash subpoenas issued by Smart Capital [Adv. Dkt. 75], filed October 3, 2024;

(2) Smart Capital's motions to compel WERM's responses to: requests for production [Adv. Dkt. 93], requests for admission [Adv. Dkt. 94], and interrogatories [Adv. Dkt. 95], each filed November 18, 2024;

(3) Smart Capital's motions to compel the Debtor's responses to: requests for admission [Bk III Dkt. 212], requests for production [Bk III Dkt. 213], and interrogatories [Bk III Dkt. 214], each filed November 18, 2024;

(4) Smart Capital's motion to compel further deposition of Elizabeth Peterson Group, Inc. [Adv. Dkt. 96], filed November 19, 2024;

(5) the Debtor's motion in limine to preclude Smart Capital from offering any evidence regarding alleged defaults or breaches of the Lease occurring prior to the 2020 Assumption Order [Bk III Dkt. 215], filed November 19, 2024;

(6) the Debtor's motion to compel Smart Capital's responses to interrogatories [Bk III Dkt. 217], filed November 19, 2024.

In summary, Smart Capital argues that discovery regarding the Debtor's entire history of defaults under the Lease is essential for this Court to determine whether the Debtor can assume the Lease in this case. The Debtor argues that many of Smart Capital's discovery requests are improper because they are aimed at developing evidence with respect to defaults that preceded entry of the 2014 Settlement Order, 2014 Assumption Order and the 2020 Assumption Order.

### 5.    The MPSJ

On November 26, 2024, the Court conducted a status conference regarding the Discovery Disputes and ordered the parties to present their dispute over the effect of the 2014 Assumption Order, the 2014 Settlement Order and the 2020 Assumption Order as a motion for summary judgment. The Court later memorialized its directive in a written order:

> As the Court discussed with counsel, the Discovery Disputes all relate to a more substantial legal dispute between the parties: whether and to what extent orders entered in the prior bankruptcy cases of the Debtor are preclusive—as a matter of issue preclusion and/or claim preclusion—of issues and/or claims raised in the Complaint, the Counterclaims, the Third Assumption Motion and the Injunction Motions. The Court conclude[d] that the most

efficient way to address these disputes is to adjudicate these legal issues first, pursuant to one or more motions for summary judgment under Federal Rule of Civil Procedure 56. *See* Adv. Dkt. 100; Bk III Dkt. 233. After this threshold issue is adjudicated, the Court can address any outstanding discovery issues. Pending that decision, the Court ordered that "no additional motion pertaining to discovery may be filed by the Debtor or Smart Capital" in the Third Bankruptcy Case or Adversary Proceeding. Adv. Dkt. 100 at ¶ 3; Bk III Dkt. 233 at ¶ 3.[12]

On December 16, 2024, the Debtor filed the MPSJ, a declaration of McAbian and a request for judicial notice. Bk III Dkts. 237, 238. On January 6, 2025, Smart Capital filed an opposition to the MPSJ (the "Opposition"), together with declarations of Chang and Zachary Schorr, counsel for Smart Capital. Bk III Dkt. 247. On January 20, 2025, the Debtor filed a reply to the Opposition. Bk III Dkt. 253. After considering the oral arguments of counsel at multiple hearings, this matter is ripe for decision.

## IV.    LEGAL STANDARDS

### A.    Summary Judgment under Fed. R. Civ. P. 56

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id.* at 324. In determining whether a genuine issue of material fact exists, "'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To establish a genuine issue, the non–moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of

---

[12] In September 2025, Smart Capital attempted to circumvent this order by filing a motion to examine the Debtor's bank pursuant to Federal Rule of Bankruptcy Procedure 2004, which the Court denied and declined to reconsider. Bk III Dkts. 331, 338, 339, 344.

evidence in support of the [non–moving party]'s position will be insufficient."). Rather, the nonmoving

party must provide "evidence of such a caliber that 'a fair–minded jury could return a verdict for the

[nonmoving party] on the evidence presented.'" *United States v. Wilson*, 881 F.2d 596, 601 (9th Cir.

1989) (quoting *Anderson*, 477 U.S. at 252).

**B.    Assumption of Unexpired Lease Under 11 U.S.C. § 365**

Bankruptcy Code section 365(a) provides that "the trustee, subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). In a

chapter 11 case, the debtor in possession may exercise this power. 11 U.S.C. § 1107(a). Section

365(b)(1), however, establishes some of the restrictions on this power:

> If there has been a default in an executory contract or unexpired lease of the debtor, the
> trustee may not assume such contract or lease unless, at the time of assumption of such
> contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such
> default other than a default that is a breach of a provision relating to the satisfaction
> of any provision (other than a penalty rate or penalty provision) relating to a default
> arising from any failure to perform nonmonetary obligations under an unexpired
> lease of real property, if it is impossible for the trustee to cure such default by
> performing nonmonetary acts at and after the time of assumption, except that if such
> default arises from a failure to operate in accordance with a nonresidential real
> property lease, then such default shall be cured by performance at and after the time
> of assumption in accordance with such lease, and pecuniary losses resulting from
> such default shall be compensated in accordance with the provisions of this
> paragraph;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly
> compensate, a party other than the debtor to such contract or lease, for any actual
> pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

Thus, a debtor in possession may assume a lease only if it: (A) cures the default (or provides

adequate assurances that it will); (B) provides compensation for any actual pecuniary loss resulting from

the default (or provides adequate assurances that it will); and (C) provides adequate assurances of future

performance under the lease. 11 U.S.C. § 365(b)(1)(A)–(C). If no default has occurred, section

365(b)(1)'s requirements—cure, compensation, and adequate assurances of future performance—are not

triggered. *See Hawkeye Ent., LLC*, 49 F.4th at 1236.

17

# V.    DISCUSSION

The Debtor asserts that Smart Capital, in opposing the pending Third Assumption Motion, is precluded from asserting any defaults that may have existed under the Lease prior to the assumption of that Lease in 2014 and 2020.[13] The Debtor makes four principal arguments. The first three arguments are premised on distinct but related doctrines that preclude a party from litigating a matter based on a prior litigation and/or adjudication by a court: (i) the collateral attack doctrine, (ii) claim preclusion, and (iii) issue preclusion. The fourth argument is premised on a voluntary settlement and release of claims between the parties in 2014.

## A.    Collateral Attack Doctrine

The Debtor contends that Smart Capital's assertion of defaults that may have existed prior to entry of the 2020 Assumption Order is barred as an impermissible collateral attack on that order. The Court agrees.

"The legal system and society generally have a significant interest in the finality of court orders and judgments. In turn, this interest requires that federal court orders carry the full force of law unless and until extinguished through appropriate processes." *Foster v. First Interstate Bank (In re Shoot the Moon, LLC)*, 642 B.R. 21, 23 (Bankr. D. Mont. 2022) (footnotes omitted). One such process is a direct appeal. *Id.* at 24. Another, less direct challenge, is a motion for relief from an order or judgment under Federal Rule of Civil Procedure 60(b). *Id.*

Otherwise, "collateral attacks on the judgments, orders, decrees or decisions of federal courts are improper." *Mullis v. U.S. Bankr. Ct. for Dist. of Nev.*, 828 F.2d 1385, 1393 (9th Cir. 1987) (citing *Brown v. Baden*, 815 F.2d 575, 576-77 (9th Cir. 1987)) (affirming district court's denial of injunctive relief against bankruptcy court as improper collateral attack).

> Unlike a direct appeal, a collateral attack questions the validity of a judgment or order in a separate proceeding that is not intended to obtain relief from the judgment. 18 Moore's Federal Practice, § 131.02[2]. It seeks, through the second suit, to avoid or evade the earlier judgment, or to deny its force and effect. Even where the second action has an independent purpose and contemplates some other relief, it is a collateral attack if, in some fashion, it would overrule a previous judgment.

---

[13] Because the Court concludes below that the 2020 Assumption Order acts as a bar to asserting all defaults preceding its entry, the Court only analyzes the preclusive effect of the 2020 Assumption Order. The preclusion of defaults preceding entry of the 2020 Assumption Order necessarily includes all defaults that would have preceded the earlier 2014 Assumption Order.

1  *Uecker & Assocs., Inc. v. L.G. Hunt & Assocs., Inc. (In re Am. Basketball League, Inc.)*, 317 B.R. 121,

2  128 (Bankr. N.D. Cal. 2004). "This collateral attack doctrine prevents courts from effectively overruling

3  or altering final orders via indirect routes and is firmly grounded on the need for finality." *Shoot the*

4  *Moon, LLC*, 642 B.R. at 24 (citing *Am. Basketball League, Inc.*, 317 B.R. at 128) (footnote omitted).

5  Moreover, this doctrine "applies equally in the bankruptcy context." *Id.* & n.12 (citing authorities).

6        The decretal language of the 2020 Assumption Order not only approves assumption of the Lease

7  under Bankruptcy Code section 365(a) but also expressly "deems" the Lease "reinstated … as if no

8  default exists or ever existed." Bk I Dkt. 242 at 4; Bk II Dkt. 230 at 4. Smart Capital's present effort to

9  litigate the existence of prior defaults under the Lease is an impermissible collateral attack on the 2020

10  Assumption Order.

11        The 2020 Assumption Order was appealed by Smart Capital but ultimately affirmed by the Ninth

12  Circuit Court of Appeals. Although the Court of Appeals found that the Court used the wrong legal

13  standard, it found the error harmless and affirmed the 2020 Assumption Order without alteration to any

14  decretal provision. *Hawkeye Ent., LLC*, 49 F.4th 1232. Furthermore, the time to seek relief under Federal

15  Rule of Civil Procedure 60(b) has long since expired.

16        Smart Capital argues that it is not bound by the 2020 Assumption Order because, at that time,

17  defaults existed that it was not aware of and therefore did not assert in opposition to the Second

18  Assumption Motion. But the argument is unavailing. The express language of the 2020 Assumption

19  Order "deems" the Lease reinstated "as if" no such defaults "ever existed." In other words, the operative

20  language of the order declares that going forward, any prior default will be treated as if it never existed.

21  Smart Capital's attempt to litigate the existence and nature of prior defaults here is in direct contradiction

22  of that judicial declaration.

23        That Smart Capital may contend this language was improper or unjustified is unpersuasive. Even

24  an order premised on legal error may not be collaterally attacked. *See United Student Aid Funds, Inc. v.*

25  *Espinosa*, 559 U.S. 260, 275 (2010) (bankruptcy court order discharging student loan debt was legal

26  error but nevertheless enforceable against creditor that had notice of error and failed to timely object or

27  appeal). The Debtor gave Smart Capital notice of the provisions proposed to be used in the 2020

28

1 Assumption Order, and Smart Capital did not object to such use. *See* Bk II Dkt. 228 (Debtor's notice of

2 lodgment of proposed 2020 Assumption Order); Bankr. C.D. Cal. Local R. 9021-1(b)(3) (providing

3 procedure to file objection to form of lodged order). The Court subsequently issued the 2020

4 Assumption Order without altering the Debtor's proposed language. *Compare* Bk II Dkt. 228 *with* Bk II

5 Dkt. 230. Smart Capital appealed that order, and the Court of Appeals affirmed it without alteration. The

6 order is now final and binding on Smart Capital.

7       Accordingly, pursuant to the express terms of the 2020 Assumption Order, Smart Capital is

8 barred from asserting any defaults under the Lease that may have existed at the time the 2020

9 Assumption Order was entered.

10 ### B.     Claim Preclusion

11       The doctrine of res judicata, more recently referred to as claim preclusion,[14] prohibits relitigation

12 "of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of

13 whether they were asserted or determined in the prior proceeding." *Lucky Brand Dungarees, Inc. v.*

14 *Marcel Fashions Grp., Inc.*, 590 U.S. 405, 4121 (2020) (quoting *Brown v. Felsen*, 442 U.S. 127, 131

15 (1979)). "A final judgment on the merits of an action precludes the parties or their privies from

16 relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v.*

17 *Moitie*, 452 U.S. 394, 398 (1981) (citing *Commissioner v. Sunnen*, 333 U.S. 591, 597 (1948)).

18       "The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor*

19 *v. Sturgell*, 553 U.S. 880, 891 (2008) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497,

20 507–08 (2001)). Under federal law, application of the claim preclusion doctrine requires: (1) an identity

21 of claims; (2) a final judgment on the merits; and (3) the same parties or privity between parties. *Owens*

22 *v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001). "[T]he proponent of preclusion

23 has both the burden of persuasion and the correlative risk of non-persuasion." *George v. City of Morro*

24

25

26 [14] "Although the Latin terms 'res judicata' and 'collateral estoppel' historically have been used to describe preclusion principles generally, in modern usage these terms have been retitled and their distinct meanings emphasized. 'Res judicata' is now referred to as claim preclusion, and 'collateral estoppel' is referred to as issue preclusion." *Yaikian v. Yaikian (In re*

27 *Yaikian)*, 508 B.R. 175, 182 (Bankr. S.D. Cal. 2014); *see also Taylor v. Sturgell*, 553 U.S. 880, 892 n.5 (2008) ("These terms have replaced a more confusing lexicon.").

28

1  *Bay (In re George)*, 318 B.R. 729, 737 (B.A.P. 9th Cir. 2004) (citing *Educ. Credit Mgmt. Corp. v. Repp*
2  *(In re Repp)*, 307 B.R. 144, 148 n.3 (B.A.P. 9th Cir. 2004)).

3       The Debtor argues the doctrine of claim preclusion prohibits Smart Capital from asserting in this
4  case any defaults under the Lease in existence prior to the 2020 Assumption Order—even defaults that it
5  did not assert at the time. The Debtor argues that because Smart Capital had the opportunity to assert
6  such defaults as defenses to (i.e., in opposition to) the Second Assumption Motion, it should be barred
7  from asserting any such defaults now. In contrast, Smart Capital argues that claim preclusion should not
8  apply here and that it should be free to assert any defaults that have ever existed under the Lease,
9  irrespective of its prior litigation of the Second Assumption Motion.

10      The parties do not dispute that the same parties are involved here that were involved in the prior
11  litigation. The parties disagree, however, on the other two elements: whether there is an identity of
12  claims and a final judgment on the merits. The Court concludes below that the remaining elements are
13  satisfied.

14              **1.    Identity of Claims**

15      The Ninth Circuit Court of Appeals has adopted a four-factor test for determining whether there
16  is an "identity of claims" for purposes of claim preclusion: "'(1) whether the two suits arise out of the
17  same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment
18  would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve
19  infringement of the same right; and (4) whether substantially the same evidence is presented in the two
20  actions.'" *Warfield v. Nance (In re Nance)*, 156 F.4th 961, 966 (9th Cir. 2025) (quoting *Mpoyo v. Litton*
21  *Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005)).

22      These factors are meant to be flexible; "identity of causes of action 'cannot be determined
23  precisely by mechanistic application of a simple test.'" *Costantini v. Trans World Airlines*, 681 F.2d
24  1199, 1202 n.7 (9th Cir. 1982) (quoting *Abramson v. Univ. of Haw.*, 594 F.2d 202, 206 (9th Cir. 1979)).
25  Moreover, the transactional nucleus of facts factor "is the most important." *Id*. at 1202 (citing *Harris v.*
26  *Jacobs*, 621 F.2d 341, 343 (9th Cir. 1980)).

27
28
                                    21

This case presents the unusual situation in which a chapter 11 debtor is seeking the same relief, under the same statute, with respect to the same unexpired lease, in a subsequent chapter 11 case. The typical claim preclusion problem requires the Court to compare two civil complaints and assess whether there is an identity of claims between causes of action asserted in each complaint. Nevertheless, claim preclusion applies in bankruptcy and "'must be properly tailored to the unique circumstances that arise when the previous litigation took place in the context of a bankruptcy case.'" *Alary Corp. v. Sims (In re Associated Vintage Grp., Inc.)*, 283 B.R. 549, 558–59 (B.A.P. 9th Cir. 2002) (quoting *E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337 (3rd Cir. 2000)).

Faithful application of the applicable legal standards demonstrates that there is an "identity of claims" between the prior and current lease assumption litigation.

### a.    Transactional Nucleus of Facts

The Second and Third Assumption Motions share a common transactional nucleus of facts. Under Bankruptcy Code section 365(a), the entitlement of a debtor in possession to assume a lease depends on the debtor's status as lessee, the validity of the lease, and the unexpired status of that lease. Under Bankruptcy Code section 365(b)(1), assumption is conditioned on the existence, nature and extent of defaults under the lease and whether the debtor in possession has taken (or will take) certain curative or compensatory measures with respect to those defaults.

In the Second Bankruptcy Case, Smart Capital opposed the Second Assumption Motion. Smart Capital had approximately one year to conduct discovery and participated in a four-day evidentiary hearing focused on the very issues contemplated by section 365(b)(1). As the lessor opposing the Debtor's assumption of the Lease, Smart Capital had the opportunity to assert and demonstrate all defaults that may have occurred under the Lease during the eleven-year period in which the Debtor was lessee of the Premises, and to demand satisfaction of the curative and compensatory provisions of section 365(b)(1).

In its opposition to the Third Assumption Motion in this case, Smart Capital wants to take discovery and litigate the existence of defaults that may have existed both *before* and *after* entry of the 2020 Assumption Order. Its effort to litigate the existence and significance of such defaults is based on

1    the very same transactional nucleus of facts at issue in the Second Bankruptcy Case: the conduct of the

2    Debtor and its subtenant with respect to the operation and maintenance of the Premises during the period

3    preceding the 2020 Assumption Order.

4        Naturally, Smart Capital could not raise in the prior case any conduct that had not yet occurred.

5    Thus, the conduct of the Debtor and its subtenant that may constitute a default *following* entry of the

6    2020 Assumption Order is not part of the common transactional nucleus of facts and is not subject to

7    claim preclusion.

8        Pointing to the text of section 365(b)(1), Smart Capital insists that it should be permitted to

9    litigate and oppose assumption here based on *any* defaults that have occurred at any time under the

10   Lease. Bk. III Dkt. at 10-11. In *Hawkeye Entertainment, LLC*, the Court of Appeals noted that the

11   curative provisions of the statute are triggered "[i]f there *has been* a default." 49 F.4th at 1237 (quoting

12   11 U.S.C. § 365(b)(1)) (emphasis added). The Court of Appeals held that "[u]sing the present-perfect

13   tense in this this way refers to situations where a default has occurred regardless of whether that default

14   has been resolved or is ongoing." *Id.* Thus, Smart Capital argues that it should be able to rely on *any*

15   default in the past to support its opposition to the Third Assumption Motion.

16       But its argument conveniently ignores the doctrine of claim preclusion. Whatever the scope of

17   section 365(b)(1), claim preclusion intervenes to provide finality and conserve judicial resources on

18   "issues that were or could have been raised" in prior litigation under that statute. *See Federated Dep't*

19   *Stores, Inc.,* 452 U.S. at 398. In most cases, this would not be an issue because a motion seeking

20   assumption of a lease normally is the first and only time those issues have been litigated. But this is not

21   most cases. Here, Smart Capital had a full and fair opportunity to litigate, in a prior bankruptcy case, all

22   defaults that may have existed at the time—which make up the transactional nucleus of facts.[15]

23

24

---

[15] Smart Capital makes a slightly different but related argument that fares no better. Smart Capital contends that it must be able to conduct discovery into and assert defaults that occurred prior to the entry of the 2020 Assumption Order because those alleged defaults—i.e., all defaults since the inception of the Lease—are relevant to the requirement that the Debtor provide "adequate assurance of future performance" under Bankruptcy Code section 365(b)(1)(C). Again, the argument misses the point. Together, the 2020 Assumption Order and the Court of Appeals' decision affirming that order concluded (notwithstanding certain harmless errors) that the requirements of section 365(b)(1) were essentially satisfied. By operation of claim preclusion, Smart Capital is now barred from litigating under section 365(b)(1)(C) the adequate assurance issue with respect to any defaults that preceded entry of that order.

### b.      Impairment of Established Rights and Interests

Before it can approve a debtor's assumption of an unexpired lease, the bankruptcy court must find that the curative requirements of section 365(b)(1) have been satisfied with respect to defaults under the lease. *See Hawkeye Ent., LLC*, 49 F.4th at 1236–37. Otherwise, the statute does not permit assumption. *See id.* Thus, the Court could not have issued the 2020 Assumption Order unless, at that time, it determined that the Debtor had cured any defaults under the Lease.

Permitting Smart Capital to turn back the clock, relitigate the issue, and assert defaults it did not raise at the time would call into question the very premise on which that order was entered, the rights that were granted to the Debtor under the order, and the grounds on which the order was affirmed on appeal. Doing so also would undermine the Court's order confirming the Debtor's chapter 11 plan in the Second Bankruptcy Case, which order expressly relied on the entry of the 2020 Assumption Order as a material component and enabled the Debtor to reorganize its business affairs.

### c.      Infringement of the Same Right

The rights involved in the Second and Third Assumption Motions are identical. In both instances, the Debtor is asserting its right as a debtor in possession to assume the Lease under section 365(a), subject to the requirements of section 365(b)(1). In opposition, Smart Capital is asserting its rights to curative relief under section 365(b)(1). The rights are being asserted in separate bankruptcy cases and at separate moments in time, but the rights themselves are identical.

### d.      Substantially Same Evidence

In the prior case, the universe of relevant evidence covered the Debtor's conduct as a lessee under the Lease since at least 2014 through its assumption in 2020. But for the application of claim preclusion principles, the universe of relevant evidence would cover the same period and extend further into the present. The resulting overlap would be substantial and would encompass evidence that was or could have been presented in the prior case.

### 2.      Final Judgment on the Merits

The 2020 Assumption Order is a final judgment on the merits. As noted, Smart Capital appealed the 2020 Assumption Order, which the Ninth Circuit Court of Appeals affirmed in a detailed opinion that

1    addressed the merits of the order. *See Hawkeye Ent., LLC*, 49 F.4th 1232. Smart Capital nevertheless

2    argues that the 2020 Assumption Order is not a "final judgment on the merits" because the Court of

3    Appeals held that the Court had incorrectly limited the curative requirements of section 365(b)(1) to

4    "material" defaults. *Id.* at 1237.

5            Smart Capital is wrong. The Court of Appeals ultimately found that the error was harmless

6    because the Court had determined that all defaults by the Debtor had been cured as of the time of

7    assumption and that any adequate assurance required by the Debtor's defaults would not have implicated

8    Smart Capital's substantive rights. *Id.* at 1240-41. Based on that finding, the Court of Appeals affirmed.

9    Nothing in the Court of Appeals' decision alters the finality of the 2020 Assumption Order or alters its

10   nature as a decision on the merits.

11           **3.        The Effect of Claim Preclusion**

12           For the foregoing reasons, the Court concludes that claim preclusion applies here. Based on the

13   litigation that culminated in the 2020 Assumption Order, Smart Capital is barred from asserting—in

14   opposition to assumption of the Lease in this case—any default thereunder that may have existed prior

15   to entry of the 2020 Assumption Order, regardless of whether it was previously raised. *See Federated*

16   *Dep't Stores, Inc. v. Moitie*, 452 U.S. at 398 (claim preclusion "precludes the parties or their privies from

17   relitigating issues that were or could have been raised in [the prior] action"). Conversely, any Lease

18   default that has occurred *after* entry of the 2020 Assumption order is not barred.

19           This result is not surprising. Courts repeatedly have barred the nondebtor party to an unexpired

20   lease or executory contract from asserting in a subsequent action any default that it failed to raise prior

21   to assumption. *See, e.g., Arriva Pharms., Inc. v. Lezdey (In re Arriva Pharms., Inc.)*, 456 B.R. 419, 424–

22   25 (Bankr. N.D. Cal. 2011) (barring assertion of breaches under executory license agreement that were

23   not raised in opposition to assumption of agreement under chapter 11 plan); *NCL Corp. v. Lone Star*

24   *Bldg. Ctrs. (E.) Inc.*, 144 B.R. 170, 179 (S.D. Fla. 1992) (barring environmental cleanup claims under

25   lease against lessee that were not asserted in opposition to assumption of lease by predecessor chapter 11

26   debtor); *Georgia Ports Auth. v. Diamond Mfg. Co. (In re Diamond Mfg. Co.)*, 164 B.R. 189, 199 (Bankr.

27

28

S.D. Ga. 1994) (barring environmental indemnity claims under lease that were not asserted in opposition to lease assumption).

Smart Capital contends that it should not be precluded from asserting two specific defaults under the Lease because, at the time of the 2020 Assumption Order, Smart Capital was not aware of the underlying facts, could not have been aware of them, and was prevented from becoming aware of them by Debtor's purported concealment of them. *See* Bk III, Dkt. 247 at 30-33.

Smart Capital's first contention is that the Debtor (or its subtenant) made alterations to the Premises in violation of the Lease prior to entry of the 2020 Assumption Order. Smart Capital argues that it was not aware of these alterations because the Debtor did not provide appropriate notice and/or request permission, as required by the Lease. Smart Capital contends it only began to make inquiries into this matter when a ceiling tile at the Premises fell in 2024. Smart Capital suggests that it was unaware of any alterations made in breach of the Lease prior to issuance of the 2020 Assumption Order and therefore could not have raised them as an objection to the Second Assumption Motion.

Smart Capital's second contention is that the Debtor's subtenant has been violating the Lease by serving alcohol without the necessary approval of the City of Los Angeles. Its argument is based on tortured logic, but goes something like this: (i) McAbian, the principal of the Debtor and its subtenant, WERM, secured City permission to serve alcohol under the prior authorization, called CUB-PA4, by making fraudulent representations to the City of Los Angeles, (ii) McAbian improperly recorded the CUB-PA4 document in the records of the Los Angeles County Recorder's Office, (iii) based on the foregoing, the CUB-PA4 was void *ab initio* (even though it was never revoked by the issuing agency and Smart Capital did not seek to revoke it until after it had expired), and (iv) therefore, the Debtor's subtenant has been serving alcohol in violation of the Lease since 2013. Smart Capital contends that it was unaware of the circumstances giving rise to these arguments during the Second Bankruptcy Case.

The Court is not persuaded. First, generally, a party's prior lack of knowledge, or its subsequent discovery of new evidence, is not an exception to the application of claim preclusion. *See Constantini v. Trans World Airlines,* 681 F.2d 1199, 1202-03 (9th Cir. 1982) (holding that exception to claim preclusion not available where precluded party did not allege any efforts in prior suit to discover purportedly

concealed information); *see also Hudson v. Hedge,* 27 F.3d 274, 276 (7th Cir. 1994); *Saud v. Bank of New York*, 929 F.2d 916, 920 (2nd Cir. 1991). Second, it is not clear in the Ninth Circuit whether there is a "fraudulent concealment exception" to claim preclusion. *Constantini,* 681 F.2d at 1202-03 (declining to decide that legal question but nevertheless rejecting appellant's contention that there were adequate allegations to sustain a finding of concealment). Third, even assuming such an exception exists, the Court is not persuaded by any evidence in the summary judgment record that Smart Capital was prevented or otherwise unable to discover in the prior case the facts on which these defaults are now asserted.

As for alleged alterations to the Premises, Smart Capital had ample opportunity during the Second Bankruptcy Case to discover the evidence it belatedly seeks in this case. As noted, in the Second Bankruptcy Case, Smart Capital had nearly a year to conduct formal discovery under the Federal Rules of Civil Procedure.  Among other things, those rules provide for both the production of documents and the entering onto land for purposes of inspection. *See* Fed. R. Civ. P. 34; Fed. R. Bankr. P. 7034 (incorporating Fed. R. Civ. P. 34). And even before the Second Assumption Motion was filed, Smart Capital had the right as lessor to inspect and examine the Premises on 24 hours' notice. Bk III Dkt. 237 at 20 (Lease Section 10.2). The evidence in the summary judgment record does not substantiate or even raise a material dispute suggesting that Smart Capital was prevented from exercising these rights prior to the four-day trial on the Second Assumption Motion. The declaration testimony of Chang offered in opposition to the MPSJ does describe his thought process in wanting to explore the issue of alterations to the Premises following the detachment of a ceiling tile in 2024, but it does not support the contention that Smart Capital could not have discovered any alterations that existed at the time of the Second Assumption Motion. *See* Bk III Dkt. 247-1 at 11-12 (¶¶ 56-67).

Likewise, the summary judgment record does not support the contention that Smart Capital could not have conducted discovery in the prior case regarding its theory that CUB-PA4 authorizing alcohol sales was somehow invalid. The CUB-PA4 was issued by the City of Los Angeles in 2013. If Smart Capital had any concerns about the bona fides of the CUB-PA4—or was looking for any possible defaults on which to challenge the Second Assumption Motion, as it appears to be doing—Smart Capital

could have easily conducted discovery into the issuance of that approval. Nothing about the facts it claims to have recently discovered were concealed or otherwise unavailable. Indeed, the Master Covenant recorded against the Premises pursuant the CUB-PA4, which is central to Smart Capital's theory, is literally a public record. *See* Bk III Dkt. 247-6 at 124–35. The Master Covenant was recorded at the Los Angeles County Recorder's Office in 2013. Nothing in the summary judgment record establishes that Smart Capital could not have found this document by way of a routine search of real property records.

Smart Capital had a full and fair opportunity to discover and assert any default that may have existed prior to entry of the 2020 Assumption Order. Claim preclusion bars Smart Capital from doing so now.

### C.     Issue Preclusion

The doctrine of collateral estoppel, now referred to as issue preclusion, "generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see also Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012).

"The burden is on the party seeking to rely upon issue preclusion to prove each of the elements have been met." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050–51 (9th Cir. 2008). "This means providing 'a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action.'" *Plyam v. Precision Dev., LLC (In re Plyam)*, 530 B.R. 456, 462 (B.A.P. 9th Cir. 2015) (quoting *Kelly v. Okoye (In re Kelly)*, 182 B.R. 255, 258 (B.A.P. 9th Cir. 1995), *aff'd*, 100 F.3d 110 (9th Cir. 1996)).

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. at 891 (2008). The requirements for issue preclusion under federal common law are:

(1) there was a full and fair opportunity to litigate the issue in the previous action;

(2) the issue was actually litigated in that action;

(3) the issue was lost as a result of a final judgment in that action; and

(4) the person against whom issue preclusion is asserted in the present action was a party or in privity with a party in the previous action.

*U.S. Internal Revenue Svc. v. Palmer (In re Palmer)*, 207 F.3d 566, 568 (9th Cir. 2000).

The Debtor argues that, in connection with the Section Assumption Motion, the Court determined the nature and extent of the Lease defaults existing at the time. As such, the Debtor argues that Smart Capital is barred by issue preclusion from relitigating those issues.

The 2020 Assumption Order is a federal court judgment, so federal common law on issue preclusion controls. *See Taylor v. Sturgell*, 553 U.S. at 891. Regarding the first element, as a creditor in the Second Bankruptcy Case, Smart Capital had a full and fair opportunity to litigate the existence of defaults prior to the 2020 Assumption Order. The parties conducted "extensive" discovery for nearly a year. *Hawkeye Ent., LLC*, 625 B.R. at 757; Bk II Dkts. 111, 164. As for the second element, Smart Capital actually did litigate the existence of such defaults by opposing the Second Assumption Motion, participating in a four-day trial on it, and unsuccessfully appealing the result of that trial to the Ninth Circuit Court of Appeals. As noted above, the 2020 Assumption Order is a final judgment. Finally, Smart Capital does not contest that it was a party to and participated extensively in the Second Bankruptcy Case.

Accordingly, even if application of the claim preclusion doctrine did not bar Smart Capital from asserting any default under the Lease that may have existed prior to entry of the 2020 Assumption Order, the doctrine of issue preclusion does.

### D. Voluntary Settlement and Release of Claims

The Debtor argues that the New Vision Settlement, which the Court approved in the 2014 Settlement Order, constitutes a general release between the Debtor and Smart Capital's predecessor regarding any claimed breaches or defaults, both known and unknown, based on actions that occurred prior to entry of the 2014 Settlement Order. Bk III Dkt. 236 at 30-31; Bk III Dkt. 253 at 21-24. Relying on the enumerated list of claims released in Section 10(a) of the New Vision Settlement, Smart Capital contends that the New Vision Settlement constitutes a "limited release," and that Smart Capital's predecessor did not release claims related to the Debtor's alleged "construction on the Premises, use of the Premises for an unlawful purpose, or fraudulently applying for the CUB-PA4." Bk III Dkt. 247 at 31.

1  Smart Capital offers no legal authorities in support of its narrow interpretation of the New Vision

2  Settlement. *Id.*

3         The New Vision Settlement states that the Bankruptcy Code and California law governs its

4  interpretation. Bk I Dkt. 226-1 at 8. When interpreting a contract under California law, "[t]he whole of a

5  contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause

6  helping to interpret the other." Cal. Civ. Code § 1641; *see also* Cal. Civ. Proc. Code § 1858 ("where

7  there are several provisions or particulars, such a construction is, if possible, to be adopted as will give

8  effect to all."). Where general and specific provisions are inconsistent, the specific provision will

9  control, Cal. Civ. Proc. Code § 1859; however, "[p]articular clauses of a contract are subordinate to its

10 general intent." Cal. Civ. Code § 1650. The apparent main purpose of the parties is to be given effect.

11 *See* Cal. Civ. Code §§ 1652, 1653, 1648.

12        Here, the intent of the parties in the New Vision Settlement is unambiguous per its terms. The

13 parties' mutual intent was to "fully and forever" "resolv[e] all disputes between them" and "to effectuate

14 a full and complete release of any and all claims for relief, whether known or unknown, that may be

15 asserted by them against each other." Bk I Dkt. 226-1 at 6-7 (§§ 10(a), (c)). When giving effect to this

16 main purpose, the result is obvious: Smart Capital is precluded from raising any default under the Lease

17 that may have existed prior to entry of the 2014 Settlement Order.

18        While the New Vision Settlement does include an enumerated list of claims that the parties

19 contemplate being waived pursuant to the general release, that particular clause is subordinate to the

20 general intent of the New Vision Settlement. *See* Cal. Civ. Code § 1650. Moreover, the language

21 preceding that list is particularly instructive: "the Parties … hereby fully and forever release each other

22 … from any and all claims … which they have, or could claim to have against each other arising from or

23 related to: … (2) all claims alleged in, or related to the [First] Assumption Motion…." Bk I Dkt. 226-1 at

24 6 (emphasis added). Contrary to Smart Capital's assertions, this broad language means that the parties'

25 waiver does not concern solely the issues that the parties *had* raised in the litigation and contested

26 matters pending between them at the time they executed the New Vision Settlement (e.g., solely the

27

28

1  defaults actually alleged in New Vision's opposition to the First Assumption Motion). Instead, the

2  parties' waiver includes any issues that they *could have* raised.

3       As noted previously, in opposition to the First Assumption Motion, Smart Capital's predecessor

4  could have raised any default under the Lease that may have existed prior to entry of the 2014

5  Settlement Order. The New Vision Settlement contemplates waiver of Smart Capital's right to raise all

6  such defaults, regardless of whether those alleged defaults were "known or unknown, suspected or

7  unsuspected." *See id.* at 6-7 (§§ 10(a), (b)).

8       The New Vision Settlement contains only two exceptions to the parties' general release: (i) "the

9  parties' rights and obligations under the Lease and the First Amendment," and (ii) the "claims, if any,

10 that any Party may have against Pax or its principals." Bk I Dkt. 226-1 at 6 (§ 10(a)). Only the first

11 exception is relevant here. Pursuant to that exception, Smart Capital's predecessor did not waive Smart

12 Capital's rights to assert Lease defaults that allegedly occurred after entry of the 2014 Settlement Order.

13 Accordingly, Smart Capital is barred from asserting any defaults under the Lease that may have existed

14 at the time the 2014 Settlement Order was entered.

15                        **VI.    CONCLUSION**

16       As set forth above, the Debtor has met its burden of showing that there is no genuine issue of

17 material fact that Smart Capital is precluded from asserting or seeking discovery on alleged defaults

18 existing under the Lease prior to entry of the 2020 Assumption Order.[16] Smart Capital is not precluded

19 from asserting defaults under the Lease occurring after entry of the 2020 Assumption Order.

20 Accordingly, the Court will enter a separate order granting the MPSJ.

21

22

23    Date: December 8, 2025
                                        _____
24                                      Martin R Barash
                                        United States Bankruptcy Judge
25

26

27 ---
[16] This necessarily includes any alleged defaults existing at the time the 2014 Assumption Order and the 2014 Settlement
28 Order were entered.

                                    31